CINDY COHN (SBN 145997)
cindy@eff.org
LEE TIEN (SBN 148216)
KURT OPSAHL (SBN 191303)
MATTHEW ZIMMERMAN (SBN 212423)
MARK RUMOLD (SBN 279060)
DAVID GREENE (SBN 160107)
JAMES S. TYRE (SBN 083117)
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Tel.: (415) 436-9333; Fax: (415) 436-9993

THOMAS E. MOORE III (SBN 115107)
tmoore@rroyselaw.com
ROYSE LAW FIRM, PC
1717 Embarcadero Road
Palo Alto, CA 94303
Tel.: 650-813-9700; Fax: 650-813-9777

Attorneys for Plaintiffs

RACHAEL E. MENY (SBN 178514)
rmeny@kvn.com
MICHAEL S. KWUN (SBN 198945)
BENJAMIN W. BERKOWITZ (SBN 244441)
KEKER & VAN NEST, LLP
633 Battery Street
San Francisco, California 94111
Tel.: (415) 391-5400; Fax: (415) 397-7188

RICHARD R. WIEBE (SBN 121156)
wiebe@pacbell.net
LAW OFFICE OF RICHARD R. WIEBE
One California Street, Suite 900
San Francisco, CA 94111
Tel.: (415) 433-3200; Fax: (415) 433-6382

ARAM ANTARAMIAN (SBN 239070)
aram@eff.org
LAW OFFICE OF ARAM ANTARAMIAN
1714 Blake Street
Berkeley, CA 94703
Tel.: (510) 289-1626

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

FIRST UNITARIAN CHURCH OF LOS
ANGELES, *et al.*,

        Plaintiffs,

    v.

NATIONAL SECURITY AGENCY, *et al.*,

        Defendants.

Case No: 3:13-cv-03287 JSW

**PLAINTIFFS' MOTION FOR
PARTIAL  SUMMARY JUDGMENT
THAT THE TELEPHONE RECORDS
PROGRAM IS UNLAWFUL UNDER
SECTION 215 OF THE PATRIOT
ACT AND THE FIRST
AMENDMENT**

Date:  February 7, 2014
Time:  9:00 a.m.
Hon. Jeffrey S. White
Courtroom 11 - 19th Floor

**TABLE OF CONTENTS**

I.   INTRODUCTION ...................................................................................................1

II.  STATEMENT OF FACTS AND STATUTORY BACKGROUND ...................................3

     A.   The Mass Collection of Call Detail Records. ......................................................3

     B.   History and Evolution of the Mass Collection of Call Records Program. .............5

III. ISSUES FOR DECISION ........................................................................................5

IV.  THE MASS COLLECTION OF ELECTRONIC TELEPHONE CALL DETAIL
     RECORDS IS NOT LAWFULLY AUTHORIZED BY SECTION 215 ..........................6

     A.   The Mass Collection of Telephone Call Detail Records Is Well Beyond
          the Limits of Relevance. ................................................................................6

          1.   The Mass Collection Is Not Limited to Things "Relevant to an
               Authorized Investigation." ......................................................................7

          2.   The Mass Collection Exceeds the Bounds of What Can Be
               Obtained with a Grand Jury Subpoena Duces Tecum. ...............................9

     B.   Because the SCA Describes an Exhaustive Set of Circumstances Under
          Which a Telephone Service Provider May Produce its Customers'
          Telephone Records, Section 215 Does Not Authorize the Production of
          Such Records. ..............................................................................................12

     C.   The Present and Future Electronic Telephonic Data that the Government
          Collects is Not a "Tangible Thing" Within the Meaning of Section 215..............13

     D.   Congress Did Not Ratify the Government's Interpretation of Section 215
          When Congress Extended the PATRIOT Act. ...................................................15

V.   THE MASS COLLECTION OF AMERICAN'S PUBLIC TELEPHONE
     RECORDS IS UNCONSTITUTIONAL BECAUSE THE GOVERNMENT
     MUST USE THE LEAST RESTRICTIVE MEANS AVAILABLE SO AS NOT
     TO INFRINGE PLAINTIFFS' FIRST AMENDMENT ASSOCIATIONAL
     RIGHTS ...............................................................................................................17

     A.   Governmental Surveillance that Reveals Individuals' Affiliations in
          Political and Social Organizations Is Subject to Exacting Constitutional
          Scrutiny. .......................................................................................................18

     B.   The Mass Collection of Telephone Call Records Infringes Plaintiffs'
          Associational Rights Under the First Amendment. ...........................................20

i

C.   The Mass Collection Program Is Not Carefully Tailored to Avoid
Unnecessary Interference with Plaintiffs' Associational Rights. ...........................24

VI.   CONCLUSION ............................................................................................................25

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Albemarle Paper Co. v. Moody*,
   422 U.S. 405 (1975) ...............................................................................................16

*Am. Commc'ns Ass'n v. Douds*,
   339 U.S. 382 (1950) ...............................................................................................18

*Barnhardt v. Peabody Coal Co.*,
   537 U.S. 149 (2003) ...............................................................................................15

*Brock v. Local 375, Plumbers Int'l Union of America*,
   860 F.2d 346 (9th Cir. 1988) ..........................................................................18, 20

*Buckley v. Valeo*,
   424 U.S. 1 (1976) ...................................................................................................20

*Butterbaugh v. Dep't of Justice*,
   336 F.3d 1332 (Fed. Cir. 2003) .............................................................................15

*Cal. Pro-Life Council, Inc. v. Getman*,
   328 F.3d 1088 (9th Cir. 2003) ........................................................................18, 20

*Carrillo Huettel, LLP v.SEC*,
   2011 WL 601369 (S.D. Cal. Feb. 11, 2011).........................................................11

*Dolan v. Postal Service*,
   546 U.S. 481 (2006) ...............................................................................................13

*Dole v. Local Union 375, Plumbers Int'l Union of Am.*,
   921 F.2d 969 (9th Cir. 1990) ...........................................................................20, 24

*FEC v. Hall-Tyner Election Campaign Committee*,
   678 F. 2d 416 (2d Cir. 1982) .................................................................................23

*FTC v. Am. Tobacco Co.*,
   264 U.S. 298 (1924) .................................................................................................7

*FTC v. Invention Submission Corp.*,
   965 F.2d 1086 (D.C. Cir. 1992).............................................................................11

*Forest Grove Sch. Dist. v. T.A.*,
   557 U.S. 230 (2009) ...............................................................................................16

*Gibson v. Fla. Legislative Investigation Comm.*,
   372 U.S. 539 (1963) ...............................................................................................19

iii

*Goshawk Dedicated Ltd. v. Am. Viatical Services, LLC,*
   2007 WL 3492762 (N.D. Ga. Nov. 5, 2007) .................................................................12

*Hale v. Henkel,*
   201 U.S. 43 (1906) ....................................................................................9, 10, 11

*In re Corrado Bros. Inc.,*
   367 F. Supp. 1126 (D. Del. 1973) ..............................................................................10

*In re Grand Jury Investigation,*
   174 F. Supp. 393 (S.D.N.Y. 1959) ...........................................................................10

*In re Grand Jury Proceedings,*
   827 F.2d 301 (8th Cir. 1987) ...................................................................................11

*In re Grand Jury Subpoena,*
   846 F. Supp. 11 (S.D.N.Y. 1994) .........................................................................10, 11

*In re Horowitz,*
   482 F.2d 72 (2d Cir. 1973) ..................................................................................10, 11

*In re Subpoena Duces Tecum,*
   228 F.3d 341 (4th Cir. 2000) ...................................................................................11

*Jama v. Immigration and Customs Enforcement,*
   543 U.S. 335 (2005) ...........................................................................................15, 16

*Kasten v. Saint-Gobain Performance Plastics Corp.,*
   131 S. Ct. 1325 (2011).............................................................................................13

*Kusper v. Pontikes,*
   414 U.S. 51 (1973) ...................................................................................................18

*Long Island Care at Home, Ltd. v. Coke,*
   551 U.S. 158 (2007) .................................................................................................13

*Lorillard v. Pons,*
   434 U.S. 575 (1978) .................................................................................................16

*McMann v. SEC,*
   87 F.2d 377 (2d Cir. 1937) .........................................................................................8

*Medtronic Sofamar Danek, Inc. v. Michelson,*
   229 F.R.D. 550 (W.D. Tenn. 2003).............................................................................12

*NAACP v. Alabama,*
   357 U.S. 449 (1958) ...........................................................................................18, 19

iv

*Nat'l Labor Rel. Bd. v. Gullett Gin Co.,*
    340 U.S. 361 (1951) ...................................................................................15

*Perry v. Schwarzenegger,*
    591 F.3d 1126 (9th Cir. 2009) ...................................................18, 19, 20, 24

*Roberts v. United States Jaycees,*
    468 U.S. 609 (1984) ...................................................................................18

*SEC v. Sloan,*
    436 U.S. 103 (1978) ...................................................................................17

*Satterfield v. Simon & Schuster, Inc.,*
    569 F.3d 946 (9th Cir. 2009) .......................................................................13

*Schwimmer v. United States,*
    232 F.2d 855 (8th Cir. 1956) ..................................................................10, 11

*Shelton v. Tucker,*
    364 U.S. 479 (1960) ...............................................................................24, 25

*Socialist Workers Party v. Attorney General,*
    510 F.2d 253 (2d Cir. 1974) ........................................................................19

*United States v. Calandra,*
    414 U.S. 338 (1974) .....................................................................................9

*United States v. Hill,*
    459 F.3d 966 (9th Cir. 2006) ........................................................................11

*United States v. Jones,*
    132 S. Ct. 945 (2012).................................................................................24

*United States v. Powell,*
    379 U.S. 48 (1964) ......................................................................................15

*United States v. R. Enterprises, Inc.,*
    498 U.S. 292 (1991) ......................................................................................9

*United States v. Upham,*
    168 F.3d 532 (1st Cir. 1999).........................................................................12

*Wall v. Kholi,*
    131 S. Ct. 1278 (2011)..................................................................................13

*Zweibon v. Mitchell,*
    516 F.2d 594 (D.C. Cir. 1975)..................................................................19, 23

v

# FEDERAL STATUTES

18 U.S.C. § 2701 ........................................................................................................2

18 U.S.C. § 2702 ...........................................................................................2, 12, 13

18 U.S.C. § 2703 ...........................................................................................2, 12, 13

18 U.S.C. § 2709 ...........................................................................................2, 12, 13

18 U.S.C. § 3127 ..................................................................................................14, 15

50 U.S.C. § 1861 ...............................................................................................*passim*

# CONSTITUTIONAL PROVISIONS

U.S. Const. amend. I............................................................................................*passim*

U.S. Const. amend. IV ....................................................................................3, 7, 23

U.S. Const. amend. V ...............................................................................................3

U.S. Const. amend. XIV ........................................................................................18

# OTHER AUTHORITIES

*Black's Law Dictionary* (5th ed. 1979) ................................................................14

*The Random House Dictionary of the English Language* (unabridged ed. 1966)........................14

Verizon Communications, Fact Sheet ........................................................................7

**NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT**

PLEASE TAKE NOTICE that on February 7, 2014 at 9:00 a.m. in Courtroom 11, 19th Floor, United States District Court, 450 Golden Gate Ave., San Francisco, CA, plaintiffs will move for partial summary judgment holding that the National Security Agency's ("NSA's") and Federal Bureau of Investigation's ("FBI's") program involving the mass collection of the telephone records of plaintiffs as well as of millions of other American telephone users was not lawfully authorized under section 215 of the USA PATRIOT Act ("PATRIOT Act"), 50 U.S.C. § 1861, and violates plaintiffs' First Amendment right of association.  Plaintiffs' motion is based on the accompanying memorandum, the declaration of Thomas E. Moore III, the declarations of the plaintiffs, the filings and pleadings of record in this action and the argument and evidence presented at the hearing on this motion.

By this motion, plaintiffs seek a determination that defendants are liable to them on Counts I and IV of the First Amended Complaint (Dkt. No. 9), and a declaration that the government's program is illegal.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.      INTRODUCTION**

The United States government collects the call detail records of every telephone call made within the United States, thereby accumulating a massive database of information about the communications of every single person and organization in the country.  This practice is not only historically unprecedented in scope, it is illegal. The program is not authorized by the statute that the government relies upon, and it violates the freedom of association guaranteed by the First Amendment.

The government operated its mass collection program in secret and without seeking judicial approval for the first four years of its existence.  The government initiated the program in late 2001. In May 2006, the government apparently persuaded the Foreign Intelligence Surveillance Court ("FISC") in an *ex parte* proceeding to accede to a theory that the program was authorized by section 215 of the PATRIOT Act (50 U.S.C. § 1861).  The program has continued over the last seven years under a series of FISC orders.

1

Section 215 of the PATRIOT Act, the business records provision of the Act, was not intended to permit the mass collection of the American public's telephone records and does not authorize the government's mass surveillance program. The government's PATRIOT Act argument (and the FISC's acceptance of it) is wrong for three reasons:

*First*, section 215 requires the things collected to be "relevant to an authorized investigation," but the mass collection of all telephone calling records and retention of those records for a period of five years is outside the scope of any notion of relevance. The government admits that the vast majority of the phone records it collects have nothing whatsoever to do with terrorism.

*Second*, section 215 is a general statute and is, therefore, superseded in relevant part by the more specific Stored Communications Act, 18 U.S.C. § 2701, *et seq*. ("SCA"). Section 2702 and 2703 of the SCA specifically apply to telephone records and list the exclusive means for the government to obtain such records from telephone service providers. Sections 2702 and 2703 of the SCA do not authorize the government to obtain records through section 215 of the PATRIOT Act. Section 2709 of the SCA, however, expressly authorizes the FBI to obtain call records using national security letters, but does not allow mass collection.

*Third*, section 215 applies only to the production of "tangible things." The words "tangible things" has a plain meaning: corporeal things, that is, things that can be felt or touched. The electronic telephone data that the government collects on an ongoing basis is an intangible thing.

Independently, the mass call detail records collection program violates the First Amendment. First Amendment rights of freedom of association are burdened when the government seeks to collect the identities of the participants in an expressive association and the fact of communications among them. In such situations, the government must use the least restrictive means available to collect the information it needs so as to minimize the impact on the associational liberty. The government's mass suspicionless collection of information cannot satisfy this test.

Plaintiffs are religious, social, and political associations who, from time to time, take dissenting positions on social and political issues. These groups rely on their ability to communicate with their members outside of the government's gaze, and deeply value their ability to assure those who seek to communicate with them that the fact of their communication will not be shared with the

1   government.  However, because their communications with their own members and with other

2   groups are reflected within the electronic telephone records that the government has collected from

3   various telephone service providers on an ongoing basis over more than a decade, plaintiffs can no

4   longer guarantee the confidentiality of their associations.

5           The fact of the government's mass collection program has now been openly acknowledged.

6   It is undisputed that that the program collects and stores the data of hundreds of millions of non-

7   suspect persons and organizations without any attempt to narrow the collection on the basis of actual

8   suspicious behavior.  The illegality of the program under both section 215 and the First Amendment

9   may thus be resolved on summary judgment.[1]  And it must be resolved in plaintiffs' favor.

10  **II.      STATEMENT OF FACTS AND STATUTORY BACKGROUND**

11          **A.      The Mass Collection of Call Detail Records.**

12          Since approximately October 2001 the NSA has secretly been collecting the telephone

13  records of millions of innocent Americans. (Declaration of Thomas E. Moore III ("Moore Decl.")

14  Ex. D, pp. 7, 11, 13).  As described further below, the government appears to have shifted its internal

15  legal theories in support of the mass collection over time, starting with a theory rooted primarily in

16  inherent Executive power.

17          The current theory, based on section 215 of the PATRIOT Act, was first approved by the

18  FISC in secret in May 2006.  In relevant part, section 215 allows the FBI to apply to the FISC for an

19  Order:

20          requiring the production of any tangible things (including books, records, papers,
            documents, and other items) for an investigation to obtain foreign intelligence
21          information

22  50 U.S.C. § 1861(a)(1), upon presenting:

23          a statement of facts showing that there are reasonable grounds to believe that the
24          tangible things sought are relevant to an authorized investigation  . . . to obtain
            foreign intelligence information not concerning a United States person or to protect
25          against international terrorism or clandestine intelligence activities, . . .

26  _____

27  [1] The plaintiffs' complaint also contains counts based on the Fourth and Fifth Amendments as well
    as for the return of property. Plaintiffs do not at this time seek summary judgment on those causes of
28  action and reserve the right to seek adjudication of those claims at a later time.

50 U.S.C. § 1861(b)(2)(A).  The statute also contains the following proviso, that the Order:

> may only require the production of a tangible thing if such thing can be obtained with a subpoena duces tecum issued by a court of the United States in aid of a grand jury investigation or with any other order issued by a court of the United States directing the production of records or tangible things . . .

50 U.S.C. § 1861(c)(2)(D).

The government's interpretation of section 215 as allowing the mass collection of telephone records has never been subjected to the test of any adversarial litigation.  No telephone service provider has ever challenged a FISC order for the production of such records.  (Moore Decl. Ex. L, pp. 15-16).

The program sweeps in all call detail records for telephone calls wholly within the United States and between the United States and other countries.  The program's wide swath was described in a recently revealed order of the FISC that compelled Verizon to:

> produce to the [NSA] . . . and **continue production on an ongoing daily basis thereafter** for the duration of this Order, unless otherwise ordered by the Court, an electronic copy of the following tangible things: **all call detail records** or 'telephony metadata' created by Verizon **for communications (i) between the United States and abroad; or (ii) wholly within the United States,** including local telephone calls . . . .Telephony metadata includes comprehensive communications routing information, including but not limited to session identifying information (*e.g.*, originating and terminating telephone number, International Mobile Subscriber Identity (IMSI) number, International Mobile station Equipment Identity (IMEI) number, etc.), trunk identifier, telephone calling card numbers, and time and duration of call.

(Moore Decl. Ex. H, pp. 1-2) (emphasis added).

The government subsequently released a redacted version of a "primary order," which apparently was the legal authority for the Verizon order, which is a "secondary order." (Moore Decl. Ex. G).  The primary order found that the government's application had complied with section 215 of the PATRIOT Act and set out some of the characteristics of the program.  Among other things, the primary order authorized the NSA to conduct searches of its call detail database based on selection terms (*i.e.*, telephone numbers linked to terrorism) that certain officials might approve from time to time during effective dates of the order.  (Moore Decl. Ex. G, pp. 6-9).  The primary order

4

1  authorized the NSA to retain all call-detail data for five years.  (Moore Decl. Ex. G, p. 14).  The

2  FISC renewed the primary order most recently on October 11, 2013.  (Moore Decl. Ex. N).

3       **B.    History and Evolution of the Mass Collection of Call Records Program.**

4       The mass collection of telephone records originated in October 2001 as part of the

5  "President's Surveillance Program" ("PSP"), which was the name given to a number of intelligence

6  activities begun by the NSA at the Executive's request premised on secret Executive branch internal

7  legal opinions that asserted that President had the power to override the limitations of FISA.  (Moore

8  Decl. Ex. E, pp. 5-7, 10-15, 29-30).  Neither the President, the Justice Department, the NSA, nor any

9  other agency applied to the FISC for the authority to engage in the PSP.  (Moore Decl. Ex. E, pp. 30-

10  31).

11      The government continued this secret mass surveillance, including the bulk collection of

12  telephone records, without court approval until details of the PSP started to become public.  In

13  December 2005, *The New York Times* revealed that the NSA was engaging in electronic surveillance

14  of the American public without judicial approval.  (Moore Decl. Ex. A).  In May 2006, *USA Today*

15  confirmed that the NSA had been collecting the telephone records of ordinary Americans directly

16  from telecommunications companies, and several Members of Congress further confirmed the

17  program.  (Moore Decl. Ex. B).

18      That same month, May 2006, the government first applied to the FISC for the formal

19  authority to collect the telephone records of both international-to-domestic telephone calls and

20  domestic-to-domestic telephone calls of Americans.  (Moore Decl. Ex. M, p. 16 n. 14).  The FISC

21  then issued a series of orders granting the government's request, which remained largely hidden

22  from the American public until June 2013, when the Verizon secondary order came to light.  (Moore

23  Decl. Ex. I).

24  **III.    ISSUES FOR DECISION**

25      1.    Whether the mass collection of presently existing and future telephone records of

26  hundreds of millions of non-suspect Americans is authorized by section 215 of the PATRIOT Act.

27      2.    Whether the mass collection of presently existing and future telephone records of

28  hundreds of millions of non-suspect Americans violates the First Amendment right to freedom of

association.

## IV.   THE MASS COLLECTION OF ELECTRONIC TELEPHONE CALL DETAIL RECORDS IS NOT LAWFULLY AUTHORIZED BY SECTION 215

### A.   The Mass Collection of Telephone Call Detail Records Is Well Beyond the Limits of Relevance.

Section 215 does not expressly state that it authorizes mass collection of telephone records. It does not use the terms "bulk" or "mass" collection or otherwise suggest that the government may obtain "all" of a telephone service provider's calling records. Such words would have made the Congressional intent clear and the statutory language plain. Any such words also would have sparked an actual public discussion of the advisability of mass collection of innocent Americans' telephone records at the time the law was enacted and likely again when it was reauthorized. The fact that no such discussion occurred, and indeed is loudly and prominently occurring now, demonstrates that the language of the statute does not even hint at the possibility of imposing a mass collection program on the American public.

Lacking an express Congressional authorization, the government has attempted to squeeze its massive program of telephone records collection into an interpretation of the text of section 215. To do so, it must first demonstrate that the program is within the statutory limits of "relevance." Yet the mass collection of all telephone call detail records is well beyond any conception of "relevance" and the text of section 215 cannot be so contorted.

The text of section 215 sets out two express standards for the relevance of the tangible things collected, neither of which authorizes the government to seize the telephone records of hundreds of millions of Americans and American organizations when only a miniscule number of those records will actually have any connection with international terrorism. First, any application for an order must contain "a statement of facts showing that there are reasonable grounds to believe that the tangible things sought are relevant to an authorized investigation (other than a threat assessment)." 50 U.S.C. § 1861(b)(2)(A). Second, any order compelling such production "may only require the production of a tangible thing if such thing can be obtained with a subpoena *duces tecum* issued by a court of the United States in aid of a grand jury investigation or with any other order issued by a

court of the United States directing the production of records or tangible things."  50 U.S.C.

§ 1861(c)(2)(D).   This second standard creates an outer boundary tied to another form of

investigatory process with established limits.  The first standard further narrows the universe of

permissible requests, describing how the "tangible thing" must relate to an existing investigation.

The limiting language of section 215 is consistent with our legal system's well-established

abhorrence of "fishing expeditions" in which the government has unbounded and *ad hoc*

investigative powers.  As Justice Oliver Wendell Holmes, Jr. remarked in 1924:

> Anyone who respects the spirit as well as the letter of the Fourth Amendment would
> be loath to believe that Congress intended to authorize one of its subordinate
> agencies to sweep all our traditions into the fire . . ., and to direct fishing expeditions
> into private papers on the possibility that they may disclose evidence of crime. We
> do not discuss the question whether it could do so if it tried, **as nothing short of the
> most explicit language would induce us to attribute to Congress that intent**. . . . .
> **It is contrary to the first principles of justice to allow a search through all the
> respondents' records, relevant or irrelevant, in the hope that something will
> turn up.**

*FTC v. Am. Tobacco Co.*, 264 U.S. 298, 305-06 (1924) (emphasis added).

### 1.      The Mass Collection Is Not Limited to Things "Relevant to an Authorized Investigation."

Only an infinitesimal fraction of the telephone records collected has any bearing on an

investigation into international terrorism.  The government admits as much:  "The vast majority of

the telephony metadata is never seen by any person because it is not responsive to the limited queries

that are authorized." (Moore Decl. Ex. K, pp. 4, 15). The FISC similarly found that "nearly all of the

call detail records collected pertain to communications of non-U.S. persons who are <u>not</u> the subject

of an FBI investigation to obtain foreign intelligence information, are communications of U.S.

persons who are <u>not</u> the subject of an FBI investigation to protect against international terrorism or

clandestine intelligence activities, and are data that otherwise could not be legally captured in bulk

by the government."  (Moore Decl. Ex. C, p.12) (emphasis in original)).  The amount of call data

collected is staggering:  Verizon professes to carry an average of one billion residential and small

1    business calls day.[2]  With 1,826 days in a typical five-year period, the government collects and stores

2    call data on well over a trillion calls from Verizon alone.  The amount of call data that is actually

3    queried is microscopic in comparison:  In 2012, fewer than 300 unique telephone numbers related to

4    terrorism were used to query the data.  (Moore Decl. Ex. J).

5           Section 215 provides what things can be "sought" by or "produced" to the government and

6    requires the finding of relevance at that juncture.   But by design, the government's general

7    collection of all records makes no distinction between relevant and irrelevant records at the time of

8    production.  Instead, it seeks all information without regard to its relationship to an authorized

9    investigation.  Since the statute's "relevance" limitations apply at the time of production of tangible

10   things, they are not met here.[3]

11          Compulsory process is unreasonable whenever "it is out of proportion to the end sought, as

12   when the person served is required to fetch all his books at once to an exploratory investigation

13   whose purposes and limits can be determined only as it proceeds."  *McMann v. SEC*, 87 F.2d 377,

14   379 (2d Cir. 1937) (Hand, J.).  The government's mass collection of a vast amount of call data is the

15   very paradigm of such an unlimited "exploratory investigation."

16          The government contends that the mass collection of call data permits the effective use of

17   analytical tools to detect contacts between foreign terrorists and potentially unknown associates

18   within the United States.  Absent a historical aggregation of telephone records in bulk – so the

---

20   [2] Verizon Communications, Fact Sheet (http://newscenter2.verizon.com/kit/vcorp/factsheet.html).

21   [3] The FISC reauthorization Order of August 2013 indirectly addresses the "relevance" problem by
     treating the NSA as a kind of relevance screen prior to handing the information over to the FBI.  The

22   Order actually requires production in the first instance not to the FBI, as the statute provides, but to
     the NSA. It then forbids production to the FBI absent minimization, which is intended to exclude

23   irrelevant information (Moore Decl. Ex. L, p. 13).   The court even stated that "no Orders for
     production would issue from this Court" without such minimization.  (Moore Decl. Ex. L, p. 23).

24   Thus the FISC appears to acknowledge that the initial production of all records includes vast
     amounts of irrelevant information, which is why it cannot go to the FBI first, but then relies on the

25   minimization procedures by the NSA to remove the irrelevant information from what gets
     "produced" to the FBI, the named authority under the statute.  But nothing in the statute authorizes

26   this "relevance" screening by the NSA, much less authorizes the NSA to collect irrelevant data.

27   Congress authorized only the FBI to use section 215, and if the FBI cannot use it here, the NSA
     certainly cannot.

28

---

8

1   argument goes – it might not be feasible to identify all of the connections between terrorists across

2   different providers' networks.   (Moore Decl. Ex. K, p. 3).   The government's argument is a

3   rationalization for ignoring the relevance requirements of section 215, not an argument for being in

4   compliance with them.   In addition to improperly shifting the question of relevance to post-collection

5   queries, the argument also seeks to tie the breadth of "relevance" to the government's use of

6   sophisticated analytical tools.   The plaintiffs are unaware of any precedent that supports such an

7   idea, and nothing in the text of section 215 can be used to attribute to Congress that intent.   More

8   importantly, if technological developments in analytical tools could expand the definition of the

9   concept of "relevance" to embrace increasingly massive amounts of data, then the limits of

10   "relevance" would become illusory, or at least would be shifting ever-outward based upon the

11   (largely secret) expanding universe of the government's capabilities of collection and analysis.

12   The government's argument also fails because section 215 requires a showing that the

13   tangible things sought "are relevant to an authorized investigation" not to non-specific, potential

14   future investigations, or to broad investigative goals.   Both "are" and "an authorized investigation"

15   are in the present tense.   Thus, the required showing is of relevance to an existing investigation at the

16   time of application.   Congress could have used other words to include future investigations, but it did

17   not.

### 2.   The Mass Collection Exceeds the Bounds of What Can Be Obtained with a Grand Jury Subpoena *Duces Tecum*.

18
19

20   Section 215 also limits "relevance" by keying the term to grand jury subpoenas *duces tecum*;

21   the government may seek only those records that could be obtained through this form of compulsory

22   process.   The breadth of a subpoena *duces tecum* cannot be unlimited:   "A grand jury's subpoena

23   *duces tecum* will be disallowed if it is 'far too sweeping in its terms to be regarded as reasonable'

24   under the Fourth Amendment."   *United States v. Calandra*, 414 U.S. 338, 346 (1974) (quoting *Hale*

25   *v. Henkel*, 201 U.S. 43, 76 (1906)); *See United States v. R. Enterprises, Inc.*, 498 U.S. 292, 299

26   (1991) ("The investigatory powers of the grand jury are nevertheless not unlimited.").

27   Grand jury subpoenas *duces tecum* seeking the entirety of a person's documents are

28   improper.   Rather, they must be limited to specific, relevant categories of documents.   In *Hale v.*

9

*Henkel*, the Supreme Court quashed a grand jury subpoena precisely because the documents to be produced constituted virtually all of the writings in the subpoenaed party's possession: "If the writ had required the production of all the books, papers, and documents found in the office of MacAndrews & Forbes Company, it would scarcely be more universal in its operation or more completely put a stop to the business of that company."  *Hale*, 201 U.S. at 76.

In *Schwimmer v. United States*, 232 F.2d 855 (8th Cir. 1956), the Eighth Circuit quashed a subpoena seeking the entirety of a lawyer's files.  In so doing, the court noted the following:

> Ordinarily, as a matter of both extrinsic and intrinsic aspect, the compelled production before a grand jury of all of one's books and papers en masse, where they constitute a substantial body, a variety of accumulation, or an extensive-period product, and the subpoena is without indication or limitation of any nature as to class of persons, or type of transaction, or extent of period, to which the production is intended to be related, will judicially impress as not constituting a reasonable search and seizure.

*Id*. at 861.

In *In re Horowitz*, 482 F.2d 72 (2d Cir. 1973) (Friendly, J.), the Second Circuit modified a grand jury subpoena *duces tecum* on the grounds that it was overbroad.  The subpoena required the production of three file cabinets belonging to the accountant of the target of a grand jury investigation.  The file cabinets contained hundreds of files.  The Second Circuit held that such an approach was flawed: "What is more troubling is the matter of relevance.  The subpoena requires production of all documents contained in the files, without any attempt to define classes of potentially relevant documents or any limitations as to subject matter or time period."  *Id*. at 79.

This theme that "subpoenas properly are interpreted as seeking categories of paper documents, not categories of filing cabinets" was resumed twenty years later in *In re Grand Jury Subpoena*, 846 F. Supp. 11,13 (S.D.N.Y. 1994), in which the court rejected a subpoena *duces tecum* directing the production of the central processing units (including hard disk drives) within multiple computers owned by a corporation.[4]

---

[4]  District courts that have addressed other grand jury subpoenas *duces tecum* that have sought all of a person's documents are in accord.  *See In re Grand Jury Investigation*, 174 F. Supp. 393, 395 (S.D.N.Y. 1959) ("I hold that this subpoena which required production of practically every paper

1        The possibility that some small amount of relevant records might be found in the mass of

2  records subpoenaed did not cure the foregoing grand jury subpoenas of being overbroad. A small

3  proportion of relevant documents were also likely to be found within the business documents in *Hale*

4  *v. Henkel*, the lawyer's files in *Schwimmer*, the accountant's files in *Horowitz* and the hard disk

5  drives in *In re Grand Jury Subpoena*. The problem with those cases was not that relevant records

6  would not be found; the problem was that the subpoenas sought too much information that would not

7  be relevant. Those cases confirm that the eventuality that relevant information might be contained in

8  a much larger collection of information does not justify the production of the entire collection of

9  information.

10       The farthest limits of a subpoena *duces tecum* were perhaps reached in *In re Grand Jury*

11  *Proceedings*, 827 F.2d 301 (8th Cir. 1987). In that case, the government had learned that drug

12  traffickers were using wire transfers from a certain Western Union office in Kansas City, Missouri,

13  to pay for drugs, so the government served a subpoena on Western Union requiring it to produce

14  wire money transfer information of transfers of over $1,000. But the scope of that subpoena was

15  affirmed on appeal only because the records were sought from a single Western Union office for a

16  relatively short period of time as part of a grand jury investigation into drug dealing in the Kansas

17  City area. *Id.* at 304. The case certainly does not stand for the proposition that the records of a

18  trillion individual telephone calls made by all Americans can be collected and stored for up to five

19  years.[5]

20

---

21  outside of routine correspondence relating to every phase of the corporation's affairs, in an unlimited

22  exploratory investigation as is here frankly proposed, 'whose purposes and limits can be determined only as it proceeds,' is unreasonable."); *In re Corrado Bros. Inc.*, 367 F. Supp. 1126, 1131 (D. Del.

23  1973) ("[The government's] reasoning carried to its logical extreme, places no limits on the scope of materials subject to grand jury investigation. No document no matter how remote from the nature of

24  an investigation would be spared seizure on the basis that it *might* possibly contain important

25  information.")

[5]  Some cases have affirmed broad subpoenas, but only where, unlike here, the party producing the

26  large volume of records was itself the target of an investigation or a party to an action. *See In re*

27  *Subpoena Duces Tecum*, 228 F.3d 341, 350-51 (4th Cir. 2000) (physician compelled to comply with subpoena to produce patient files as part of investigation into allegations against the physician for

28  health care fraud); *FTC v. Invention Submission Corp.*, 965 F.2d 1086, 1089-90 (D.C. Cir. 1992)

---

11

1

2

**B.     Because the SCA Describes an Exhaustive Set of Circumstances Under Which a Telephone Service Provider May Produce its Customers' Telephone Records, Section 215 Does Not Authorize the Production of Such Records.**

3

4

5

6

Independent of the relevance limitations, Congress did not contemplate that section 215 could be used to authorize the mass collection of telephone records because it specified in the Stored Communications Act (SCA) the methods for obtaining telephone records from telephone service providers.  Those methods are exhaustive and exclusive.  They do not include section 215.

7

8

9

10

11

12

13

14

15

16

Section 2703(c)(1)(A) through (E) of the SCA comprises the exhaustive set of methods by which the government may compel a telephone service provider to produce the telephone records of its customers.  *See* 18 U.S.C. § 2703(c)(1) ("A governmental entity may require a provider of electronic communication service or remote computing service to disclose a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications) only when the governmental entity" complies with subsections (A) through (E)).  An order under section 215 for the production of telephone records to the government is not listed among those methods.  The SCA otherwise prohibits a telephone service provider from "knowingly divulge[ing] a record or other information pertaining to a subscriber or customer . . . to any governmental entity."  *See* 18 U.S.C. § 2702(a)(3).  Moreover, the SCA expressly grants the FBI

17

18

19

20

21

22

23

24

25

26

27

28

(company being investigated for false advertising of its business of promoting other people's inventions compelled to produce financial data and names of clients, advertisers and data bank participants); *United States v. Hill*, 459 F.3d 966, 975-6 (9th Cir. 2006) (upholding a search warrant for the seizure of a suspect's computer and storage media so as to search for child pornography at police laboratory, but requiring an affidavit giving a reasonable explanation about why a wholesale seizure was necessary); *Carrillo Huettel, LLP v. SEC*, 2011 WL 601369 (S.D. Cal. Feb. 11, 2011) (law firm suspected of securities laws violations was compelled to produce trust account information for all clients as they might reveal concealed connections among clients); *Goshawk Dedicated Ltd. v. Am. Viatical Services, LLC*, 2007 WL 3492762 (N.D. Ga. Nov. 5, 2007) (defendant compelled to produce database with actuarial data where defendant's representations about actuarial data were at the center of the litigation); *United States v. Upham*, 168 F.3d 532, 535 (1st Cir. 1999) (upholding a search warrant for suspect's girlfriend's computer where child pornography images were traced to that computer and the mechanics of the search for images could not readily have been done on the spot); *Medtronic Sofamar Danek, Inc. v. Michelson*, 229 F.R.D. 550, 552 (W.D. Tenn. 2003) (defendant's backup tapes of emails produced where plaintiff showed that a number of printed emails were directly relevant to the case and that the defendant only printed a small percentage of its emails).

"national security letter" authority to obtain call records for international terrorism or intelligence purposes.  18 U.S.C. § 2709.

It is a fundamental rule of statutory construction that statutes that address specific situations govern over those that address general situations.  *See Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 170 (2007).  Because SCA sections 2702, 2703, and 2709 are specific, referencing specific methods for telephone records, and because PATRIOT Act section 215 is general, referencing tangible business records, the government must use the methods listed in the SCA and not section 215 to compel the production of telephone records.

### C.   The Present and Future Electronic Telephonic Data that the Government Collects Is Not a "Tangible Thing" Within the Meaning of Section 215.

Section 215 is ill-suited for the purposes to which the government seeks to put it in yet another way as well: the law allows the government to obtain only an order "requiring the production of *tangible things* (including books, records, papers, documents, and other items)." (emphasis added).  But the telephone call records sought by the NSA are not *tangible* in two ways: The records exist only as electronic records and, at the time the order is issued, the records do not yet exist at all.

Congress deliberately chose the phrase "tangible things."  Congress repeated the phrase no less than thirteen times in section 215.  50 U.S.C. § 1861 (b)(1)(B), (b)(2)(A), (b)(2)(B), (c)(1), (c)(2)(A), (c)(2)(B), (c)(2)(D), (d)(1), (d)(2)(B), (e), (f)(1)(A), (g)(2)(A), (h).  Congress clearly intended the phrase to impose a limitation that excludes "intangible things."

When construing a phrase in a statute such as "tangible things," a court is to give the words used "their ordinary, contemporary, common meaning, absent an indication Congress intended them to bear some other different import."  *Wall v. Kholi*, 131 S. Ct. 1278, 1283 (2011); *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 (9th Cir. 2009) (A court must "first look to the language of the statue to determine whether it has a plain meaning.").  Any doubts about a plain meaning then turn "upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents and authorities that inform the analysis."  *Kasten v. Saint-Gobain*

1 | *Performance Plastics Corp.*, 131 S. Ct. 1325, 1330 (2011) (quoting *Dolan v. Postal Service*, 546

2 | U.S. 481, 486 (2006)).

3 | "Tangible things" has a plain meaning. Black's Law Dictionary defines an equivalent

4 | phrase, "tangible property" as "[t]hat which may be felt or touched, and is necessarily corporeal . . ."

5 | *Black's Law Dictionary*, p. 1306 (5th ed. 1979).[6] This plain meaning leaves no doubt that a "tangible

6 | thing" must be a presently existing thing. A "tangible thing" cannot encompass electronic data that

7 | is generated in the future. Yet, the FISC orders (Moore Decl. Exs. G, H) expressly require telephone

8 | service providers to "continue production on an ongoing daily basis thereafter for the duration of this

9 | Order" as new electronic telephonic data is created by their customers. Electronic data that does not

10 | yet exist is, by its nature, intangible.

11 | Even if the order were limited to existing electronic data, the statutory text supports a

12 | meaning of "tangible things" as "necessarily corporeal." Subsection (a)(1) states in a parenthetical

13 | that "tangible things" includes "books, records, papers, documents," each of which have a corporeal

14 | form, namely, a writing on paper. Notably, words such as "data," "computer data" or "electronic

15 | data" are absent from the parenthetical. Because electronic data cannot be felt or touched, nor is in

16 | any way corporeal, it is not a tangible thing within the meaning of section 215.

17 | The limitation of "tangible things" to the corporeal might seem unduly constraining in a

18 | computer-centric world, but such a constraint is consistent with the broader context under which

19 | Congress enacted the PATRIOT Act. Congress was demonstrably aware of the advent of electronic

20 | data reflecting telephonic and electronic communications at the time that it enacted the PATRIOT

21 | Act in 2001. Not only does the SCA already cover stored communications records, but Congress

22 | also expressly addressed such electronic data in section 216 of the PATRIOT Act, which governs

23 | pen registers and trap and trace devices. Section 216 of the PATRIOT Act expanded the definition

24 | of "pen register" to mean "a device or process which records or decodes dialing, routing, addressing,

25 |

26 | ───────────────

27 | [6] The definition of just the word, "tangible," in common-usage dictionaries also lists "corporeal" as the dominant meaning of the word "tangible." *See, e.g., The Random House Dictionary of the*

28 | *English Language*, p. 1452 (unabridged ed. 1966).

or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted . . . ." 18 U.S.C. § 3127(3). A "trap and trace device," in turn, was defined as "a device or process which captures the incoming electronic or other impulses which identify the originating number or other dialing, routing, addressing, and signaling information reasonably likely to identify the source of a wire or electronic communication." 18 U.S.C. § 3127(4). Because Congress expressly referenced "electronic . . . impulses" and specific types of telephonic data in section 216, the absence of similar words in section 215 reflects a Congressional intent to exclude such things from the meaning of "tangible things" in section 215. *See Barnhardt v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) (the inclusion of one thing suggests the exclusion of another).

### D. Congress Did Not Ratify the Government's Interpretation of Section 215 When Congress Extended the PATRIOT Act.

The government has asserted in its white paper that Congress "legislatively ratified" the government's sweeping interpretation of section 215, and the FISC has recently adopted that position. (Moore Decl. Exs. K, L, M). Congress purportedly did so by reauthorizing section 215 after the mass collection program had been in place for some time but while it was still a secret from much of Congress and virtually all of Congress' constituents. The government contends that Congress knew about – and ratified – the program because a classified briefing paper was provided to the House and Senate Intelligence Committees and was made available for review by all members of Congress. That classified briefing paper noted that the Government and the FISC had interpreted section 215 to authorize the mass collection of telephone records of the American public. (Moore Decl. Ex. K, p. 17).

The government vastly understates the amount of consensus required for a court to find implied Congressional ratification of a statutory interpretation. Implied Congressional ratification is not established merely upon a showing that Congress, or some subset of its members, was on notice about an interpretation of the statute. Rather, ratification will be found only where Congress reenacted a statute without change and where the specific interpretation of the statute was broad and unquestioned. *Jama v. Immigration and Customs Enforcement*, 543 U.S. 335, 349 (2005); *United*

1  *States v. Powell*, 379 U.S. 48, 55 n.13 (1964).  The required broad and unquestioned interpretation

2  may be established by evidence that "Congress considered [the interpretation] in great detail," *Nat'l*

3  *Labor Rel. Bd. v. Gullett Gin Co.*, 340 U.S. 361, 366 (1951), and specifically evidence of

4  "[e]xtensive hearings, repeated efforts at legislative correction, and public controversy." *Butterbaugh*

5  *v. Dep't of Justice*, 336 F.3d 1332, 1342 (Fed. Cir. 2003).

6         Alternatively, ratification may be established by a *broad unanimity* of judicial decisions.

7  This is a demanding standard.  In *Jama*, the Supreme Court declined to find ratification even though

8  Congress reenacted the legislation after two Court of Appeals decisions had adopted the proposed

9  interpretation.  *Jama*, 543 U.S. at 349.  In contrast, in *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230,

10 239-40 (2009), the Supreme Court found implied ratification only because Congress did not change

11 a statutory provision following the Supreme Court's own definitive interpretation of that provision.

12 *See also Lorillard v. Pons*, 434 U.S. 575, 580 (1978) (finding ratification where "every court to

13 consider the issue" had interpreted the statute in the same way); *Albemarle Paper Co. v. Moody*, 422

14 U.S. 405, 414 n.8 (1975) (finding ratification because "[t]he Court of Appeals that have confronted

15 the issue are unanimous").

16        In this case, no evidence supports implied ratification.  The issue was not debated in

17 Congress, nor, because of the overwhelming secrecy that the government applied to the legal

18 interpretations of FISA, were there public hearings or a public debate.  There is no evidence of

19 extensive deliberations or any rejected efforts at legislative correction specific to the mass collection

20 program.  And, there was no broad unanimity of judicial decisions precisely because of the secrecy

21 surrounding the FISC's decisions.

22        In fact, the classified briefing paper on which the government relies was inconsequential in

23 its scope.  That five-page brief was made available for members of Congress to read in a secure

24 location for a limited period of time in both 2009 and 2011, when Congress was considering whether

25 to reauthorize section 215 as a whole.  (Moore Decl. Ex. K, pp. 17-18).  The five-page report was

26 only a brief summary, sorely lacking in detail, and contained only one sentence that hinted at the

27 breadth of the program, as follows: "The orders generally require production of the business records

28 (as described above) relating to substantially all of the telephone calls handled by the companies,

16

1   including both calls made between the United States and a foreign country and calls made entirely

2   within the United States."  (Moore Decl. Ex. E, p. 3).

3         Even if mere notice to Congress were enough, it would have to be *actual* notice.  The

4   doctrine of implied ratification is subordinate to the fundamental principle that statutory

5   interpretation turns on Congress' *actual* intent: as such, ratification requires *actual* notice, not

6   constructive notice.  The doctrine never has been—and never should be—applied in circumstances

7   like these, where the government has kept its interpretation of the law secret and there is no evidence

8   that anything more than a handful of Members of Congress had actual knowledge of the

9   government's interpretation.  *See SEC v. Sloan*, 436 U.S. 103, 121 (1978) ("We are extremely

10  hesitant to presume general congressional awareness of the Commission's construction [of a statute]

11  based only upon a few isolated statements in the thousands of pages of legislative documents.  That

12  language in a Committee Report, without additional indication of more widespread congressional

13  awareness, is simply not sufficient to invoke the presumption in a case such as this.")

14  **V.    THE MASS COLLECTION OF AMERICAN'S PUBLIC TELEPHONE**
    **RECORDS IS UNCONSTITUTIONAL BECAUSE THE GOVERNMENT MUST**
15  **USE THE LEAST RESTRICTIVE MEANS AVAILABLE SO AS NOT TO**
    **INFRINGE PLAINTIFFS' FIRST AMENDMENT ASSOCIATIONAL RIGHTS**
16

17        Plaintiffs are organizations that gather people together to advance political beliefs.  Plaintiff

18  Calguns works to assist California gun owners in exercising their rights.  (Declaration of Gene

19  Hoffman, Jr. ("Hoffman Decl.") ¶ 2.)  Plaintiff National Lawyers Guild primarily helps organize

20  lawyers to political ends, as well as providing legal assistance in politically-charged cases.

21  (Declaration of Heidi Boghosian ("Boghosian Decl.") ¶ 2.)  Plaintiffs Greenpeace, Patient Privacy

22  Rights, and the National Organization for the Reform of Marijuana Laws ("NORML"), each work to

23  change law and policy on widely different subject matters.  (Declarations of Deepa Padmanabha

24  ("Padmanabha Decl.") ¶ 2; Deborah C. Peel, M.D. ("Peel Decl.") ¶ 2; Dale Gieringer ("Gieringer

25  Decl.") ¶ 2.)  For all plaintiffs, the ability to communicate with others confidentially is vital to their

26  organizational missions.  (*See, e.g.*, Declaration of Dinah PoKempner ("PoKempner Decl.") ¶¶ 4-5.)

27  By collecting the telephone records of the organizations and their members, the government has

28  established its own database of the associations of plaintiffs and their members.  Under well-

established First Amendment law, the mass collection burdens plaintiffs' associational freedoms and thus requires the government to limit its efforts to the least restrictive means of meeting the government's ends.

### A.   Governmental Surveillance that Reveals Individuals' Affiliations in Political and Social Organizations Is Subject to Exacting Constitutional Scrutiny.

The "freedom to associate with others for the common advancement of political beliefs and ideas is a form of 'orderly group activity' protected by the First and Fourteenth Amendments." *Kusper v. Pontikes*, 414 U.S. 51, 56-57 (1973).  Indeed, the freedom of association supports and enhances other First Amendment rights.  "An individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed."  *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984).

In order to protect this fundamental First Amendment freedom, "a significant encroachment upon associational freedom cannot be justified upon a mere showing of a legitimate state interest." *Kusper*, 414 U.S. at 58.  Infringements on freedom of association may survive constitutional scrutiny only when they "serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms."  *Roberts*, 468 U.S. at 623.

This exacting scrutiny applies not only to direct restraints on associations, but also to more subtle and indirect governmental actions that "would have the practical effect 'of discouraging' the exercise of constitutionally protected political rights."  *NAACP v. Alabama*, 357 U.S. 449, 461 (1958) (quoting *Am. Commc'ns Ass'n v. Douds*, 339 U.S. 382, 393 (1950)).  *See also Perry v. Schwarzenegger*, 591 F.3d 1126, 1139 (9th Cir. 2009) (quoting *NAACP v. Alabama*, 357 U.S. at 461) ("The government may abridge the freedom to associate directly, or 'abridgement of such rights, even though unintended, may inevitably follow from varied forms of governmental action.'").

The compelled disclosure of the identities of those who associate with each other is among the most egregious of such indirect restraints.  *NAACP v. Alabama*, 357 U.S. at 462 (holding First Amendment violated by requiring disclosure of membership lists); *Perry*, 591 F.3d at 1139-40; *Cal.*

18

*Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1101 (9th Cir. 2003) (holding that compelled disclosure of affiliation with a group "unquestionably infringes upon the exercise of First Amendment rights"); *Brock v. Local 375, Plumbers Int'l Union of America*, 860 F.2d 346, 349 (9th Cir. 1988) (finding that "disclosure of the identities of the Fund's members or contributors may adversely affect" the ability of these persons to exercise their associational rights). *See also Zweibon v. Mitchell*, 516 F.2d 594, 634 (D.C. Cir. 1975) (emphasizing that unchecked mass surveillance empowers entities to violate First Amendment associational rights by revealing the names and addresses of individuals that called or donated to an organization, a revelation in plain violation of *NAACP v. Alabama*); *Socialist Workers Party v. Attorney General*, 510 F.2d 253, 257 (2d Cir. 1974) (holding that values of preserving freedom of association justified enjoining transmission of names of persons attending controversial convention obtained through surveillance techniques).

The scrutiny that is triggered by the compelled disclosure of identities reflects "the vital relationship between the freedom to associate and privacy in one's associations." *NAACP v. Alabama*, 357 U.S. at 462. Indeed, anonymity is often necessary to the effective exercise of associational rights. *Perry*, 591 F.3d at 1142 ("Implicit in the right to associate with others to advance one's shared political beliefs is the right to exchange ideas and formulate strategy and messages, and to do so in private."). "It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute [an] . . . effective . . . restraint on freedom of association. . . . Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." *Gibson v. Fla. Legislative Investigation Comm.*, 372 U.S. 539, 544 (1963) (quoting *NAACP v. Alabama*, 357 U.S. at 462).

To establish a violation of First Amendment associational rights, the plaintiff must first demonstrate a *prima facie* showing of arguable First Amendment infringement. *Perry*, 591 F.3d at 1140. The burden then shifts to the government to demonstrate that the information sought is the least restrictive means of obtaining the information. *Id.*

19

**B.     The Mass Collection of Telephone Call Records Infringes Plaintiffs'
Associational Rights Under the First Amendment.**

A plaintiff can demonstrate *prima facie* infringement by showing: (1) that the disclosure of the information has resulted in harassment, membership withdrawal, or discouragement of new members;[7] or (2) the existence of other consequences which objectively suggest an impact on, or chilling, of the members' associational rights.  *Perry*, 591 F.3d at 1140; *Brock*, 860 F.2d at 350, n.1. This second showing may be satisfied by demonstrating that the plaintiff is self-censoring by not engaging in particular communications.  *California Pro-Life Council, Inc.*, 328 F.3d at 1093.  A plaintiff asserting a chilling effect of this type need show only a causal nexus between the government's acquisition of the information and the self-censorship.  *Dole v. Local Union 375, Plumbers Int'l Union of Am.*, 921 F.2d 969, 972 (9th Cir. 1990).

In this case, each plaintiff has suffered a concrete and actual associational injury: each plaintiff has lost the ability to assure its members, supporters and constituents that the fact of the telephonic communications between them will be kept confidential.  (*See, e.g.,* Declaration of Sherwin Siy ("Siy Decl.") ¶ 4).  Plaintiffs need to communicate with their constituents without the government's knowledge that the communications have taken place, and their constituents likewise value and often require that the government not know that they are communicating with plaintiffs. This ability to assure confidentiality is central to the plaintiffs' organizational missions.  For example, many of the constituents who seek services from CAIR-CA, CAIR-Ohio and CAIR Foundation, have been subject to government surveillance in the past.  Discretion and confidentiality in communications are of paramount importance to them.  (Declaration of Jennifer Nimer ("Nimer Decl.") ¶ 10; Declaration of Zahra Billoo ("Billoo Decl.') ¶ 8); Declaration of Gadeir Abbas ("Abbas

---

[7] Although it is not sufficient to allege broadly only a subjective fear of future governmental reprisals, the Supreme Court has cautioned against imposing "unduly strict requirements of proof" as to these factors; thus the evidence need only show "'a reasonable probability'" that the disclosure of the information will subject association members to governmental or private reprisals.  *Brock*, 860 F.2d at 350 n.1 (quoting *Buckley v. Valeo*, 424 U.S. 1, 71-72 (1976)).  *See also Perry*, 591 F.3d at 1143 (finding a *prima facie* case based on declarations that "created a reasonable inference that disclosure would have the practical effects of discouraging political association and inhibiting internal . . . communications that are essential to effective association and expression").

1   Decl.") ¶ 4).  Gun owners traditionally used telephones to communicate with plaintiff Calguns

2   specifically because they did not want to create an electronic trail that could later be used against

3   them by the government.  (Hoffman Decl. ¶ 4).

4           The inability to assure confidentiality in communications, aside from being an injury in and

5   of itself, also has measurable impacts on plaintiffs' activities.  For example, CAIR-OHIO often

6   works on international causes that go against U.S. foreign policy and involve "countries of interest"

7   to the U.S. government.  CAIR-OHIO frequently uses the telephone to coordinate these efforts and

8   also uses phone banking to rally support among Ohio's Muslim community.  (Nimer Decl. ¶ 15).

9   Because the government examines not only who persons of interest call, but also who those who

10  receive those calls in turn call, CAIR-OHIO has realized that when it calls people, it subjects them to

11  increased government scrutiny.  That the very act of communicating by telephone with CAIR-OHIO

12  creates a risk of governmental scrutiny also discourages constituents from calling it.  (Nimer Decl.

13  ¶¶ 13-14).  The mass collection of call records has thus deterred persons from calling CAIR-OHIO,

14  discouraged CAIR-OHIO from calling its constituents, thus hindering CAIR-OHIO's ability to

15  provide legal services to its clients and interfered with the organization's ability to assess whether or

16  not to retain particular clients.  (Nimer Decl. ¶ 8).  CAIR-OHIO has thus been forced to counsel

17  clients in person rather than by telephone.  (Nimer Decl. ¶ 9).  CAIR-CA, for similar reasons, has

18  also seen both a decrease in communications from its constituency of Muslim Americans.  (Billoo

19  Decl. ¶¶ 3, 5-18).

20          Other plaintiffs have also experienced a decrease in telephone calls from their constituents.

21  Calguns has seen a general decrease in calls from its members, and at least one of its members, who

22  is known only by an alias and would contact them only via a blocked-number telephone, has not

23  phoned since the existence of the program became public.  (Hoffman Decl. ¶ 6).  The Franklin

24  Armory likewise reports a 70 percent decrease in phone calls to its facility, a decrease it cannot

25  attribute to market conditions or seasonal fluctuations.  (Declaration of Jay Jacobson ("Jacobson

26  Decl.") ¶ 4). Human Rights Watch knows that those who associate with and pass information to it

27  are commonly subject to retaliation; it also believes that individuals have refrained from reporting

28  human rights abuses to it because of concerns about the security of such communications.

1   (PoKempner Decl. ¶ 8).  (*See also* Declaration of Rick Hoyt ("Hoyt Decl.") ¶ 5; Declaration of

2   Constance Kane ("Kane Decl.") ¶ 3; Declaration of Brandon Combs ("Combs Decl.") ¶ 5;

3   Declaration of Matthew F. Wood ("M. Wood Decl.") ¶ 5).

4        Several other plaintiffs that operate telephone hotlines have similarly reported an abrupt drop

5   in the number of calls that they receive since the revelation in June that the NSA was collecting all

6   call detail records.  For example, California NORML reports receiving approximately ten fewer calls

7   each day.  (Gieringer Decl. ¶ 9).  This decrease was not surprising considering that NORML's

8   members are frequently harassed by federal law enforcement officials.  (Gieringer Decl. ¶¶ 5-8).

9   Students for a Sensitive Drug Policy, for similar reasons, saw a comparable drop.  (Declaration of

10  Anastacia Cosner ("Cosner Decl.") ¶¶ 4-6).  Patient Privacy Rights Foundation ("PPRF") saw its

11  hotline calls halved, from 40 to 20 per month, after the program became public.  (Peel Decl. ¶ 6).

12  PPRF believes that many of these lost callers were whistleblowers who rely on the fact of their calls

13  to PPRF remaining confidential.  (Peel Decl. ¶¶ 3-6, 12).  The National Lawyers Guild has also

14  experienced a decrease in communications from members and constituents working on litigation and

15  advocacy.  (Boghosian Decl. ¶ 4).

16       Many of the plaintiffs have heard from their constituents that they are highly concerned that

17  the government now knows they have communicated with them.  (Hoyt Decl. ¶ 6; Gieringer Decl.

18  ¶ 5; Jacobson Decl. ¶ 5; Combs Decl. ¶ 6; Declaration of Deborah Liu ("Liu Decl.") ¶ 5; Declaration

19  of Tracy Rosenberg ("Rosenberg Decl.") ¶ 9; Declaration of Rabbi Arthur Waskow ("Waskow

20  Decl.") ¶ 7; Declaration of Kay Guinane ("Guinane Decl.") ¶ 5; M. Wood Decl. ¶ 4; Cosner Decl.

21  ¶ 7).  This concern has led these constituents to decrease their total engagement with plaintiffs, not

22  just their telephone communications.  (Declaration of Shahid Buttar ("Buttar Decl.") ¶ 4; Meinrath

23  Decl. ¶¶ 7-10; Liu Decl. ¶ 5; Kane Decl. ¶ 4).  Media Alliance has had several of its members ask to

24  terminate their memberships and have their data expunged from the Media Alliance database

25  because of the government's collection of call detail records.  (Rosenberg Decl. ¶ 9).  The Free

26  Software Foundation, as an entity that actively promotes privacy and freedom, necessarily attracts

27  members who insist on privacy in their communications.  The organization's integrity has been

28  damaged because it is not able to offer potent assurances of privacy itself.  (Declaration of John

22

1    Wood ("J. Wood Decl.") ¶ 5).

2          Several of the plaintiffs, prior to the revelation of the call details records collection program,

3    had strict confidentiality policies governing their telephone communications.  All have had to revise

4    their policies and are struggling to seek out other ways of communicating confidentially.  (Gieringer

5    Decl. ¶ 6; Peel Decl. ¶¶ 9, 12; PoKempner Decl. ¶¶ 7-9; Rosenberg Decl. ¶ 8).  For example, the

6    National Lawyers Guild, which often opposes the federal government in litigation, tries to avoid

7    using its Verizon landlines, moving as much of its communications as possible to in-person

8    meetings, a move that substantially burdens its operations and its ability to provide as vigorous a

9    legal representation as possible.  (Boghosian Decl. ¶ 4).  Charity & Security Network has similarly

10   had to delay activities until in-person meetings could be arranged, a move that has hampered its

11   ability both to communicate about sensitive factual and strategic issues and to work effectively.

12   (Guinane Decl. ¶ 9).  Acorn Active Media, whose members work daily with human rights workers

13   and democracy advocates around the world, is struggling to implement alternate forms of

14   confidential communication, a task made especially difficult because many of its associates lack the

15   technological acumen to use such tools.  (Declaration of Sascha Meinrath ("Meinrath Decl.") ¶ 11).

16   Human Rights Watch's security team is likewise expending resources studying new protocols to

17   keep its confidential communications secure.  (PoKempner Decl. ¶ 9).  CAIR Foundation has been

18   forced to counsel clients in person rather than over the phone and has had to utilize specialized

19   encryption software to communicate with clients overseas.  These electronic conversation do not,

20   however, qualitatively replace telephone communications.  (Abbas Decl. ¶¶ 4).

21          Even in the absence of such evidence, the fact that individuals have been chilled in their

22   associations with controversial, unpopular or dissident organizations when the government is

23   collecting records of communications is objectively obvious:  courts have long recognized that the

24   fear of "unsupervised and unlimited" surveillance can chill "free and robust exercise of the First

25   Amendment right[] of . . . association."  *Zweibon*, 516 F.2d at 633.  S*ee also FEC v. Hall-*

26   *Tyner Election Campaign Committee*, 678 F. 2d 416, 420, 423 (2d Cir. 1982) ("Privacy is an

27   essential element of the right of association and the ability to express dissent effectively. . . .  Such

28   forced revelations [of names] would likely lead to 'vexatious inquiries' which consequently could

23

instill in the public an unremitting fear of becoming linked with the unpopular or the unorthodox."). As Justice Sotomayor recently wrote in the Fourth Amendment context:  "[a]wareness that the government may be watching chills associational and expressive freedoms.  And the government's unrestrained power to assemble data that reveal private aspects of identity is susceptible to abuse." *United States v. Jones*, 132 S. Ct. 945, 956 (2012) (Sotomayor, J., concurring).

### C.    The Mass Collection Program Is Not Carefully Tailored to Avoid Unnecessary Interference with Plaintiffs' Associational Rights.

In order to overcome the harm to plaintiffs' First Amendment rights, the government must use the least association-restrictive means possible to obtain the information it seeks.  *Perry*, 591 F.3d at 1141.  That is, the government must acquire the least amount of information necessary to achieve the stated governmental interest.  *Dole*, 950 F.2d at 1461.

The telephone call records program, by collecting the records of every single telephone call made to, from, or within the United States, and retaining that information for five years, is not the least restrictive means to meet the government's interest in combating international terrorism.  In *Shelton v. Tucker*, 364 U.S. 479 (1960), the Supreme Court considered a similarly indiscriminate collection of associational information, which required teachers to provide all of their associational ties for a five-year period, even though many of those ties – like nearly all of the telephone calls in collected by the government here – had no reasonable relationship to the government's compelling interest in making sure that its teachers were fit.  The Supreme Court explained the difference between a properly tailored request and the broad one before it:

> The question to be decided here is not whether the State of Arkansas can ask certain of its teachers about all their organizational relationships.  It is not whether the State can ask all of its teachers about certain of their associational ties.  It is not whether teachers can be asked how many organizations they belong to, or how much time they spend in organizational activity. The question is whether the State can ask every one of its teachers to disclose every single organization with which he has been associated over a five-year period.  The scope of the inquiry required by Act 10 is completely unlimited.  The statute requires a teacher to reveal the church to which he belongs, or to which he has given financial support.  It requires him to disclose his political party, and every political organization to which he may have contributed over a five-year period.  It requires him to list, without number, every conceivable kind of associational tie—social, professional, political, avocational, or religious. Many such relationships could have no possible bearing upon the teacher's occupational competence or fitness.

24

1   *Id*. at 487-88.

2        As in *Shelton*, this mass collection is not even remotely "carefully tailored." It is not tailored

3   at all. The government may certainly conduct targeted surveillance of individuals suspected of

4   having ties to international terrorism, and it has many means by which to do so. But the mass

5   collection of telephone records reveals all the information that the Supreme Court objected to in

6   *Shelton* – social, professional, political, avocational, or religious – and not just from a comparatively

7   narrow group like teachers, but from all Americans who have a telephone.

8   **VI.   CONCLUSION**

9        Plaintiffs' motion for partial summary judgment should be granted.

10  DATED:  November 6, 2013                  Respectfully submitted,

11                                              /s/ Thomas E. Moore III

12                                            Thomas E. Moore III

13                                            CINDY COHN
                                              LEE TIEN
                                              KURT OPSAHL
14                                            MATTHEW ZIMMERMAN
                                              MARK RUMOLD
15                                            DAVID GREENE
                                              JAMES S. TYRE
16                                            ELECTRONIC FRONTIER FOUNDATION

17
                                              RICHARD R. WIEBE
18                                            LAW OFFICE OF RICHARD R. WIEBE

19                                            THOMAS E. MOORE III
                                              ROYSE LAW FIRM, PC
20
                                              RACHAEL E. MENY
21                                            MICHAEL S. KWUN
                                              BENJAMIN W. BERKOWITZ
22                                            KEKER & VAN NEST, LLP

23                                            ARAM ANTARAMIAN
                                              LAW OFFICE OF ARAM ANTARAMIAN
24
                                              Attorneys for Plaintiffs
25

26

27

28