CINDY COHN (SBN 145997)
cindy@eff.org
LEE TIEN (SBN 148216)
KURT OPSAHL (SBN 191303)
MATTHEW ZIMMERMAN (SBN 212423)
MARK RUMOLD (SBN 279060)
DAVID GREENE (SBN 160107)
JAMES S. TYRE (SBN 083117)
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Tel.: (415) 436-9333; Fax: (415) 436-9993

THOMAS E. MOORE III (SBN 115107)
tmoore@rroyselaw.com
ROYSE LAW FIRM, PC
1717 Embarcadero Road
Palo Alto, CA 94303
Tel.: 650-813-9700; Fax: 650-813-9777

Attorneys for Plaintiffs

RACHAEL E. MENY (SBN 178514)
rmeny@kvn.com
MICHAEL S. KWUN (SBN 198945)
BENJAMIN W. BERKOWITZ (SBN 244441)
KEKER & VAN NEST, LLP
633 Battery Street
San Francisco, California 94111
Tel.: (415) 391-5400; Fax: (415) 397-7188

RICHARD R. WIEBE (SBN 121156)
wiebe@pacbell.net
LAW OFFICE OF RICHARD R. WIEBE
One California Street, Suite 900
San Francisco, CA 94111
Tel.: (415) 433-3200; Fax: (415) 433-6382

ARAM ANTARAMIAN (SBN 239070)
aram@eff.org
LAW OFFICE OF ARAM ANTARAMIAN
1714 Blake Street
Berkeley, CA 94703
Telephone: (510) 289-1626

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

FIRST UNITARIAN CHURCH OF LOS ANGELES, *et al.*,

Plaintiffs,

v.

NATIONAL SECURITY AGENCY, *et al.*,

Defendants.

Case No: 3:13-cv-03287 JSW

**DECLARATION OF ZAHRA BILLOO FOR THE COUNCIL ON AMERICAN-ISLAMIC RELATIONS CALIFORNIA IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Date: February 7, 2014
Time: 9:00 A.M.
Hon. Jeffrey S. White
Courtroom 11 - 19th Floor

I, Zahra Billoo, hereby declare:

1. I am the Executive Director of the San Francisco Bay Area office of the Council on American-Islamic Relations, California chapter. The facts contained in the following affidavit are known to me of my own personal knowledge and if called upon to testify, I could and would competently do so.

2. CAIR-CA is a chapter of CAIR, America's largest Muslim civil liberties and advocacy organization. Its mission is to enhance the understanding of Islam, encourage dialogue, protect civil liberties, empower American Muslims, and build coalitions that promote justice and mutual understanding. Each year we provide direct and free legal services to hundreds of California Muslims complaining of discrimination and targeting based on their religious beliefs. We reach thousands more through our "know your rights" workshops at campuses, community centers, and mosques across the state.

3. The compelled disclosure of our phone records to the government has resulted in an inability to assure our constituency that the fact of their communication with us is, indeed, confidential, leading to an increased reticence on the part of the California Muslim community to seek our organization's assistance. This reticence, in turn, undermines our ability to effectively advance and advocate CAIR's mission: enhancing the understanding of Islam and protecting the civil liberties of our constituents.

4. I say this based on the following facts:

5. CAIR provides legal services and advice to individuals unjustly targeted by government surveillance and investigations. Of the hundreds of individuals we represent and serve, many call with complaints of FBI visits and other law enforcement harassment. These individuals are overwhelmingly innocent Americans who are being contacted by federal law enforcement to be "voluntarily" questioned about their religious beliefs and political activities.

6. For example: in *Islamic Shura Council v. FBI*, 11 plaintiffs including CAIR-CA and CAIR-CA's Greater Los Angeles Area Executive Director Hussam Ayloush, learned that the FBI had been monitoring them for an extended period of time, had kept extensive records of this

surveillance and had then misrepresented having any documents about it in response to a FOIA request filed by plaintiffs

7. To provide another example, between 2011 and 2012, CAIR-CA's attorneys have assisted over 170 Californians complaining of FBI visits and harassment. In the overwhelming majority of these cases, the complainants were never charged with any crime. In instances where the complainants did not assert their right to counsel immediately and did agree to speak with law enforcement, they were then surprised to be questioned about their religious beliefs and practices.

8. Many members of the Muslim community are afraid of upsetting law enforcement by asserting their rights. They often believe the promises and threats made by FBI agents to "complicate" or escalate things, talk to their neighbors and employers, or even assist with or harm immigration applications. Further, many members of the community are even unaware of their rights and so cooperate from a broader place of fear and a general sense of unawareness of the unconstitutional nature of the interaction. Because of these concerns, our clients and constituents often ask for the utmost confidentiality when seeking our help.

6. Further, many members of the California Muslim community fear their communications are being surveilled by law enforcement. These fears are not speculative.

7. For example, CAIR-CA represents Yasir Afifi. In 2010, Afifi discovered what he later learned was a GPS tracking device under his car during a routine oil change. He took pictures of the device, placed them on the internet to attempt to learn what it was, and just a couple of days later was visited by FBI agents outside his apartment. The agents identified themselves and in no uncertain terms asked for the device to be returned. They threatened him, if he didn't return the device. When he did, the agents questioned him about his family and community members. FOIA documents obtained on his behalf, as well as conversations with one of the FBI agents and the mechanic who performed the oil change confirmed Afifi's account of what happened.

8. Similarly, the ACLU and Advancing Justice-Asian Law Caucus obtained thousands of pages of documents revealing the FBI's "outreach" efforts in Northern California mosques. The documents showed that for several years agents had visited dozens of Bay Area Muslim houses of

worship under the guise of conducting outreach but instead had been gathering information, which would be filed as intelligence. While many community leaders had for so long been receptive to law enforcement attempts to build relationships, learning later that outreach was never the primary objective confirmed the fears of many.

9. CAIR was able to make assurances of confidentiality prior to the disclosure of the Associational Tracking Program and attempt to continue to do so. However, since the disclosure, we cannot assure our clients and constituents, as well as all others who seek to communicate with us, that the fact of their communications to and with us are confidential.

10. Further, we can no longer assure our constituents that their communications with us will not, in the eyes of the federal government, implicate them or otherwise create a relationship with another individual who has also contacted CAIR to seek assistance.

11. To illustrate, CAIR-CA's four offices manage intake lines that allow the general public, and, more specifically, members of the American Muslim community, to call to seek help if they are contacted by law enforcement or if they have concerns about law enforcement, surveillance, or travel abroad. Some callers explain that they are afraid to speak over the phone for fear of monitoring, and will either withhold all identifying information in conversations or will insist on meeting in person.

12. The overwhelming majority of people who contact us are never indicted or otherwise formally accused of any crime.

13. Nevertheless, CAIR-CA's work does involve cases (some high profile) involving individuals who have been charged with aiding terrorism or who have been monitored by the FBI and Joint Terrorism Task Forces for their religious and political activism.

14. It is my understanding that the government uses the Associational Tracking Program to investigate the contacts and relationships between those suspected of terrorism-related activities and crimes.

15. It is also my understanding that, when using the Associational Tracking Program, the government often examines multiple "degrees" of relationships between individuals, or "hops" of

associations. This means the government can examine the contact patterns and relationships between an individual and their contacts; their contacts' contacts; and the contacts of their contacts' contacts. I understand that these webs of associations can expand to include many thousands, if not millions, of people.

16. By virtue of this "guilt by association" form of analysis, large swaths of the California Muslim community may be subject to government scrutiny, simply by virtue of having contacted CAIR and because of CAIR's advocacy efforts on behalf of those wrongly accused. That is, if a CAIR client accused of a terrorism-related crime contacts us, all those who contact CAIR may subsequently be put at risk of government scrutiny, solely through their shared "association" with CAIR.

17. Since the disclosure of the Associational Tracking Program, we have lost the ability to confidently assure American Muslim community members, as well as all others who seek to communicate with us, that the fact of their communications to and with us will be kept confidential.

18. When the very act of communicating by phone with those we aim to serve puts our constituents at risk for further government scrutiny, our organizational mission is essentially undermined. The Associational Tracking Program undermines CAIR's ability to effectively accomplish its mission of defending the civil liberties of American Muslims.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on _______ __, 2013 at _____, California.

____________________________
ZAHRA BILLOO

associations. This means the government can examine the contact patterns and relationships between an individual and their contacts; their contacts' contacts; and the contacts of their contacts' contacts. I understand that these webs of associations can expand to include many thousands, if not millions, of people.

16. By virtue of this "guilt by association" form of analysis, large swaths of the California Muslim community may be subject to government scrutiny, simply by virtue of having contacted CAIR and because of CAIR's advocacy efforts on behalf of those wrongly accused. That is, if a CAIR client accused of a terrorism-related crime contacts us, all those who contact CAIR may subsequently be put at risk of government scrutiny, solely through their shared "association" with CAIR.

17. Since the disclosure of the Associational Tracking Program, we have lost the ability to confidently assure American Muslim community members, as well as all others who seek to communicate with us, that the fact of their communications to and with us will be kept confidential.

18. When the very act of communicating by phone with those we aim to serve puts our constituents at risk for further government scrutiny, our organizational mission is essentially undermined. The Associational Tracking Program undermines CAIR's ability to effectively accomplish its mission of defending the civil liberties of American Muslims.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on November 1, 2013 at Santa Clara California.

ZAHRA BILLOO