Case3:13-cv-03287-JSW Document48 Filed11/06/13 Page1 of 6

CINDY COHN (SBN 145997)
cindy@eff.org
LEE TIEN (SBN 148216)
KURT OPSAHL (SBN 191303)
MATTHEW ZIMMERMAN (SBN 212423)
MARK RUMOLD (SBN 279060)
DAVID GREENE (SBN 160107)
JAMES S. TYRE (SBN 083117)
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Tel.: (415) 436-9333; Fax: (415) 436-9993

THOMAS E. MOORE III (SBN 115107)
tmoore@rroyselaw.com
ROYSE LAW FIRM, PC
1717 Embarcadero Road
Palo Alto, CA 94303
Tel.: 650-813-9700; Fax: 650-813-9777

Attorneys for Plaintiffs

RACHAEL E. MENY (SBN 178514)
rmeny@kvn.com
MICHAEL S. KWUN (SBN 198945)
BENJAMIN W. BERKOWITZ (SBN 244441)
KEKER & VAN NEST, LLP
633 Battery Street
San Francisco, California 94111
Tel.: (415) 391-5400; Fax: (415) 397-7188

RICHARD R. WIEBE (SBN 121156)
wiebe@pacbell.net
LAW OFFICE OF RICHARD R. WIEBE
One California Street, Suite 900
San Francisco, CA 94111
Tel.: (415) 433-3200; Fax: (415) 433-6382

ARAM ANTARAMIAN (SBN 239070)
aram@eff.org
LAW OFFICE OF ARAM ANTARAMIAN
1714 Blake Street
Berkeley, CA 94703
Telephone: (510) 289-1626

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

FIRST UNITARIAN CHURCH OF LOS ANGELES, *et al.*,

    Plaintiffs,

    v.

NATIONAL SECURITY AGENCY, *et al.*,

    Defendants.

Case No: 3:13-cv-03287 JSW

**DECLARATION OF BERIN SZOKA ON BEHALF OF TECHFREEDOM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Date: February 7, 2014
Time: 9:00 A.M.
Hon. Jeffrey S. White
Courtroom 11 - 19th Floor

DECLARATION OF BERIN SZOKA ON BEHALF OF TECHFREEDOM ISO PLAINTIFFS' MSJ

I, BERIN SZOKA, hereby declare:

1. I am the President of TechFreedom. The facts contained in the following affidavit are known to me of my own personal knowledge and, if called upon to testify, I could and would competently do so.

2. Our organization is a non-profit[1] think tank based in Washington, D.C. Our mission is promoting technology that improves the human condition and expands individual capacity to choose by educating the public, policymakers, and thought leaders about the kinds of public policies that enable technology to flourish. TechFreedom seeks to advance public policy that makes experimentation, entrepreneurship, and investment possible, and thus unleashes the ultimate resource: human ingenuity.

3. All of TechFreedom's employees use Verizon for business and personal purposes. The compelled disclosure of our phone records to the government will decrease our organization's capacity to effectively communicate with policymakers, journalists, thought leaders, civil society allies, and our donors.

4. TechFreedom's ability to effectively advocate for our positions and influence lawmakers, policymakers, journalists and thought leaders, as well as to raise funds from donors, often hinges on our ability to communicate, and develop, our policy positions in confidence.

5. Since the disclosure of the Associational Tracking Program, we have lost the ability to assure policymakers, journalists, thought leaders, civil society allies, and our donors, that the fact of their communications to and with us will be kept confidential.

6. Indeed, in many circumstances, disclosure of the fact and timing of a particular communication is more important and revealing than the content of the communication.

7. This is particularly so in the case of TechFreedom's fundraising. Private communication is often essential for fundraising purposes: Some donors are less willing to engage

---

[1] We have applied for federal tax-exempt status under Section 501(c)(3); while we have not yet received that status, we are operating according to the requirements of federal tax law.

with the organization and its employees if they know the fact of their communications will not be confidential.

8. Moreover, the timing of our communication with other parties, such as donors, might imply a chain of causation between donations, positions we take, and changes to the intellectual landscape that result from our advocacy – even where such causation does not actually exist. Such inaccurate perceptions could substantially damage our reputation for independence or even potentially jeopardize our non-profit status. Even if we were vindicated, the mere fact of an investigation or suggestion of impropriety could damage our reputation, limit our effectiveness and harm our ability to raise support for our work.

9. This fear is neither speculative nor abstract. Indeed, my former think tank, The Progress & Freedom Foundation (PFF), was the subject of a three year investigation by the Internal Revenue Service into whether PFF had, by funding a college course (Renewing American Civilization") taught by then-House-Speaker Newt Gingrich, violated its tax-exempt status by engaging in electoral politics. The investigation ultimately concluded that the course and course book "were educational in content," rather than electoral. While this finding vindicated PFF, the investigation did considerable damage to PFF's reputation, its relationship with Gingrich, and its ability to raise money from individuals who sympathized with Gingrich's futurist views. Combined with speculation that the investigation was itself politically motivated, this experience further chilled PFF's ability to exercise its free speech rights within the confines of its tax-exempt status by causing its future employees to be excessively cautious about engaging in speech that either might conceivably raise legitimate questions of tax law or that might raise the ire of those in a position to launch another such investigation.

10. The disclosure of TechFreedom's communication records similarly harms our ability to fully advocate and advance our positions with policymakers.

11. For example, if TechFreedom has taken a public position on a particular issue, and policymakers are poised to vote on that issue, the content of our communication to policymakers and their staffs can safely be inferred: our communications will likely be consistent with our

2

public position.

12. In this example, however, the *fact and timing* of our communication with a lawmaker can be substantially more revealing. For example, if TechFreedom communicates with a policymaker shortly before that policymaker shifts his or her public position to align more closely with TechFreedom's position, it can safely be assumed that TechFreedom's communication had some influence over that decision.

13. Because of the acrimonious and partisan nature of Washington politics, the Associational Tracking Program will necessarily cause policymakers to be more inhibited with their communications with TechFreedom. For some policymakers, a change in their policy positions attributable to TechFreedom's advocacy may imply, accurately or not, an association or relationship that the policymaker might otherwise be unwilling to publicly acknowledge.

14. This inhibition, in turn, hinders TechFreedom's ability to advocate effectively for its ideas.

15. Similarly, our communications with journalists and foreign nationals is limited by the risk of disclosure. Knowing that the government will retain a record of all our communications, and the inevitable possibility of disclosure, will reduce the likelihood of such individuals working with TechFreedom on important Internet freedom issues, which are inherently trans-national and often require collaboration with foreign civil society groups and policymakers.

16. Given the nature of our work, all the parties we deal with are exceptionally sensitive to the risk of breaches of data collected by the government – be they inadvertent, the result of malicious attacks on U.S. government servers, or intentional leaks or disclosures by politically motivated individuals. Nor are the parties we deal with likely to accept official insistence that data collected for one purpose by one agency will not be shared with other government agencies or with policymakers. In short, the fact the government collects our call records in the first instance is sufficient to inhibit parties from engaging with us without inhibition.

17. The compelled disclosure to the government of all TechFreedom's telephone communications, and the associated risk that those communications may later be disclosed, is a

3

DECLARATION OF BERIN SZOKA ON BEHALF OF TECHFREEDOM
ISO PLAINTIFFS' MSJ
CASE NO. 13-cv-3287 JSW

risk some policymakers, journalists, thought leaders, civil society allies, and donors are unwilling to take.

18. As a result, the Associational Tracking Program has chilled TechFreedom's ability to effectively advocate for our positions and advance our organizational mission.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October ___, 2013 at _____, _____.
                                                                                                                 [City]           [State]

_____
BERIN SZOKA

risk some policymakers, journalists, thought leaders, civil society allies, and donors are unwilling to take.

18. As a result, the Associational Tracking Program has chilled TechFreedom's ability to effectively advocate for our positions and advance our organizational mission.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October 29, 2013 at Washington, DC.
[City]    [State]

_____
BERIN SZOKA