Alex Abdo
aabdo@aclu.org
Brett Max Kaufman
bkaufman@aclu.org
Patrick Toomey
ptoomey@aclu.org
Jameel Jaffer
jjaffer@aclu.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
Telephone: (212) 549-2500
Facsimile: (212) 549-2654

Julia Harumi Mass (CA SBN 189649)
jmass@aclunc.org
Nicole A. Ozer (CA SBN 228643)
nozer@aclunc.org
Matthew T. Cagle (CA SBN 286101)
mcagle@aclunc.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
    OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, California 94111
Telephone: (415) 621-2493
Facsimile: (415) 255-8437

*Attorneys for Amici Curiae Senator Ron Wyden,*
*    Senator Mark Udall, & Senator Martin Heinrich*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

FIRST UNITARIAN CHURCH OF
    LOS ANGELES *et al.*,

                            *Plaintiffs*,

    v.

NATIONAL SECURITY AGENCY *et al.*,

                            *Defendants*.

Case No. 3:13-cv-03287 JSW

**BRIEF OF *AMICI CURIAE* SENATOR RON WYDEN, SENATOR MARK UDALL & SENATOR MARTIN HEINRICH IN SUPPORT OF PLAINTIFFS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ i

INTRODUCTION ........................................................................................... 1

ARGUMENT ................................................................................................. 3

   I.    AMICI HAVE SEEN NO EVIDENCE THAT THE BULK COLLECTION OF
        AMERICANS' PHONE RECORDS HAS PROVIDED USEFUL INTELLIGENCE
        UNOBTAINABLE THROUGH LESS INTRUSIVE MEANS ................................. 3

       A.    Amici have seen no evidence that the bulk collection of Americans'
            phone records under Section 215 is uniquely necessary to the
            national security of the United States ........................................... 3

       B.    The government possesses a number of legal authorities with
            which it may obtain the call records of suspected terrorists and
            those in contact with suspected terrorists ..................................... 8

       C.    Amici have seen no evidence that bulk collection was necessary
            to obtain information critical to specific counterterrorism
            investigations ............................................................................ 11

  II.    THE GOVERNMENT'S LEGAL INTERPRETATION OF SECTION 215
        COULD BE EXTENDED TO AUTHORIZE BULK COLLECTIONS OF
        AMERICANS' DATA BEYOND THE CALL RECORDS AT ISSUE IN
        THIS CASE ............................................................................................ 14

CONCLUSION ............................................................................................. 15

# TABLE OF AUTHORITIES

**Cases**

*In re Application of the FBI for an Order Requiring the Production of Tangible Things from [Redacted]*, No. BR 13-80 (FISC Apr. 25, 2013) ................................................10

*In re Production of Tangible Things*, No. BR 08-13 (FISC Mar. 2, 2009) ................................4

*In re Production of Tangible Things*, No. BR 08-13, 2008 WL 9475145 (FISC Dec. 12, 2008) ................................................................................................................9

*In re Production of Tangible Things*, No. BR 13-109, 2013 WL 5741573 (FISC Aug. 29, 2013) ................................................................................................5, 15

**Statutes**

18 U.S.C. § 2702 ................................................................................................................9

18 U.S.C. § 2703 ................................................................................................................9

18 U.S.C. § 2709 ..........................................................................................................9, 10

18 U.S.C. § 3122 ................................................................................................................9

18 U.S.C. § 3125 ................................................................................................................9

50 U.S.C. § 1842 ................................................................................................................9

50 U.S.C. § 1843 ..............................................................................................................10

50 U.S.C. § 1861 ................................................................................................................9

**Other Authorities**

155 Cong. Rec. S9563 (daily ed. Sept. 17, 2009) ................................................................2

157 Cong. Rec. S3258 (daily ed. May 24, 2011) ................................................................2

157 Cong. Rec. S3360 (daily ed. May 25, 2011) ................................................................1

157 Cong. Rec. S3386 (daily ed. May 26, 2011) ..........................................................1, 15

157 Cong. Rec. S3389 (daily ed. May 26, 2011) ..............................................................15

159 Cong. Rec. S6056 (daily ed. July 30, 2013) ..............................................................12

*Administration White Paper: Bulk Collection of Telephony Metadata Under Section 215 of the USA PATRIOT Act* (Aug. 9, 2013) ..........................................5, 10

H. Permanent Select Comm. on Intelligence, *54 Attacks in 20 Countries Thwarted by NSA Collection* (July 23, 2013) ..........................................12

Joint Statement for the Record by Michael Leiter, Director, National Counterterrorism Center, & [Redacted], Associate Deputy Director for Counterterrorism, Signals Intelligence Directorate, NSA, Before the H. Permanent Select Comm. on Intelligence Closed Hearing on Patriot Act Reauthorization (Oct. 21, 2009) ..........................................4

Letter from [Redacted], Attorney, Office of General Counsel, NSA, to SSCI (Apr. 1, 2011) ..........................................15

Letter from Ronald Weich, Assistant Attorney General, to Silvestre Reyes, Chairman, H. Permanent Select Comm. on Intelligence (Dec. 14, 2009) ..........................................4, 13

Letter from Sen. Ron Wyden & Sen. Mark Udall to Eric Holder, Attorney General (Mar. 15, 2012) ..........................................14

*Media Leaks Facts & Context (Long Version)* (Aug. 1, 2013) ..........................................6, 14

Nat'l Comm'n on Terrorist Attacks Upon the U.S., *9/11Commission Report* (2004) ..........................................13

*Oversight of the Administration's Use of FISA Authorities: Hearing Before the H. Comm. on the Judiciary*, 113th Cong. (July 17, 2013) ..........................................5, 12

*Oversight of the Federal Bureau of Investigation: Hearing Before the H. Comm. on the Judiciary*, 113th Cong. (June 13, 2013) ..........................................13

*Potential Changes to the Foreign Intelligence Surveillance Act: Hearing Before the H. Permanent Select Comm. on Intelligence*, 113th Cong. (Oct. 29, 2013) ..........................................5, 11

Press Release, Sen. Mark Udall, Surveillance Reform Package Ends Bulk Collection of Phone Records, Creates Constitutional Advocate for Secret Court (Sept. 25, 2013) ..........................................8

Press Release, Sen. Martin Heinrich, Heinrich Says FISA Improvements Act Doesn't Go Far Enough To Protect American Privacy Rights (Oct. 31, 2013) ..........................................14

Press Release, Sen. Martin Heinrich, Heinrich Statement on National Security Agency Phone Records Program (June 6, 2013) ..........................................11

Press Release, Sen. Martin Heinrich, Udall, Heinrich Back Effort To End Dragnet Collection of Phone Data & Add Meaningful Oversight of Surveillance Programs (Oct. 29, 2013) ..........................................8

Press Release, Sen. Ron Wyden & Sen. Mark Udall, Wyden, Udall Issue
    Statement on Effectiveness of Declassified NSA Programs (June 19, 2013) ...............6, 7, 11

Press Release, Sen. Ron Wyden & Sen. Mark Udall, Wyden, Udall Statement on
    the Disclosure of Bulk Email Records Collection Program (July 2, 2013)..................7, 14, 15

Press Release, Sen. Ron Wyden, Wyden Statement on President Obama's
    Proposed Reforms to the FISC and PATRIOT Act (Aug. 9, 2013) .........................................8

*Report on the National Security Agency's Bulk Collection Programs Affected by*
*USA PATRIOT Act Reauthorization* ....................................................................................4, 9

*Report on the National Security Agency's Bulk Collection Programs for USA*
*PATRIOT Act Reauthorization* ...............................................................................................4

Sen. Richard Durbin, Remarks at the Senate Judiciary Committee Executive
    Business Meeting (Oct. 1, 2009) ...........................................................................................2

Sen. Ron Wyden, Keynote Address at Cato Institute Conference: NSA
    Surveillance: What We Know; What to Do About It (Oct. 9, 2013) ...................................6, 7

Sen. Ron Wyden, Remarks as Prepared for Delivery for the Center for American
    Progress Event on NSA Surveillance (July 23, 2013)......................................................8, 14

Siobhan Gorman, Evan Perez & Janet Hook, *U.S. Collects Vast Data Trove*, Wall
    St. J., June 7, 2013 .................................................................................................................5

Sisi Wei, Theodoric Meyer & Justin Elliott, *How the NSA's Claim on Thwarted*
*Terrorist Plots Has Spread*, ProPublica, Oct. 23, 2013 ..........................................................6

*Strengthening Privacy Rights and National Security: Oversight of FISA*
*Surveillance Programs: Hearing Before the S. Comm. on the Judiciary*, 113th
    Cong. (July 31, 2013) ...............................................................................................6, 10, 13

**Rules**

Fed. R. Crim. P. 17(c) ...............................................................................................................9

*Amici Curiae* Ron Wyden, Mark Udall, and Martin Heinrich are United States Senators and members of the Senate Select Committee on Intelligence. Senator Wyden has represented the state of Oregon since 1996. Senator Udall has represented the state of Colorado since January 2009. Senator Heinrich has represented the state of New Mexico since January 2013. Together with a number of other Senators, Senators Wyden, Udall, and Heinrich have introduced bipartisan legislation to reform the nation's surveillance laws, including the Foreign Intelligence Surveillance Act. *Amici* submit this brief, in support of Plaintiffs' Motion for Partial Summary Judgment, to provide important context for the Court's consideration of Plaintiffs' claims and to underscore the larger implications of this case.

As members of the Senate Select Committee on Intelligence, *Amici* Senators Wyden and Udall have for years participated in the oversight of government surveillance conducted under the Patriot Act that they knew would astonish most Americans. They sought to warn the public about those activities as best they could without disclosing classified information. They also co-sponsored an amendment to the Patriot Act's reauthorization that sought to address the problem of government officials "secretly reinterpret[ing] public laws and statutes" and "describ[ing] the execution of these laws in a way that misinforms or misleads the public." *See* 157 Cong. Rec. S3360 (daily ed. May 25, 2011) (introducing SA 384 to S. 990, 112th Cong. § 3 (2011)); *see also* 157 Cong. Rec. S3386 (daily ed. May 26, 2011) (statement of Sen. Wyden) ("The fact is anyone can read the plain text of the PATRIOT Act. Yet many Members of Congress have no idea how the law is being secretly interpreted by the executive branch."); 157 Cong. Rec. S3258 (daily ed. May 24, 2011) (statement of Sen. Udall) ("Congress is granting powers to the executive branch

that lead to abuse, and, frankly, shield the executive branch from accountability.").[1]

Now that the government's bulk call-records program has been exposed, the government has defended it vigorously. *Amici* submit this brief to respond to the government's claim, which it is expected to repeat in this suit, that its collection of bulk call records is necessary to defend the nation against terrorist attacks. *Amici* make one central point: As members of the committee charged with overseeing the National Security Agency's surveillance, *Amici* have reviewed this surveillance extensively and have seen no evidence that the bulk collection of Americans' phone records has provided any intelligence of value that could not have been gathered through less intrusive means. The government has at its disposal a number of authorities that allow it to obtain the call records of suspected terrorists and those in contact with suspected terrorists. It appears to *Amici* that these more targeted authorities could have been used to obtain the information that the government has publicly claimed was crucial in a few important counterterrorism cases.

In assessing the lawfulness of the government's bulk call-records program, it is also important to understand the implications of the government's interpretation of Section 215. The government's legal interpretation of Section 215 could be extended to authorize bulk collections of information far beyond the call records at issue in this case, such as financial or medical records, or even records indicating the location of ordinary Americans. The Court should thus

---

[1] Colleagues of *Amici* raised similar concerns. *See, e.g.*, Sen. Richard Durbin, Remarks at the Senate Judiciary Committee Executive Business Meeting at 68:00, (Oct. 1, 2009), http://1.usa.gov/1fPvpwb ("Section 215 is unfortunately cloaked in secrecy. Some day that cloak will be lifted, and future generations will ask whether our actions today meet the test of a democratic society: transparency, accountability, and fidelity to the rule of law and our Constitution."); 155 Cong. Rec. S9563 (daily ed. Sept. 17, 2009) (statement of Sen. Feingold).

treat with skepticism the government's claims that its use of the statute is cabined by the supposedly unique characteristics of call records.

Because the government's call-records program needlessly intrudes upon the privacy rights of hundreds of millions of Americans, *Amici* believe the bulk collection of these phone records should be ended.

## ARGUMENT

I. ***AMICI* HAVE SEEN NO EVIDENCE THAT THE BULK COLLECTION OF AMERICANS' PHONE RECORDS HAS PROVIDED USEFUL INTELLIGENCE UNOBTAINABLE THROUGH LESS INTRUSIVE MEANS.**

   A. *Amici* have seen no evidence that the bulk collection of Americans' phone records under Section 215 is uniquely necessary to the national security of the United States.

The executive branch has claimed in public and in newly declassified submissions to the Senate Select Committee on Intelligence ("SSCI") that the bulk collection of Americans' phone records is a vital national security program that is uniquely valuable in protecting the American people, that its aims cannot be achieved through alternative means, and that it has been effective in preventing terrorist activity against Americans. *Amici* have reviewed the bulk-collection program extensively, and none of these claims appears to hold up to scrutiny.

Since the executive branch began using Section 215 to collect the phone records of Americans in bulk, it has asserted to the members of Congress to whom it revealed that collection that the program was necessary to protect national security because it uniquely enables the government to track the associations of suspected terrorists. For example, as votes in both chambers of Congress on the reauthorization of the Patriot Act approached in 2009, the Department of Justice made available to members of the SSCI and the House Permanent Select Committee on Intelligence ("HPSCI") a report on the NSA's bulk collection under Section 215.

*See* Letter from Ronald Weich, Assistant Attorney General, to Silvestre Reyes, Chairman, HPSCI at 1 (Dec. 14, 2009), http://1.usa.gov/1i31wui ("2009 Weich Letter"). The report represented that the "NSA's bulk collection programs provide important tools in the fight against terrorism" that are "unique in that they can produce intelligence not otherwise available to NSA." *See Report on the National Security Agency's Bulk Collection Programs Affected by USA PATRIOT Act Reauthorization* at 1 ("2009 NSA Report") (attached to 2009 Weich Letter).[2]

The executive branch has made the same assurances to the Foreign Intelligence Surveillance Court ("FISC") in its applications for orders renewing the bulk phone-records program. In December 2008, the executive branch asserted to the FISC that "having access to the call detail records 'is vital to NSA's counterterrorism intelligence mission' because '[t]he only effective means by which NSA analysts are able continuously to keep track of [redacted] and all affiliates of one of the aforementioned entities [who are taking steps to disguise and obscure their communications and identities], is to obtain and maintain an archive of metadata that will permit these tactics to be uncovered.'" Order at 2, *In re Production of Tangible Things*, No. BR 08-13 (FISC Mar. 2, 2009) (alterations in original) (quoting NSA declaration submitted to FISC on December 11, 2008), http://1.usa.gov/14DDhzd; *see also In re Production of Tangible Things*,

---

[2] The executive branch has made similar representations to Congress in other settings. *See, e.g.*, *Report on the National Security Agency's Bulk Collection Programs for USA PATRIOT Act Reauthorization* (attached to Letter from Ronald Weich, Assistant Attorney General, to Dianne Feinstein, Chairman, & Saxby Chambliss, Vice Chairman, SSCI (Feb. 2, 2011), http://1.usa.gov/1i38XSh); Joint Statement for the Record by Michael Leiter, Director, National Counterterrorism Center, & [Redacted], Associate Deputy Director for Counterterrorism, Signals Intelligence Directorate, NSA, Before the HPSCI Closed Hearing on Patriot Act Reauthorization 2 (Oct. 21, 2009), http://1.usa.gov/1i3bP1u. Many of these documents also made representations about the value and importance of the NSA's bulk email-records collection program that later proved to be inaccurate. *See infra* note 7–8.

No. BR 13-109, 2013 WL 5741573, at *7 (FISC Aug. 29, 2013) (discussing government

assertions of necessity).

In the months following the government's official declassification of the bulk phone-

records program, government officials have told the American public much the same thing.

Immediately after the bulk phone-records collection program was disclosed, a White House

spokesman defended it as a "critical tool in protecting the nation from terror threats." Siobhan

Gorman, Evan Perez & Janet Hook, *U.S. Collects Vast Data Trove*, Wall St. J., June 7, 2013,

http://on.wsj.com/16RgOAf; *see Administration White Paper: Bulk Collection of Telephony*

*Metadata Under Section 215 of the USA PATRIOT Act* 12 (Aug. 9, 2013),

http://big.assets.huffingtonpost.com/Section215.pdf ("*215 White Paper*") ("[F]or Section 215 to

be effective in advancing its core objective, the FBI must have the authority" to engage in bulk

collection.). And executive-branch officials continue to publicly make similar claims.[3]

More recently and under public scrutiny, the government has retreated from its most

aggressive claims about the need for the bulk call-records program. *See, e.g.*, Decl. of FBI

Acting Ass't Dir. Robert J. Holley in Opp'n to Pls.' Mot. for Prelim. Inj. ("Holley Decl.") ¶ 23,

*Am. Civil Liberties Union v. Clapper*, No. 13-cv-3994 (S.D.N.Y. Oct. 1, 2013) ("Bulk metadata

analysis sometimes provides information earlier than the FBI's other investigative methods and

---

[3] *See, e.g.*, *Potential Changes to the Foreign Intelligence Surveillance Act: Hearing Before the H. Permanent Select Comm. on Intelligence*, 113th Cong. at 55:40 (Oct. 29, 2013), http://www.c-spanvideo.org/program/AgencyPro ("Oct. 29 HPSCI Hearing") (statement of John C. Inglis, Deputy Director, NSA) ("It needs to be the whole haystack."); *Oversight of the Administration's Use of FISA Authorities: Hearing Before the H. Comm. on the Judiciary*, 113th Cong. at 59:00 (July 17, 2013), http://c-spanvideo.org/program/ISAO ("July 17 HJC Hearing") (statement of James M. Cole, Deputy Attorney General) (similar).

techniques.").[4] That retreat is justified, but the government continues to claim—without

demonstrated evidence—that the bulk phone-records program is uniquely important for U.S.

national security. As *Amici* and others have made clear, the evidence shows that the executive

branch's claims about the effectiveness of the bulk phone-records program have been vastly

overstated and, in some cases, utterly misleading. *See* Sen. Ron Wyden, Keynote Address at

Cato Institute Conference: NSA Surveillance: What We Know; What to Do About It at 31:24–

32:07 (Oct. 9, 2013), http://www.cato.org/multimedia/events/nsa-surveillance-what-we-know-

what-do-about-it-morning-keynote ("Wyden Cato Keynote").

For example, the executive branch has defended the program by claiming that it helped

"thwart" or "disrupt" fifty-four specific terrorist plots. *See* Sisi Wei, Theodoric Meyer & Justin

Elliott, *How the NSA's Claim on Thwarted Terrorist Plots Has Spread*, ProPublica, Oct. 23,

2013, http://projects.propublica.org/graphics/nsa-54-cases; *see generally Media Leaks Facts &*

*Context (Long Version)* (Aug. 1, 2013), http://1.usa.gov/17wwh38 ("*Facts & Context*"). But that

claim conflates the bulk-collection program with other foreign-intelligence authorities.[5] In fact,

---

[4] *See also, e.g.*, Brief for the United States in Opp'n, *In re Elec. Privacy Info. Ctr.*, No. 13-58, 2013 WL 5702390, at *31 (U.S. Oct. 11, 2013) (Without bulk collection of phone records under Section 215, "it *may not be* feasible for the NSA to identify chains of communications that cross different telecommunications networks . . . ." (emphasis added)); Holley Decl. ¶ 9 ("[E]xperience has shown that NSA metadata analysis, *in complement with* other FBI investigatory and analytical capabilities, produces information pertinent to FBI counter-terrorism investigations, *and can contribute* to the prevention of terrorist attacks." (emphases added)).

[5] *See* Press Release, Sen. Ron Wyden & Sen. Mark Udall, Wyden, Udall Issue Statement on Effectiveness of Declassified NSA Programs (June 19, 2013), http://1.usa.gov/1brNWxz ("Wyden–Udall Effectiveness Release"); *accord Strengthening Privacy Rights and National Security: Oversight of FISA Surveillance Programs: Hearing Before the S. Comm. on the Judiciary*, 113th Cong. (July 31, 2013), http://1.usa.gov/1brQ0Wb ("July 31 SJC Hearing") (statement of Sen. Patrick Leahy, Chairman, Senate Judiciary Committee) ("Leahy Statement") ("Some supporters of this program have repeatedly conflated the efficacy of the Section 215 bulk metadata collection program with that of Section 702 of FISA. I do not think this is a

as *Amici* know from their regular oversight of the intelligence community as members of the SSCI, "it appears that the bulk phone records collection program under section 215 of the USA Patriot Act played little or no role in most of these disruptions." Wyden–Udall Effectiveness Release; *see* Wyden Cato Keynote at 31:39 ("The fact is that number has not held up . . . . The number seems to just keep going down, and down, and down.").[6] Indeed, of the original fifty-four that the government pointed to, officials have only been able to describe two that involved materially useful information obtained through the bulk call-records program. *See Continued Oversight of FISA Surveillance Programs: Hearing Before the S. Comm. on the Judiciary*, 113th Cong. at 43:00 (Oct. 2, 2013), http://cs.pn/18jdL2b (statement of Keith B. Alexander, Director, NSA). Even the two supposed success stories involved information that *Amici* believe—after repeated requests to the government for evidence to the contrary—could readily have been obtained without a database of all Americans' call records. *See infra* Part I.C.

In both public statements and in newly declassified submissions to the SSCI, intelligence officials have significantly exaggerated the phone-records program's effectiveness. Based on the experience of *Amici*, the public—and this Court—should view the government's claims regarding the effectiveness of its surveillance programs with searching skepticism and demand evidence rather than assurances before accepting them. *See* Press Release, Sen. Ron Wyden & Sen. Mark Udall, Wyden, Udall Statement on the Disclosure of Bulk Email Records Collection Program (July 2, 2013), http://1.usa.gov/1bs6wWa ("Wyden–Udall Bulk Email Release").[7] With

---

coincidence, and it needs to stop. The patience and trust of the American people is starting to wear thin.").

[6] *Accord* Leahy Statement ("The list simply does not reflect dozens or even several terrorist plots that Section 215 helped thwart or prevent—let alone 54, as some have suggested.").

[7] As the Wyden–Udall Bulk Email Release notes, the phone-records program is not the only example of inflated executive claims to the effectiveness of surveillance programs that grossly

respect to the bulk phone-records collection program specifically, *Amici* have not been shown evidence that it provides the value that intelligence officials have claimed.[8]

B. The government possesses a number of legal authorities with which it may obtain the call records of suspected terrorists and those in contact with suspected terrorists.

*Amici* have consistently argued that the bulk phone-records program needlessly tramples on Americans' privacy rights, particularly in light of the authorities available to the government that can also be used to acquire call records of suspected terrorists and those in contact with suspected terrorists in a targeted manner. *See* Press Release, Sen. Martin Heinrich, Udall, Heinrich Back Effort To End Dragnet Collection of Phone Data & Add Meaningful Oversight of Surveillance Programs (Oct. 29, 2013), http://1.usa.gov/182XcHE; Press Release, Sen. Mark Udall, Surveillance Reform Package Ends Bulk Collection of Phone Records, Creates Constitutional Advocate for Secret Court (Sept. 25, 2013), http://1.usa.gov/1bBGLku ("Udall Reform Release"). Even the valid claims by intelligence officials about certain useful information obtained through the bulk phone-records program fail to explain why the government could not have simply obtained this information directly from phone companies using more calibrated legal instruments. A number of legal authorities would have allowed the government to do so.

---

violate Americans' privacy rights. *See* Sen. Ron Wyden, Remarks as Prepared for Delivery for the Center for American Progress Event on NSA Surveillance (July 23, 2013), http://www.americanprogress.org/wp-content/uploads/2013/07/7232013WydenCAPspeech.pdf ("Wyden CAP Speech") (In defending bulk email-records program, intelligence officials "significantly exaggerated the program's effectiveness to both Congress and the [FISC]").

[8] *See, e.g.*, Press Release, Sen. Ron Wyden, Wyden Statement on President Obama's Proposed Reforms to the FISC and PATRIOT Act (Aug. 9, 2013), http://1.usa.gov/1bBEyWb ("I have seen absolutely zero evidence that the bulk collection of Americans' phone records under Section 215 of the PATRIOT Act has provided any unique value to intelligence gathering or actually made Americans any safer . . . .").

For example, the Stored Communications Act permits the government to obtain precisely the same call records that are now acquired through bulk collection under Section 215 when they are "relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d). Individualized orders for phone records, as opposed to orders authorizing bulk collection, can also be obtained under Section 215. 50 U.S.C. § 1861.[9] National security letters, which do not require a court order, can also be used by the government to obtain call records for intelligence purposes. *See* 18 U.S.C. § 2709. The government can also acquire telephony metadata on a real-time basis by obtaining orders from either regular federal courts or the FISC for the installation of pen registers or trap-and-trace devices. *See* 18 U.S.C. §§ 3122, 3125; 50 U.S.C. § 1842. And the government may also seek call records using standard criminal warrants based on probable cause. *See* 18 U.S.C. § 2703(c)(A); Fed. R. Crim. P. 17(c). The government can use many of these authorities without any more evidence than what is currently required to use the bulk phone-records database, with less impact on the privacy interests of innocent Americans.

The executive branch has sometimes argued that the bulk collection of phone records is unique because it allows the NSA to "quickly identify the network of contacts that a targeted number or address is connected to." 2009 NSA Report 5; *see id.* ("Importantly, there are no intelligence collection tools that, independently or in combination, provide an equivalent capability."). As an initial matter, in exigent circumstances, the government already enjoys the authority to issue emergency authorizations or national security letters to obtain these records

---

[9] *Amici* understand that there is an ongoing legal debate regarding whether 18 U.S.C. § 2702(a)(3), which prohibits the disclosure of call records to the government subject to several limited exceptions, permits the use of Section 215 to obtain call records at all. *Amici* take no position on that legal question for the purposes of this brief, but note that the FISC currently permits such use. *See In re Production of Tangible Things*, No. BR 08-13, 2008 WL 9475145, at *3 (FISC Dec. 12, 2008).

quickly. *See* 50 U.S.C. § 1843; 18 U.S.C. § 2709. More fundamentally, the FISC orders

governing the bulk phone-records program permit the NSA's querying of the bulk phone-records

database only when "there are facts giving rise to a reasonable, articulable suspicion (RAS) that

the selection term to be queried is associated with" a "foreign terrorist organization," Primary

Order at 7, *In re Application of the FBI for an Order Requiring the Production of Tangible*

*Things from [Redacted]*, No. BR 13-80 (FISC Apr. 25, 2013). Intelligence officials have

indicated that the NSA queried the phone-records database with fewer than 300 such "selection

terms" last year. *Section 215 White Paper* 4. The RAS standard and the relatively few "selection

terms" used by the NSA demonstrate that the government could obtain targeted court orders or

issue national security letters on a case-by-case basis in lieu of querying bulk-collected data.

      The government has also suggested that a comprehensive database of Americans' phone

records is necessary to allow for the "three-hop analysis" of a suspected terrorist. *Amici* have yet

to see any evidence of such analysis contributing any value to a terrorism investigation. The

government does not "always exercise" even "a second hop," let alone a third. *See* July 31 SJC

Hearing at 1:34:20 (statement of John C. Inglis). For cases in which intelligence agencies wish to

conduct "two-hop analysis" of the network of a particular suspect, *Amici* believe that the relevant

phone records could be obtained from the phone companies using the legal authorities discussed

above. An individual order for the phone records of a suspected terrorist and anyone in contact

with that suspect could be served on multiple phone companies simultaneously and be expected

to produce the same results as a query of a bulk phone-records database.

      In addition, even though the NSA's five-year retention period for phone records exceeds

the retention period mandated by federal regulation, the NSA has been unable to identify

instances in which the government gained valuable information from phone records that the

companies themselves did not continue to possess. *See* Wyden–Udall Effectiveness Release. The

government has also recognized that "numerous technical architectures" other than bulk

collection by the government are "viable" means to accomplish the same ends as the bulk phone-

records program. Oct. 29 HPSCI Hearing at 55:05 (statement of John C. Inglis). All of these

acknowledgments support *Amici*'s consistent warnings that the bulk phone-records program goes

far beyond what is required to protect national security.[10]

Respect for Americans' privacy is not a matter of convenience—it is an imperative of the

Constitution. Despite years of receiving classified briefings and asking repeated questions of

intelligence officials in both private and public settings, *Amici* have seen no evidence that bulk

collection accomplishes anything that other less intrusive surveillance authorities could not. Bulk

collection therefore is not only a significant threat to the constitutional liberties of Americans,

but a needless one.[11]

C.     *Amici* have seen no evidence that bulk collection was necessary to obtain
       information critical to specific counterterrorism investigations.

Even in the two cases that intelligence officials have been able to identify in which the

bulk phone-records program provided any useful information about an individual involved in

terrorist activity, it has not been demonstrated that bulk collection was necessary to the

outcomes. In both of the cases, *Amici* believe the government could have used its more targeted

---

[10] *See* Press Release, Sen. Martin Heinrich, Heinrich Statement on National Security Agency Phone Records Program (June 6, 2013), http://1.usa.gov/175aD94.

[11] *See* Press Release, Sen. Martin Heinrich & Sen. Tom Udall, Udall, Heinrich Back Effort to End Dragnet Collection of Phone Data & Add Meaningful Oversight of Surveillance Programs (Oct. 29, 2013), http://1.usa.gov/182XcHE; Wyden–Udall Effectiveness Release.

authorities to obtain the phone records it claims were valuable.[12]

For example, the executive branch has publicly claimed that the bulk phone-records program was critical to the government's disruption of a plot to bomb the New York City subway system. *See, e.g.*, July 17 HJC Hearing at 36:50 (statement of Stephanie Douglas, Executive Assistant Director, National Security Division, FBI); *see also, e.g.*, HPSCI, *54 Attacks in 20 Countries Thwarted by NSA Collection* 1 (July 23, 2013), http://1.usa.gov/182Zk1W ("*54 Attacks*"). In particular, intelligence officials have claimed that a query of the bulk phone-records database for numbers linked to known terrorism suspect Najibullah Zazi returned a previously unknown number belonging to another known terrorism suspect, Adis Medunjanin. *See* July 17 HJC Hearing at 36:50 (statement of Stephanie Douglas). However, since the government had already identified Mr. Zazi as a terrorism suspect prior to querying the bulk phone-records database, it had all the evidence that it needed to obtain the phone records of Mr. Zazi and his associates using an individualized section 215 order or other legal authorities. *See supra* Part I.B. The executive branch has provided neither *Amici* nor the public with any evidence that bulk collection produced any information of unique value in preventing the subway plot.

The executive branch has also pointed to the case of Basaaly Moalin, a San Diego man convicted of sending $8,500 to support al-Shabaab in Somalia. The intelligence community has indicated that information from the bulk phone-records database "established a connection between a phone number known to be used by an extremist overseas . . . and an unknown San Diego–based number" that belonged to Mr. Moalin. *54 Attacks* 2. Yet there is no shortage of authorities under which the United States can conduct surveillance on a "phone number known

---

[12] *See* 159 Cong. Rec. S6056 (daily ed. July 30, 2013) (statement of Sen. Wyden) ("What I don't see . . . is any evidence that the U.S. Government needed to operate a giant domestic phone records surveillance program in order to catch these individuals."); *accord* Leahy SJC Statement.

to be used by an extremist overseas" and other phone numbers in contact with that phone number. *See supra* Part I.B. To claim that Mr. Moalin's case is a "but-for" example of the value of the bulk phone-records collection program, July 31 SJC Hearing at 1:37:50 (statement of John C. Inglis), is simply at odds with the available evidence. Worse, it appears to be a misleading exaggeration that has distorted the public record.

Finally, the executive branch and others have also repeated the claim that "[i]f we had had [the bulk phone-records] program in place at the time [of the September 11, 2001 attacks,] we would have been able to identify" the phone number of one of the hijackers, Khalid al-Mihdhar. *Oversight of the Federal Bureau of Investigation: Hearing Before the H. Comm. on the Judiciary* at 26, 113th Cong. (June 13, 2013), http://1.usa.gov/1aRWHm6 (statement of Robert S. Mueller, III, Director, FBI); *see* 2009 Weich Letter 2. Just as in the cases of Mr. Medunjanin and Mr. Moalin, however, it appears that Mr. al-Mihdhar's phone number could also have been obtained by the government using a variety of alternate means. Before September 11, the government was surveilling a safe house in Yemen but failed to realize that Mr. al-Mihdhar, who was in contact with the safe house, was actually inside the United States. *See, e.g.*, Nat'l Comm'n on Terrorist Attacks Upon the U.S., *9/11 Commission Report* 266, 270, 272 (2004). The government could have used any number of authorities to determine whether anyone in the United States was in contact with the safe house that it was already targeting. It did not need a record of every American's phone calls to establish that simple connection.

The three cases discussed above—the three cases most heavily cited by government officials to justify the existence of the bulk phone-records program—make clear that there appears to be nothing uniquely valuable about the program, and that existing alternative legal authorities are sufficient to accomplish the United States' legitimate intelligence objectives

without systematically infringing on the privacy rights of hundreds of millions of Americans.

Of note, intelligence officials have repeatedly asserted that additional examples, which remain secret, show that the bulk phone-records collection program has "contributed to" or "provided value in" the investigation of a total of twelve different "homeland-related terrorist events." *Facts & Context* 3. *Amici* have reviewed all twelve of these examples, and have yet to see any evidence that the bulk phone-records program provided any information that was materially useful to any terrorism cases other than those involving Mr. Moalin and Mr. Medjunanin. In the opinion of *Amici*, the claim that the bulk phone-records collection program has "contributed to" twelve different counterterrorism investigations would not withstand public scrutiny, unless it were accompanied by new evidence that has not been provided to *Amici*.

## II. THE GOVERNMENT'S LEGAL INTERPRETATION OF SECTION 215 COULD BE EXTENDED TO AUTHORIZE BULK COLLECTIONS OF AMERICANS' DATA BEYOND THE CALL RECORDS AT ISSUE IN THIS CASE.

*Amici* also are concerned that the government's theory interpreting Section 215 to permit the bulk collection of Americans' records is not limited to phone records. For example, *Amici* have warned that the government's authority to collect information on law-abiding Americans is essentially limitless:

> the Patriot Act's surveillance authorities are not limited to phone records. . . . and could be used to collect other types of records in bulk as well, including information on credit card purchases, medical records, library records, firearm sales records, financial information and a range of other sensitive subjects.

Wyden–Udall Bulk Email Release; *see* Wyden CAP Speech.[13]

*Amici* have not issued these warnings lightly. As disclosed several months ago, two of

---

[13] *Accord* Press Release, Sen. Martin Heinrich, Heinrich Says FISA Improvements Act Doesn't Go Far Enough To Protect American Privacy Rights (Oct. 31, 2013), http://1.usa.gov/175by9z; Letter from Sen. Ron Wyden & Sen. Mark Udall to Eric Holder, Attorney General, at 2 (Mar. 15, 2012).

*Amici* were involved in bringing an NSA bulk-collection program focused on internet metadata to an end. *See* Wyden–Udall Bulk Email Release ("[W]e spent a significant portion of 2011 pressing intelligence officials to provide evidence of [the program's] effectiveness. They were unable to do so, and the program was shut down that year."). Recent disclosures have produced even more reasons to heed *Amici*'s words of caution. For example, one document released through a Freedom of Information Act lawsuit publicly revealed that the executive branch has interpreted its authority under Section 215 to allow the collection of information about Americans' locations. *See* Letter from [Redacted], Attorney, Office of General Counsel, NSA, to SSCI at 1 (Apr. 1, 2011), http://1.usa.gov/1gWqiy0. And FISC opinions continue to refer to still-undisclosed "secret law" interpreting crucial statutory terms in FISA related to bulk collection as well as addressing the compatibility of bulk collection with the Fourth Amendment. *See In re Production of Tangible Things*, 2013 WL 5741573, at *6 (FISC "has previously examined the issue of relevance for bulk collections. *See [Redacted]*.").

    *Amici* have long warned that Americans would be "stunned," "angry," and "alarmed" if they were to see the government's secret interpretation of Section 215. 157 Cong. Rec. S3386, 3389 (daily ed. May 26, 2011) (statements of Sen. Wyden & Sen. Udall). The disclosures to date about the NSA's activities have been significant, and they will surely be transformative.[14] But the government's claimed authorities are vast, and the Court should treat with skepticism the argument that the unique characteristics of call records cabin the government's use of the statute.

## CONCLUSION

    Accordingly, the Court should grant Plaintiffs' motion for partial summary judgment.

---

[14] *See* Uniting and Strengthening America by Fulfilling Rights and Ending Eavesdropping, Dragnet-collection, and On-line Monitoring Act, S. 1599 / H.R. 3361, 113th Cong. (2013); Intelligence Oversight and Surveillance Reform Act, S. 1551, 113th Cong. (2013).

Dated: November 18, 2013                    Respectfully Submitted,


                                            By: /s/ Julia Harumi Mass

                                            Julia Harumi Mass (CA SBN 189649)
                                            Nicole A. Ozer (CA SBN 228643)
                                            Matthew T. Cagle (CA SBN 286101)
                                            AMERICAN CIVIL LIBERTIES UNION
                                                FOUNDATION OF NORTHERN
                                                CALIFORNIA
                                            39 Drumm Street
                                            San Francisco, California 94111
                                            Telephone: (415) 621-2493
                                            Facsimile: (415) 255-8437

                                            Alex Abdo
                                            Brett Max Kaufman
                                            Patrick Toomey
                                            Jameel Jaffer
                                            AMERICAN CIVIL LIBERTIES UNION
                                                FOUNDATION
                                            125 Broad Street, 18th Floor
                                            New York, New York 10004
                                            Telephone: (212) 549-2500
                                            Facsimile: (212) 549-2654


                                            *Attorneys for Amici Curiae*
                                                *Senator Ron Wyden,*
                                                *Senator Mark Udall, &*
                                                *Senator Martin Heinrich*