# EXHIBIT M

~~TOP SECRET//COMINT//NOFORN~~

## ~~(TS//SI//NF)~~ Report on the National Security Agency's Bulk Collection Programs for USA PATRIOT Act Reauthorization

(U) THE INFORMATION CONTAINED IN THIS REPORT DESCRIBES SOME OF THE MOST SENSITIVE FOREIGN INTELLIGENCE COLLECTION PROGRAMS CONDUCTED BY THE UNITED STATES GOVERNMENT. THIS INFORMATION IS HIGHLY CLASSIFIED AND ONLY A LIMITED NUMBER OF EXECUTIVE BRANCH OFFICIALS HAVE ACCESS TO IT. PUBLICLY DISCLOSING ANY OF THIS INFORMATION WOULD BE EXPECTED TO CAUSE EXCEPTIONALLY GRAVE DAMAGE TO OUR NATION'S INTELLIGENCE CAPABILITIES AND TO NATIONAL SECURITY. THEREFORE IT IS IMPERATIVE THAT ALL WHO HAVE ACCESS TO THIS DOCUMENT ABIDE BY THEIR OBLIGATION NOT TO DISCLOSE THIS INFORMATION TO ANY PERSON UNAUTHORIZED TO RECEIVE IT.

### Key Points

- (U) Section 215 of the USA PATRIOT Act, which expires at the end of February 2011, allows the government, upon approval of the Foreign Intelligence Surveillance Court ("FISA Court"), to obtain access to certain business records for national security investigations;
- (U) Section 402 of the Foreign Intelligence Surveillance Act ("FISA"), which is not subject to a sunset, allows the government, upon approval of the FISA Court, to install and use a pen register or trap and trace ("pen/trap") device for national security investigations;
- ~~(TS//SI//NF)~~ These authorities support two sensitive and important intelligence collection programs. These programs are authorized to collect in bulk certain dialing, routing, addressing and signaling information about telephone calls and electronic communications, such as the telephone numbers or e-mail addresses that were communicating and the times and dates <u>but not the content of</u> the calls or e-mail messages themselves;
- ~~(TS//SI//NF)~~ Although the programs collect a large amount of information, the vast majority of that information is never reviewed by any person, because the information is not responsive to the limited queries that are authorized for intelligence purposes;
- ~~(TS//SI//NF)~~ The programs are subject to an extensive regime of internal checks, particularly for U.S. persons, and are monitored by the FISA Court and Congress;
- ~~(TS//SI//NF)~~ Although there have been compliance problems in recent years, the Executive Branch has worked to resolve them, subject to oversight by the FISA Court; and
- ~~(TS//SI//NF)~~ The National Security Agency's (NSA) bulk collection programs provide important tools in the fight against terrorism, especially in identifying terrorist plots against the homeland. These tools are also unique in that they can produce intelligence not otherwise available to NSA.

Derived From: NSA/CSSM 1-52
Dated: 20070108
Declassify On: 20360101

~~TOP SECRET//COMINT//NOFORN~~

~~TOP SECRET//COMINT//NOFORN~~

### Background

~~(TS//SI//NF)~~ Since the tragedy of 9/11, the Intelligence Community has developed an array of capabilities to detect, identify and disrupt terrorist plots against the United States and its interests. Detecting threats by exploiting terrorist communications has been, and continues to be, one of the critical tools in that effort. Above all else, it is imperative that we have a capability to rapidly identify any terrorist threats emanating from within the United States.

~~(TS//SI//NF)~~ Prior to the attacks of 9/11, the NSA intercepted and transcribed seven calls from hijacker Khalid al-Mihdhar to a facility associated with an al Qa'ida safehouse in Yemen. However, NSA's access point overseas did not provide the technical data indicating the location from where al-Mihdhar was calling. Lacking the originating phone number, NSA analysts concluded that al-Mihdhar was overseas. In fact, al-Mihdhar was calling from San Diego, California. According to the 9/11 Commission Report (pages 269-272):

> *"Investigations or interrogation of them [Khalid al-Mihdhar, etc], and investigation of their travel and financial activities could have yielded evidence of connections to other participants in the 9/11 plot. The simple fact of their detention could have derailed the plan. In any case, the opportunity did not arise."*

~~(TS//SI//NF)~~ Today, under FISA Court authorization pursuant to the "business records" authority of the FISA (commonly referred to as "Section 215"), the government has developed a program to close the gap that allowed al-Mihdhar to plot undetected within the United States while communicating with a known terrorist overseas. This and similar programs operated pursuant to FISA, including exercise of pen/trap authorities, provide valuable intelligence information.

(U) Absent legislation, Section 215 will expire on February 28, 2011, along with the so-called "lone wolf" provision and roving wiretaps (which this document does not address). The pen/trap authority does not expire.

~~(TS//SI//NF)~~ The Section 215 and pen/trap authorities are used by the U.S. Government in selected cases to acquire significant foreign intelligence information that cannot otherwise be acquired either at all or on a timely basis. Any U.S. person information that is acquired is subject to strict, court-imposed restrictions on the retention, use, and dissemination of such information and is also subject to strict and frequent audit and reporting requirements.

~~(TS//SI//NF)~~ The largest and most significant use of these authorities is to support two important and highly sensitive intelligence collection programs under which NSA collects and analyzes large amounts of transactional data obtained from certain telecommunications service providers in the United States. ████████████████████████████████
████████████████████████████████ Although these programs have been briefed to the Intelligence and Judiciary Committees, it is important that other Members of Congress have access to information about these two programs when considering reauthorization of the expiring

~~TOP SECRET//COMINT//NOFORN~~

~~TOP SECRET//COMINT//NOFORN~~

PATRIOT Act provisions. The Executive Branch views it as essential that an appropriate statutory basis remains in place for NSA to conduct these two programs.

### Section 215 and Pen-Trap Collection

~~(TS//SI//NF)~~ Under the program based on Section 215, NSA is authorized to collect from certain telecommunications service providers certain business records that contain information about communications between two telephone numbers, such as the date, time, and duration of a call. There is no collection of the <u>content</u> of any telephone call under this program, and under longstanding Supreme Court precedent the information collected is not protected by the Fourth Amendment. In this program, court orders (generally lasting 90 days) are served on ▆▆▆ telecommunications companies ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆ The orders generally require production of the business records (as described above) relating to substantially all of the telephone calls handled by the companies, including both calls made between the United States and a foreign country and calls made entirely within the United States.

~~(TS//SI//NF)~~ Under the program based on the pen/trap provision in FISA, the government is authorized to collect similar kinds of information about electronic communications – such as "to" and "from" lines in e-mail, certain routing information, and the date and time an e-mail is sent – <u>excluding</u> the content of the e-mail and the "subject" line. Again, this information is collected pursuant to court orders (generally lasting 90 days) and, under relevant court decisions, is not protected by the Fourth Amendment.

~~(TS//SI//NF)~~ Both of these programs operate on a very large scale. ▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
However, as described below, only a tiny fraction of such records are ever viewed by NSA intelligence analysts.

### Checks and Balances

#### FISA Court Oversight

~~(TS//SI//NF)~~ To conduct these bulk collection programs, the government has obtained orders from several different FISA Court judges based on legal standards set forth in Section 215 and the FISA pen/trap provision. Before obtaining any information from a telecommunications service provider, the government must establish, and the FISA Court must conclude, that the information is relevant to an authorized investigation. In addition, the government must comply with detailed "minimization procedures" required by the FISA Court that govern the retention and dissemination of the information obtained. Before NSA analysts may query bulk records, they must have reasonable articulable suspicion – referred to as "RAS" – that the number or e-mail address they submit is associated with ▆▆▆▆▆▆▆▆▆▆▆▆▆▆

~~TOP SECRET//COMINT//NOFORN~~

TOP SECRET//COMINT//NOFORN

████████████████████████████████████████████ The RAS requirement is designed to protect against the indiscriminate querying of the collected data so that only information pertaining to one of the foreign powers listed in the relevant Court order ████████████████████████████████████████ ███████████ is provided to NSA personnel for further intelligence analysis. The bulk data collected under each program can be retained for 5 years.

### Congressional Oversight

(U) These programs have been briefed to the Intelligence and Judiciary Committees, through hearings, briefings, and visits to NSA. In addition, the Intelligence and Judiciary Committees have been fully briefed on the compliance issues discussed below.

### Compliance Issues

(TS//SI//NF) In 2009, a number of technical compliance problems and human implementation errors in these two bulk collection programs were discovered as a result of Department of Justice (DOJ) reviews and internal NSA oversight. However, neither DOJ, NSA, nor the FISA Court has found any intentional or bad-faith violations. ████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ In accordance with the Court's rules, upon discovery, these inconsistencies were reported as compliance incidents to the FISA Court, which ordered appropriate remedial action. The FISA Court placed several restrictions on aspects of the business records collection program until the compliance processes were improved to its satisfaction. ████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████

(U) The incidents, and the Court's responses, were also reported to the Intelligence and Judiciary Committees in great detail. The Committees, the Court and the Executive Branch have responded actively to the incidents. The Court has imposed safeguards that, together with greater efforts by the Executive Branch, have resulted in significant and effective changes in the compliance program.

(U) All parties will continue to report to the FISA Court and to Congress on compliance issues as they arise, and to address them effectively.

### Intelligence Value of the Collection

(TS//SI//NF) As noted, these two collection programs significantly strengthen the Intelligence Community's early warning system for the detection of terrorists and discovery of plots against the homeland. They allow the Intelligence Community to detect phone numbers and e-mail addresses within the United States that may be contacting targeted phone numbers and e-mail addresses associated with suspected foreign terrorists abroad and vice-versa; and entirely domestic connections between entities within the United States tied to a suspected foreign terrorist abroad. NSA needs access to telephony and e-mail transactional information in bulk so that it can quickly identify and assess the network of contacts that a targeted number or address is connected to, whenever there is RAS that the targeted number or address is associated with ████████████████████████████████████████████████████████████ ████████████████ Importantly, there are no intelligence collection tools that, independently or in combination, provide an equivalent capability.

(TS//SI//NF) To maximize the operational utility of the data, the data cannot be collected prospectively once a lead is developed because important connections could be lost in data that was sent prior to the identification of the RAS phone number or e-mail address. NSA identifies the network of contacts by applying sophisticated analysis to the massive volume of metadata – but always based on links to a number or e-mail address which itself is associated with a counterterrorism target. (Again, communications metadata is the dialing, routing, addressing or signaling information associated with an electronic communication, but **not** content ) The more metadata NSA has access to, the more likely it is that NSA can identify, discover and understand the network of contacts linked to targeted numbers or addresses  Information discovered through NSA's analysis of the metadata is then provided to the appropriate federal national security agencies, including the FBI, which are responsible for further investigation or analysis of any potential terrorist threat to the United States.

************************

(TS//SI//NF) In conclusion, the Section 215 and pen/trap bulk collection programs provide an important capability to the Intelligence Community. The attacks of 9/11 taught us that applying lead information from foreign intelligence in a comprehensive and systemic fashion is required to protect the homeland, and the programs discussed in this paper cover a critical seam in our defense against terrorism. Recognizing that the programs have implications for the privacy interests of U.S. person data, extensive policies, safeguards, and reviews have been enacted by the FISA Court, DOJ, ODNI and NSA.