# EXHIBIT Q

~~TOP SECRET//HCS//COMINT//NOFORN~~

FILED



**U.S. FOREIGN INTELLIGENCE SURVEILLANCE COURT**

UNITED STATES

FOREIGN INTELLIGENCE SURVEILLANCE COURT

WASHINGTON, D.C.

```
                                    :
                                    :
                                    :
                                    :   Docket Number:  PR/TT ▮▮▮
                                    :
                                    :
                                    :
                                    :
                                    :
```

### OPINION AND ORDER

This matter comes before the Court on an application of the Government for authority for the National Security Agency (NSA) to collect information regarding e-mail and certain other forms of Internet communications under the pen register and trap and trace provisions of the Foreign Intelligence Surveillance Act of 1978 (FISA or the Act), Title 50, United States Code (U.S.C.), §§ 1801-1811, 1841-1846. This application seeks authority for a

~~TOP SECRET//HCS//COMINT//NOFORN~~

Derived from:      Pleadings in the above-captioned docket
Declassify on:     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

much broader type of collection than other pen register/trap and trace applications and therefore presents issues of first impression.[1] For that reason, it is appropriate to explain why the Court concludes that the application should be granted as modified herein.

Accordingly, this Opinion and Order sets out the bases for the Court's findings that: (1) the collection activities proposed in the application involve the installation and use of "pen registers" and/or "trap and trace devices" as those terms are used in FISA, 50 U.S.C. §§ 1841-1846; (2) the application, which specifies restrictions on the retention, accessing, use, and dissemination of information obtained from these collection activities, "satisfies the requirements" of 50 U.S.C. § 1842 for the issuance of an order "approving the installation and use of a pen register or trap and trace device," id. § 1842(d)(1), subject to modifications stated herein;[2] and (3) the installation and use of these pen registers and/or trap and trace devices pursuant to

---

[1]  The application was filed in two steps: an application filed on ▇▇▇▇▇▇ followed by an addendum filed on ▇▇▇ ▇▇▇ For ease of reference, the following discussion refers to both submissions collectively as the application.

[2]  The Court has authority in this case to "enter an ex parte order as requested, or as modified." 50 U.S.C. § 1842(d)(1).

TOP SECRET//HCS//COMINT//NOFORN

this Opinion and Order will comply with the First and Fourth Amendments.

In making these findings, the Court relies on factual representations made in the application, which was submitted by the Attorney General as applicant and verified by the Director of the NSA (DIRNSA); in the separate declaration of the DIRNSA (Attachment A to the application); and in the declaration of the ████████████████████████████ (Attachment B to the application). The Court has given careful consideration to the arguments presented in the Government's memorandum of law and fact (Attachment C to the application).

By letter dated ████████████ the Court directed the Government to respond to two questions necessary to its ruling on this application. The Court relies on the Government's responses to these questions, which were provided in a letter submitted on ████████████

The Court also relies on information and arguments presented in a briefing to the Court on ████████████ which addressed the current and near-term threats posed by ████████████

---

[3] One of these questions concerned First Amendment issues presented by the application. The other concerned the length of time that the Government expected the collected information to retain operational significance. These questions and the Government's responses are discussed more fully below.

TOP SECRET//HCS//COMINT//NOFORN

3

TOP SECRET//HCS//COMINT//NOFORN

█████████ investigations conducted by the Federal Bureau of Investigation (FBI) to counter those threats, the proposed collection activities of the NSA (now described in the instant application), the expected analytical value of information so collected in efforts to identify and track operatives ████████ ████████████ and the legal bases for conducting these collection activities under FISA's pen register/trap and trace provisions.[4]

The principal statutory issues in this matter are whether the proposed collection constitutes the installation and use of "pen registers" and/or "trap and trace devices" and, if so, whether the certification pursuant to 50 U.S.C. § 1842(c)(2) is adequate. These issues are addressed below.

I.   THE PROPOSED COLLECTION IS A FORM OF PEN REGISTER AND TRAP AND TRACE SURVEILLANCE.

For purposes of 50 U.S.C. §§ 1841-1846, FISA adopts the definitions of "pen register" and "trap and trace device" set out

_____

[4] This briefing was attended by (among others) the Attorney General; ████████ the DIRNSA; the Director of the FBI; the Counsel to the President; the Assistant Attorney General for the Office of Legal Counsel; the Director of the Terrorist Threat Integration Center (TTIC); and the Counsel for Intelligence Policy.

TOP SECRET//HCS//COMINT//NOFORN

4

in 18 U.S.C. § 3127. See 50 U.S.C. § 1841(2). Section 3127

gives the following definitions:

> (3) the term "pen register" means a device or process
> which records or decodes dialing, routing, addressing,
> or signaling information transmitted by an instrument
> or facility from which a wire or electronic
> communication is transmitted, provided, however, that
> such information shall not include the contents of any
> communication, but such term does not include any
> device or process used by a provider or customer of a
> wire or electronic communication service for billing,
> or recording as an incident to billing, for
> communications services by such provider or any device
> or process used by a provider or customer of a wire
> communication service for cost accounting or other like
> purposes in the ordinary course of business;

> (4) the term "trap and trace device" means a device or
> process which captures the incoming electronic or other
> impulses which identify the originating number or other
> dialing, routing, addressing, and signaling information
> reasonably likely to identify the source of a wire or
> electronic communication, provided, however, that such
> information shall not include the contents of any
> communication.

These definitions employ three other terms — "electronic

communication," "wire communication," and "contents" - that are

themselves governed by statutory definitions "set forth for such

terms in section 2510" of title 18.  18 U.S.C. § 3127(1).

Section 2510 defines these terms as follows:

(1) "Electronic communication" is defined at 18 U.S.C.

§ 2510(12) as "any transfer of signs, signals, writing, images,

sounds, data, or intelligence of any nature transmitted in whole

or in part by a wire, radio, electromagnetic, photoelectronic or

photooptical system that affects interstate or foreign commerce,

but does not include - (A) any wire or oral communication."[5]

(2) "Wire communication" is defined at 18 U.S.C. § 2510(1)

as

> any aural transfer made in whole or in part through the
> use of facilities for the transmission of
> communications by the aid of wire, cable, or other like
> connection between the point of origin and the point of
> reception . . . furnished or operated by any person
> engaged in providing or operating such facilities for
> the transmission of interstate or foreign
> communications or communications affecting interstate
> or foreign commerce.

(3) "Contents" is defined at 18 U.S.C. § 2510(8) to

"include[] any information concerning the substance, purport, or

meaning" of a "wire, oral, or electronic communication."[6]

While the definitions of "pen register" and "trap and trace

device" each contain several elements, the application of these

---

[5]  The other exclusions to this definition at § 2510(12)(B)-
(D) are not relevant to this case.

[6]  Different definitions of "wire communication" and
"contents" are provided at 50 U.S.C. § 1801(l), (n).  However,
the definitions set forth in § 1801 apply to terms "[a]s used in
this subchapter," i.e., in 50 U.S.C. §§ 1801-1811 (FISA
subchapter on electronic surveillance), and thus have no bearing
on the meaning of "wire communication" and "contents" as used in
the definitions of "pen register" and "trap and trace device"
applicable to §§ 1841-1846 (separate FISA subchapter on pen
registers and trap and trace devices).

TOP SECRET//HCS//COMINT//NOFORN

definitions to the devices described in the application presents two primary questions: (1) Does the information to be obtained constitute "dialing, routing, addressing, or signaling information" that does not include the "contents" of any communication? (2) Does the means by which such information would be obtained come within the definition of "pen register" or "trap and trace device?" In addressing these questions, the Court is mindful that "when the statute's language is plain, the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms." Lamie v. United States Trustee, 124 S. Ct. 1023, 1030 (2004) (internal quotations and citations omitted).

A.   The Information to Be Obtained Is "Dialing, Routing, Addressing, or Signaling Information" and Not "Contents."

The Government uses the umbrella term "meta data" to designate the categories of information it proposes to collect. This meta data comprises ▮▮ categories:



TOP SECRET//HCS//COMINT//NOFORN



TOP SECRET//HCS//COMINT//NOFORN



TOP SECRET//HCS//COMINT//NOFORN

~~TOP SECRET//HCS//COMINT//NOFORN~~



Also, the address from which an e-mail was sent and ████████████████████ ████████████████ are not part of the e-mail's "contents."

───────────────────

[8] This is the first application presented to this Court for authority to ████████████████ under pen register/trap and trace authority. The Court understands that FBI devices implementing prior pen register/trap and trace surveillance authorized by this Court have not obtained ████████████ See Memorandum of Law and Fact at 23-24 n.14. The fact that prior applications did not seek authority for this specific form of collection sheds no light on the merits of the instant application.

~~TOP SECRET//HCS//COMINT//NOFORN~~

TOP SECRET//HCS//COMINT//NOFORN

████████████████████████████████

█████████ but this isolated fact does not provide "information concerning the substance, purport, or meaning" of the e-mail.  18 U.S.C. § 2510(8).[9]

The DIRNSA Declaration mentions other types of information that are not described in the application as forms of meta data to be collected.[10]  The Court understands such references to pertain to information or inferences that could be gleaned from accumulating meta data in Categories ███ ████████ ███ above and/or analyzing meta data, perhaps in conjunction with information from other sources.  This Opinion and Order authorizes only the collection of information in Categories ███ ██████ ███ ██████

---

[9] The finding that the ███████████ meta data do not constitute "content" is also supported by the assurance that meta data "does not include information from either the `subject' or `re' line of the E-mail ████████████████████████████████████████████████ DIRNSA Declaration at 3 n.1.

[10] These references in the DIRNSA Declaration include ██████ ███████████████████████████ at 12, and information said to pertain to elements of █████████ ████████████████████████████████████████████ ████████████████████████████████████████████

TOP SECRET//HCS//COMINT//NOFORN

11

TOP SECRET//HCS//COMINT//NOFORN

B.   The Methods By Which NSA Proposes to Obtain This
     Information Involve the Use of "Pen Registers" and
     "Trap and Trace Devices."

     NSA proposes to obtain meta data in the above-described

Categories ▮▮ ▮▮▮▮▮ ▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ ▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮ ▮▮▮ ▮▮▮▮▮▮ ▮▮ ▮

▮▮▮▮▮▮▮ ▮ ▮ ▮ ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

TOP SECRET//HCS//COMINT//NOFORN

TOP SECRET//HCS//COMINT//NOFORN

██████████████████████████████████████████████

Because the application of the definitions of "pen register" and "trap and trace device" to this means of collection involves a similar analysis for meta data in Categories ██ ████████ ██ ████████████████████████████████████████████, these groups of information are discussed separately below.

1.   The Methods of Collecting Categories ██████████ ██ Fall Within the Plain Meaning of the Statutory Definitions.

The above-described means of collecting information in Categories ██ ████████ ██ satisfies each of the elements of the applicable statutory definition of a "pen register." It consists of "a device or process which records or decodes" non-content routing or addressing information "transmitted by an instrument or facility from which a wire or electronic communication is transmitted." 18 U.S.C. § 3127(3). ████████████████

████████████████████████████████████████████

---

[11]  "Transmit" means "1. To convey or dispatch from one person, thing, or place to another. . . . 4. *Electron.* To send (a signal), as by wire or radio." Webster's II New College Dictionary 1171 (2001).

TOP SECRET//HCS//COMINT//NOFORN

███████████████████████████████████████████

Finally, the proposed collection does not involve "any device or process used . . . for billing, or recording as an incident to billing, for communications services . . . or . . . for cost accounting or other like purposes," which is excluded from the definition of "pen register" under section 3127(3).

Accordingly, based on "the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose," Engine Mfrs. Ass'n v. South Coast Air Quality Mgmt. Dist., 124 S. Ct. 1756, 1761 (2004) (internal quotations and citation omitted), the Court concludes that the means by which the NSA proposes to collect

---

[12] For ease of reference, this Opinion and Order generally speaks of "electronic communications." The communication involved will usually be an "electronic communication" under the above-quoted definition at 18 U.S.C. § 2510(12). In the event that the communication consists of an "aural transfer," i.e., "a transfer containing the human voice at any point between and including the point of origin and the point of reception," id. § 2510(18), then it could fall instead under the above-quoted definition of "wire communication" at § 2510(1). In either case, the communication would be "a wire or electronic communication," as required to fall within the definitions at §§ 3127(3) and 3127(4).

meta data in Categories ██ ████████ ██ above falls under the definition of "pen register" at section 3127(3).

The application also seeks authority to collect at least some of the same meta data by the same means under the rubric of a "trap and trace device" as defined at section 3127(4). Although it appears to the Court that all of the collection authorized herein comes within the definition of "pen register," the Court additionally finds that such collection, as it pertains to meta data in Categories ██ ██████ ██ ██████ ████████ ████████████████████████████████ (for example, information from the "from" line of an e-mail), also satisfies the definition of "trap and trace device" under section 3127(4).

Under section 3127(4), a "trap and trace device" is "a device or process which captures the incoming electronic or other impulses which identify the originating number or other [non-content] dialing, routing, addressing, and signaling information reasonably likely to identify the source of a wire or electronic communication." As discussed above, the proposed collection would use a device or process to obtain non-content meta data ██

Thus, based on the plain meaning of

---

[13]  "Capture" is defined as, <u>inter alia</u>, " . . . 3. To succeed in preserving in a permanent form." <u>Webster's II New College Dictionary</u> 166 (2001).

Such a result could be argued to violate the "cardinal principle of statutory construction that we must give effect, if possible, to every clause and word of a statute." <u>Williams v. Taylor</u>, 529 U.S. 362, 404 (2000) (internal quotations and citation omitted).

TOP SECRET//HCS//COMINT//NOFORN

the applicable definitions, the proposed collection involves a

form of both pen register and trap and trace surveillance.



TOP SECRET//HCS//COMINT//NOFORN

The Court

accordingly finds that the plain meaning of sections 3127(3) and 3127(4) encompasses the proposed collection of meta data.

Alternatively, the Court finds that any ambiguity on this point should be resolved in favor of including this proposed collection within these definitions, since such an interpretation would promote the purpose of Congress in enacting and amending FISA regarding the acquisition of non-content addressing information. Congress amended FISA in 1998, and again in 2001,

to relax the requirements for Court-authorized surveillance to obtain non-content addressing information through pen register and trap-and-trace devices, recognizing that such information is not protected by the Fourth Amendment. See page 29 below. As part of the USA PATRIOT Act in 2001, Congress also amended FISA to provide for Court orders for the production of "any tangible things," such as business records, under the same relevance standard as was adopted for pen register/trap and trace authorizations. See Pub. L. No. 107-56, Title II, § 215, 115 Stat. 290, codified at 50 U.S.C. § 1861.

like other forms of meta data, is not protected by the Fourth Amendment because users of e-mail do not have a reasonable expectation of privacy in such information. See pages 59-62 below. It is a form of non-content addressing information, which Congress has determined should receive a limited form of statutory protection under a relevance standard if obtained through pen register/trap and trace devices pursuant to 50 U.S.C. § 1842, and/or through compelled production of business records (e.g., toll records for long-distance phone calls) under 50 U.S.C. § 1861.

A narrow reading of the definitions of "pen register" and "trap-and-trace device" to exclude                    would

remove this particular type of non-content addressing information from the statutory framework that Congress specifically created for it. Based on such a narrow interpretation, this information could not be collected through pen register/trap and trace surveillance, even where it unquestionably satisfies the relevance standard. Nor could this information be obtained under the business records provision, because it is not generally retained by communications service providers. See page 41 below.

There is no indication that Congress believed that the availability of non-content addressing information under the relevance standard should hinge on the technical means of collection. If anything, the legislative history, see 147 Cong. Rec. S11000 (daily ed. Oct. 25, 2001) (statement of Sen. Patrick Leahy) (supporting clarification of "the statute's proper application to tracing communications in an electronic environment . . . in a manner that is technology neutral"), and the adoption of an identical relevance standard for the production of business records and other tangible things under section 1861, suggest otherwise.

Accordingly, the Court alternatively finds that, if the application of sections 3127(3) and 3127(4) to the 

were thought to be ambiguous, such

ambiguity should be resolved in favor of an interpretation of the definitions of "pen register" and "trap and trace device" that encompasses the proposed collection.

> 3. The Proposed Collection is Consistent With Other Provisions of FISA

Nothing that is fairly implied by other provisions of FISA governing pen register and trap and trace surveillance would prevent authorization of the proposed collection as a form of pen register/trap and trace surveillance. One provision requires that an order authorizing a pen register or trap and trace surveillance specify "the identity, if known, of the person to whom is leased or in whose name is listed the telephone line or other facility to which the pen register or trap and trace device is to be attached or applied." 50 U.S.C. § 1842(d)(2)(A)(ii). Plainly, there is no requirement to state the identity of such a person if it is not "known." However, this provision might still be read to imply that Congress expected that such facilities would be leased or listed to some particular person, even if the identity of that person were unknown in some cases. However, even if Congress had such a general expectation, the language of the statute does not require that there be such a person for every facility to which a pen register or trap and trace device is to be attached or applied. Drawing the contrary conclusion

TOP SECRET//HCS//COMINT//NOFORN

from the wording of § 1842(d)(2)(A)(ii) would make the
applicability of the statute depend on the commercial or
administrative practices of particular communications service
providers – a result that here would serve no apparent purpose of
Congress.  Cf. Smith v. Maryland, 442 U.S. 735, 745 (1979)
(finding that the "fortuity of whether or not the phone company
elects to make [for its own commercial purposes] a quasi-
permanent record of a particular number dialed" is irrelevant to
whether the Fourth Amendment applies to use of a pen register).[16]

In this case ███████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

---

[16] Similarly, for purposes of the subchapter on pen
register/trap and trace surveillance, FISA defines an "aggrieved
person," in relevant part, as any person "whose communication
instrument or device was subject to the use of a pen register or
trap and trace device . . . to capture incoming electronic or
other communications impulses."  50 U.S.C. § 1841(3)(B).  The
term "whose" suggests a relationship between some person and "a
communication instrument or device" that was "subject to the use
of a pen register or trap and trace device." ████████████████
████████████████████████████████████████████████████
███████████████████████████████████  Indeed, the use of
different language implies that these phrases can refer to
different objects, so that the definition of "aggrieved person"
sheds no light on whether a "facility" under § 1842(d)(2)(A)(ii)-
(iii) is necessarily associated with an individual user.

TOP SECRET//HCS//COMINT//NOFORN

The Court is satisfied that this Opinion and Order complies with the specification requirements of § 1842(d)(2)(A).

The Court recognizes that, by concluding that these definitions do not restrict the use of pen registers and trap and trace devices to communication facilities associated with individual users, it is finding that these definitions encompass an exceptionally broad form of collection. Perhaps the opposite result would have been appropriate under prior statutory language.[17] However, our "starting point" must be "the existing

_____

[17] Prior to amendments in 2001 by the USA PATRIOT Act, Public Law 107-56, Title II, § 216(c), 18 U.S.C. § 3127(3) defined "pen register" as "a device which records or decodes electronic or other impulses which identify the numbers dialed or otherwise transmitted on the telephone line to which such device is attached," and § 3127(4) defined "trap and trace device" as a "device which captures the incoming electronic or other impulses which identify the originating number of an instrument or device from which a wire or electronic communication was transmitted." 18 U.S.C.A. § 3127(3), (4) (2000). Despite this textual focus on telephone communications, especially in § 3127(3), many (though not all) courts expansively construed both definitions to apply as well to e-mail communications. Memorandum of Law and _____ at . -2? & ..16; Orin S. Kerr, Internet Surveillance Law

(continued...)

TOP SECRET//HCS//COMINT//NOFORN

statutory text," not "predecessor statutes," <u>Lamie</u>, 124 S. Ct. at
1030, and analysis of that text shows that collecting information
in Categories ▓ ▓ ▓ above by the means described in the
application involves use of "pen registers" and "trap and trace
devices."[18]

Of course, merely finding that the proposed collection falls
within these definitions does not mean that the requirements for
an order authorizing such collection have been met.  We turn now
to those requirements.

_____

[17](...continued)
<u>After the USA PATRIOT Act: The Big Brother That Isn't</u>, 97 Nw. U.
L. Rev. 607, 633-36 (2003).  Extending these prior definitions to
bulk collection regarding e-mail communications would have
required further departure from the pre-USA PATRIOT Act statutory
language.

[18]  The legislative history of the USA PATRIOT Act indicates
that Congress sought to make the definitions of "pen register"
and "trap and trace device" "technology neutral" by confirming
that they apply to Internet communications.  <u>See</u> footnote 45
below.  It does not suggest that Congress specifically gave
thought to whether the new definitions would encompass collection
in bulk from communications facilities that are not associated
with individual users.  The silence of the legislative history on
this point provides no basis for departing from the plain meaning
of the current definitions.  <u>See</u> <u>Sedima, S.P.R.L. v. Imrex Co.</u>,
473 U.S. 479, 495 n.13 (1985).

II.  THE STATUTORY REQUIREMENTS FOR ISSUING AN ORDER
     AUTHORIZING THE PROPOSED PEN REGISTER AND TRAP AND
     TRACE SURVEILLANCE HAVE BEEN MET.

Under FISA's pen register/trap and trace provisions:

> Notwithstanding any other provision of law, the
> Attorney General . . . may make an application for an
> order . . . authorizing or approving the installation
> and use of a pen register or trap and trace device for
> any investigation to obtain foreign intelligence
> information not concerning a United States person or to
> protect against international terrorism . . ., provided
> that such investigation of a United States person is
> not conducted solely upon the basis of activities
> protected by the first amendment to the Constitution
> which is being conducted by the [FBI] under such
> guidelines as the Attorney General approves pursuant to
> Executive Order No. 12333, or a successor order.

50 U.S.C. § 1842(a)(1).  This authority "is in addition to the

authority . . . to conduct . . . electronic surveillance" under

§§ 1801-1811.  Id. § 1842(a)(2).

> Such applications shall include, inter alia,
> a certification by the applicant that the information
> likely to be obtained is foreign intelligence
> information not concerning a United States person or is
> relevant to an ongoing investigation to protect against
> international terrorism . . ., provided that such
> investigation of a United States person is not
> conducted solely on the basis of activities protected
> by the first amendment to the Constitution.

Id. § 1842(c)(2).  "Upon an application made pursuant to this

section, the judge shall enter an ex parte order as requested, or

as modified, approving the installation and use of a pen register

or trap and trace device if the judge finds that the application satisfies the requirements of [§ 1842]." Id. § 1842(d)(1).

Obviously, the application has been made by the Attorney General, § 1842(a)(1), has been approved by the Attorney General, § 1842(c), and has been submitted in writing and under oath to a judge of this Court.  § 1842(b)(1).  The application, at 5, identifies the DIRNSA as "the Federal officer seeking to use the pen register or trap and trace device."  § 1842(c)(1).

The application also contains a certification by the Attorney General, at 26, containing the language specified in § 1842(c)(2).  The Government argues that FISA prohibits the Court from engaging in any substantive review of this certification.  In the Government's view, the Court's exclusive function regarding this certification would be to verify that it contains the words required by § 1842(c)(2); the basis for a properly worded certification would be of no judicial concern. See Memorandum of Law and Fact at 28-34.

The Court has reviewed the Government's arguments and authorities and does not find them persuasive.[19]  However, in

---

[19]  For example, the Government cites legislative history that "Congress intended to 'authorize[] FISA judges to issue a pen register or trap and trace order upon a certification that the information sought is relevant to'" an FBI investigation.
(continued...)

TOP SECRET//HCS//COMINT//NOFORN

this case the Court need not, and does not, decide whether it would be obliged to accept the applicant's certification without any explanation of its basis. Arguing in the alternative, the Government has provided a detailed explanation of 1) the threat currently posed by ████████████████████ 2) the reason the bulk collection described in the application is believed necessary as a means for NSA ████████████████████ ████████████████████ 3) how that information will contribute to FBI investigations to protect against ████████████████ and 4) what safeguards will be observed to ensure that the information collected will not be used for unrelated purposes or

---

[19](...continued)
Memorandum of Law and Fact at 30 (quoting S. Rep. No. 105-185, at 27 (1998). However, authorizing the Court to issue an order when a certification is made, and requiring it to do so without resolving doubts about the correctness of the certification, are quite different.

The Government also cites United States v. Hallmark, 911 F.2d 399 (10th Cir. 1990), in arguing that the Court should not review the basis of the certification. However, the Hallmark court reserved the analogous issue under Title 18 – "the precise nature of the court's review under 18 U.S.C. § 3123" of the relevancy certification in an application for a law enforcement pen register or trap and trace device – and expressed "no opinion as to whether the court may, for instance, inquire into the government's factual basis for believing the pen register or trap and trace information to be relevant to a criminal investigation." Id. at 402 n.3.

TOP SECRET//HCS//COMINT//NOFORN

TOP SECRET//HCS//COMINT//NOFORN

otherwise misused.  The Government also provides legal arguments that, under these specific circumstances, the proposed collection satisfies the relevancy requirement of § 1842(c)(2), despite its resulting in the collection of meta data from an enormous volume of communications, the large majority of which will be unrelated to international terrorism.  In view of this record, the Court will assume for purposes of this case that it may and should consider the basis of the certification under § 1842(c)(2).

Nonetheless, the Court is mindful that FISA does not require any finding of probable cause in order for pen register and trap and trace surveillance to be authorized.  In this regard, the statutory provisions that govern this case contrast sharply with those that apply to other forms of electronic surveillance and physical search.[20]  Before Congress amended FISA in 1998 to add §§ 1841-1846, this Court could authorize pen register and trap and trace surveillance only upon the same findings as would be required to authorize interception of the full contents of

---

[20]  To issue an electronic surveillance order, the Court must find "probable cause to believe that . . . the target of the electronic surveillance is a foreign power or an agent of a foreign power" and "each of the facilities or places at which the electronic surveillance is directed is being used, or is about to be used, by a foreign power or an agent of a foreign power."  50 U.S.C. § 1805(a)(3).  Similar probable cause findings are required for warrants authorizing physical search under id. § 1824(a)(3).

TOP SECRET//HCS//COMINT//NOFORN

TOP SECRET//HCS//COMINT//NOFORN

communications. See S. Rep. 105-185, at 27 (1998). When it
originally enacted §§ 1841-1846 in 1998, Congress recognized that
pen register and trap and trace information is not protected by
the Fourth Amendment and concluded that a lower standard for
authorization "was necessary in order to permit, as is the case
in criminal investigations, the use of this very valuable
investigative tool at the critical early stages of foreign
intelligence and international terrorism investigations." Id.
These 1998 provisions included a form of a "reasonable suspicion"
standard for pen register/trap and trace authorizations.[21] As
part of the USA PATRIOT Act in 2001, Congress lowered the
standard again, to the current requirement of relevance.[22] Given
this history, it is obvious that Congress intended pen register

---

[21] Under the provisions enacted in 1998, a pen register or
trap and trace application had to include "information which
demonstrates that there is reason to believe" that a
communication facility "has been or is about to be used in
communication with," inter alia, "an individual who is engaging
or has engaged in international terrorism or clandestine
intelligence activities." Public Law 105-272 § 601(2).

[22] The legislative history of the USA PATRIOT Act reflects
that, "in practice," the standard passed in 1998 was "almost as
burdensome as the requirement to show probable cause required . .
. for more intrusive techniques" and that the FBI "made a clear
case that a relevance standard is appropriate for
counterintelligence and counterterrorism investigations." 147
Cong. Rec. S11003 (daily ed. Oct. 25, 2001) (statement of Sen.
Leahy).

TOP SECRET//HCS//COMINT//NOFORN

and trap and trace authorizations to be more readily available than authorizations for electronic surveillance to acquire the full contents of communications.

The Court also recognizes that, for reasons of both constitutional authority and practical competence, deference should be given to the fully considered judgment of the executive branch in assessing and responding to national security threats[23] and in determining the potential significance of intelligence-related information.[24] Such deference is particularly

---

[23] See, e.g., Reno v. American-Arab Anti-Discrimination Comm., 525 U.S. 471, 491 (1999) ("a court would be ill equipped to determine [the] authenticity and utterly unable to assess [the] adequacy" of the executive's security or foreign policy reasons for treating certain foreign nationals as "a special threat"); Regan v. Wald, 468 U.S. 222, 243 (1984) (giving "the traditional deference to executive judgment" in foreign affairs in sustaining President's decision to restrict travel to Cuba against a Due Process Clause challenge); cf. Department of Navy v. Egan, 484 U.S. 518, 529 (1988) (outside body reviewing executive branch decisions on eligibility for security clearances could not "determine what constitutes an acceptable margin of error in assessing the potential risk").

[24] The Supreme Court has observed that, in deciding whether disclosing particular information might compromise an intelligence source, what "may seem trivial to the uninformed, may appear of great moment to one who has a broad view of the scene and may put the questioned item of information in its proper context." CIA v. Sims, 471 U.S. 159, 178 (1985) (internal quotation and citation omitted). Accordingly, the decisions of ▮▮▮▮▮ "who must of course be familiar with 'the whole picture,' as judges are not, are worthy of great deference given the magnitude of the national security interests and potential (continued...)

TOP SECRET//HCS//COMINT//NOFORN

appropriate in this context, where the Court is not charged with

making independent probable cause findings.

   A.   The Government Has Provided Information In Support of
        the Certification of Relevance.

   In support of the certification of relevance, the Government

relies on the following facts and circumstances:

   1.   The Threat Currently Posed



_____

    [24](...continued)
risks at stake." Id. at 179.

    [25] For simplicity, this opinion standardizes the variant
spellings of foreign names appearing in different documents
submitted in support of the application.

TOP SECRET//HCS//COMINT//NOFORN





2.   FBI Investigations to Track and Identify [REDACTED] in the United States



3. The Use of the Internet by ▮▮▮▮▮▮▮▮

███████████████████████████████████████████████████████

4.  The Scope of the Proposed Collection of Meta Data

In an effort both to identify unknown and to track known

operatives ████████████████████████ through their Internet

communications, NSA seeks to acquire meta data, as described

above, from all e-mail ████████████████████████

████████████████████████████████████████████████████████

████████████████ are described in detail in the application and

the DIRNSA Declaration.  In brief, they are:



---

[27] For ease of reference, the term ████████████████████ is
used to mean ████████████████████████████████████████

TOP SECRET//HCS//COMINT//NOFORN



TOP SECRET//HCS//COMINT//NOFORN



TOP SECRET//HCS//COMINT//NOFORN

TOP SECRET//HCS//COMINT//NOFORN



TOP SECRET//HCS//COMINT//NOFORN

TOP SECRET//HCS//COMINT//NOFORN

████████████████████████████████████████████

The raw volume of the proposed collection is enormous.  NSA

estimates that this collection will encompass ████████████

████████████████████████████████████████████

████████████████████████████████████ In absolute

terms, the proposed surveillance "will result in the collection

of meta data pertaining to ██████████ electronic communications,

including meta data pertaining to communications of United States

persons located within the United States who are not the subject

of any FBI investigation." Application at 4.  Some proportion of

these communications - less than half, but still a huge number in

absolute terms - can be expected to be communications ████████

TOP SECRET//HCS//COMINT//NOFORN

TOP SECRET//HCS//COMINT//NOFORN

█████  ████████████████████████  who bear no relation to  ██

████████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

5.   How NSA Proposes to Use this Data to Track Known ████

████████████████████████████████████████

As noted above, the purpose of this collection is to track

known operatives and to identify unknown operatives of ████████

████████████████  through their Internet communications.   NSA

---

[29]   As noted above, collection of meta data from  ████████
████████████████  ████████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

TOP SECRET//HCS//COMINT//NOFORN

TOP SECRET//HCS//COMINT//NOFORN

states that even identified operates ███████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

Through the proposed bulk collection, NSA would acquire an

archive of meta data for large volumes of communications that, in

NSA's estimation, represent a relatively rich environment for

finding ████████████████ communications through later analysis.[31]

_____

[31] See DIRNSA Declaration at 5 ████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

TOP SECRET//HCS//COMINT//NOFORN

41

TOP SECRET//HCS//COMINT//NOFORN

NSA asserts that more precisely targeted forms of collection against known accounts would tend to screen out the "unknowns" that NSA wants to discover, so that NSA needs bulk collection in order to identify unknown ███████████ communications. See id. at 14 ("It is not possible . . . to target collection solely to known terrorist E-mail accounts and at the same time use the advantages of meta data analysis to discover the enemy."), 15 ("To be able to fully exploit meta data, the data must be collected in bulk. Analysts know that terrorists' E-mails are located somewhere in the billions of data bits; what they cannot know ahead of time is exactly where.")

NSA proposes to employ two analytic methods on the body of archived meta data it seeks to collect. Both these methods involve querying the archived meta data regarding a particular "seed" account. In the Government's proposal, an account would qualify as a seed account only if NSA concludes, "based on the factual and practical considerations of everyday life on which reasonable and prudent persons act, there are facts giving rise to a reasonable articulable suspicion that a particular known e-mail address is associated with ████████████████████

████████████████████

TOP SECRET//HCS//COMINT//NOFORN

███████████████████████████ Application at 19-20; accord DIRNSA

Declaration at 19. The two methods are:

(1) Contact chaining. NSA will use computer algorithms to

identify within the archived meta data all e-mail ████████████

█████████████████████ accounts that have been in contact with

the seed account, as well as all accounts that have been in

contact with an account within the first tier of accounts that

had direct contact with the seed account, and ████████████████

█████████████████████████████████████ DIRNSA Declaration

at 15-16.



An example may illustrate the claimed benefits of bulk collection and subsequent analysis of meta data. ██████████ ██████████████████████████████████████████████ ██████████████████████████████████████

██████████ Without an archive of meta data, the Government could target prospective collection on that account, but information about past use would be unavailable. ███████████████

████████████ ████████████████████████████████ ███████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████.[32]

However, if an archive of meta data were available, NSA could use the newly discovered account as a "seed" account. Accounts previously in contact with the "seed" account could be identified and further investigation could be pursued to determine if the users of those accounts are █████████████ ████████████████████████████████████████████ ████████████████████████████████████

---

[32] Assuming that applicable legal requirements could be met, the Government also could collect the full contents of future messages by electronic surveillance of the account and of stored prior messages by physical search of the account. However, ███████████████ could thwart these forms of collection also.

TOP SECRET//HCS//COMINT//NOFORN

████████████████████████████████████████

These avenues of discovery made possible by archived meta data
provide the basis for NSA's assertion that bulk collection to
accumulate a meta data archive "will substantially increase NSA's
ability to detect and identify members of ████████████████
████████ DIRNSA Declaration at 15.

6.   How FBI Investigations Would Benefit from the NSA's
     Collection and Analysis

     The Government asserts that NSA's collection and analysis of
this meta data will be relevant to ████████████FBI
investigations in two ways.  First, ongoing FBI investigations
may develop grounds for reasonable suspicion that particular
accounts are used in furtherance of ████████████████████
██████   The FBI may identify such accounts to NSA for use as
"seed" accounts.  Using the methods described above, NSA may
obtain from the archived data other accounts that are in contact
with, or appear to have the same user as, the "seed" account.
This information may then be passed to the FBI as investigative
leads in furtherance of its investigation.  Memorandum of Law and
Fact at 27-28.  Alternatively, NSA querying of the archived meta
data based on information from sources other than the FBI may
identify accounts that appear to be used by someone involved in

TOP SECRET//HCS//COMINT//NOFORN

TOP SECRET//HCS//COMINT//NOFORN

███████████ activities. If such accounts are relevant to
FBI investigative responsibilities – for example, if it appears
that their users are in the United States – then NSA will provide
information to the FBI, which may prove relevant to ongoing FBI
investigations or provide the predicate for new investigations of
persons involved in ████████████████████ Under the
proposed program, NSA estimates that roughly 400 accounts would
be "tipped" to the FBI and CIA[33] annually, with an estimated
twenty-five percent of that number associated with U.S. persons.
DIRNSA Declaration at 20.

7. The Government's Proposed Procedures for Accessing,
Retaining, and Disseminating Collected Information

The application specifies proposed procedures and
restrictions for accessing, retaining, and disseminating
information from this bulk collection of meta data. Application
at 18-24. These procedures and restrictions, with certain
modifications, are set out at pages 82-87 below.

---

[33] As long as the proposed collection satisfies the
standard of relevance to an FBI investigation described in
section 1842(a)(1), (c)(2), dissemination of information to other
agencies when it is relevant to their responsibilities is
appropriate.

TOP SECRET//HCS//COMINT//NOFORN

TOP SECRET//HCS//COMINT//NOFORN

B.   The Information To Be Obtained is Likely to be Relevant
     to Ongoing FBI Investigations to Protect Against
     International Terrorism

As shown above, the application and supporting materials
demonstrate that the FBI has numerous pending investigations on
████████████████ subjects and that a major challenge faced by the
FBI is the identification of ███████████████ within the
United States. ████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████ The
application and DIRNSA declaration provide detailed explanations
of why NSA regards bulk collection of meta data as necessary for
contact chaining ████████████████ and how those analytical
methods can be expected to uncover and monitor unknown ███████
████████████████ who could otherwise elude detection.  The
DIRNSA also explains why NSA has chosen the proposed ██████████
and selection criteria in order to build a meta data archive that
will be, in relative terms, richly populated with ██████████
related communications.  On each of these points, the Court has
received sufficient information to conclude that the Government's

TOP SECRET//HCS//COMINT//NOFORN

assessments are fully considered and plausibly grounded in facts submitted to the Court.

Accordingly, the Court accepts for purposes of this application that the proposed bulk collection of meta data is necessary for NSA to employ contact chaining ███████████ ████████  The Court similarly accepts that those analytic tools are likely to generate useful investigative leads for ongoing efforts by the FBI (and other agencies) to identify and track ███ ████████████████████████████ potentially including unidentified operatives in place to facilitate or execute imminent large scale attacks within the United States.

The question remains whether these circumstances adequately support the certification that "the information likely to be obtained . . . is relevant to an ongoing investigation to protect against international terrorism," § 1842(c)(2), even though only a very small percentage of the information obtained will be from ████████████████ communications and therefore directly relevant to such an investigation. As the Government points out, the meaning of "relevant" is broad enough, at least in some contexts, to encompass information that may reasonably lead to the discovery of directly relevant information. Memorandum of Law and Fact at 34. Here, the bulk collection of meta data - <u>i.e.</u>

TOP SECRET//HCS//COMINT//NOFORN

the collection of both a huge volume and high percentage of unrelated communications - is necessary to identify the much smaller number of ████████████████ communications.

The Court is persuaded that, in the circumstances of this case, the scope of the proposed collection is consistent with the certification of relevance.[34] In so finding, the Court concludes that, under the circumstances of this case, the applicable relevance standard does not require a statistical "tight fit" between the volume of proposed collection and the much smaller proportion of information that will be directly relevant to ████

---

[34] The Government analogizes this case to ones in which the Court has authorized overbroad electronic surveillance under 50 U.S.C. §§ 1801-1811. Memorandum of Fact and Law at 42-43. The Court has authorized the latter form of collection where it is not technologically possible to acquire ███████████████████████ ██████████████████████████████████ The two situations are similar in that they both involve collection of an unusually large volume of non-foreign intelligence information as a necessary means of obtaining the desired foreign intelligence information. Yet there are also important differences between these cases. An overbroad electronic surveillance under 50 U.S.C. §§ 1801-1811 requires probable cause to believe that the target is an agent of a foreign power and uses the particular facility at which surveillance will be directed. § 1805(a)(3). In this case under 50 U.S.C. §§ 1841-1846, no probable cause findings are required, and the bulk collection is justified as necessary to discover unknown ████████████████ persons and facilities, rather than to acquire communications to and from identified agents of a foreign power. Because of these differences, the authorization of bulk collection under §§ 1841-1846 should not be taken as precedent for similar collection of the full contents of communications under §§ 1801-1811.

TOP SECRET//HCS//COMINT//NOFORN

TOP SECRET//HCS//COMINT//NOFORN

███████████ FBI investigations.  In reaching this conclusion,

the Court finds instructive Supreme Court precedents on when a

search that is not predicated on individualized suspicion may

nonetheless be reasonable under the Fourth Amendment.  See

Memorandum of Law and Fact at 43-48.[35]

The Supreme Court has recognized a "longstanding principle

that neither a warrant nor probable cause, nor, indeed, any

measure of individualized suspicion, is an indispensable

component of reasonableness in every circumstance." National

Treasury Employees Union v. Von Raab, 489 U.S. 656, 665 (1989);

accord, e.g., Board of Educ. of Indep. School Dist. No. 92 of

Pottawatomie County v. Earls, 536 U.S. 822, 829 (2002); United

States v. Martinez-Fuerte, 428 U.S. 543, 560-61 (1976).

Specifically, the Court has held that, "where a Fourth Amendment

intrusion serves special governmental needs, beyond the normal

need for law enforcement, it is necessary to balance the

individual's privacy expectations against the Government's

---

[35]  For the reasons explained below at pages 59-66, the
Court finds that there is no privacy interest protected by the
Fourth Amendment in the meta data to be collected.  Nevertheless,
the Court agrees with the Government's suggestion that the
balancing methodology used to assess the reasonableness of a
Fourth Amendment search or seizure is helpful in applying the
relevance standard to this case.  Memorandum of Law and Fact at
43.

TOP SECRET//HCS//COMINT//NOFORN

TOP SECRET//HCS//COMINT//NOFORN

interests to determine whether it is impractical to require a warrant or individualized suspicion in the particular context." Von Raab, 489 U.S. at 665-66; accord, e.g., Earls, 536 U.S. at 829.

This balancing analysis considers "the nature of the privacy interest allegedly compromised" and "the character of the intrusion" upon that interest. Earls, 536 U.S. at 830, 832. The privacy interest in the instant meta data is not of a stature protected by the Fourth Amendment. See pages 59-66 below. Moreover, the nature of the intrusion is mitigated by the restrictions on accessing and disseminating this information, under which only a small percentage of the data collected will be seen by any person. Cf. Earls, 536 U.S. at 833 (finding that restrictions on access to drug-testing information lessen the testing program's intrusion on privacy).

The assessment of reasonableness under the Fourth Amendment also considers "the nature and immediacy of the government's concerns and the efficacy of the [program] in meeting them." Id. at 834. In this case, the Government's concern is to identify and track ███████████ operatives, and ultimately to thwart terrorist attacks. This concern clearly involves national

TOP SECRET//HCS//COMINT//NOFORN

TOP SECRET//HCS//COMINT//NOFORN

security interests beyond the normal need for law enforcement[36] and is at least as compelling as other governmental interests that have been held to justify searches in the absence of individualized suspicion.  See, e.g., Earls (drug testing of secondary school students engaged in extracurricular activities); Michigan Dep't of State Police v. Sitz, 496 U.S. 444 (1990) (highway checkpoints to identify drunk drivers); Von Raab (drug testing of Customs Service employees applying for promotion to sensitive positions); Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602 (1989) (drug and alcohol testing of railroad workers).[37]  The Government's interest here has even greater "immediacy" in view of the above-described intelligence reporting and assessment regarding ongoing plans for large scale attacks within the United States.

As to efficacy under the Fourth Amendment analysis, the Government need not make a showing that it is using the least intrusive means available.  Earls, 536 U.S. at 837; Martinez-

---

[36]  See In Re Sealed Case, 310 F.3d 717, 744-46 (Foreign Int. Surv. Ct. Rev. 2002) (per curiam) (discussing the prevention of terrorist attacks as a special need beyond ordinary law enforcement).

[37]  Moreover, the Government's need in this case could be analogized to the interest in discovering or preventing danger from "latent or hidden conditions," which may justify suspicionless searches.  See, e.g., Von Raab, 489 U.S. at 668.

TOP SECRET//HCS//COMINT//NOFORN

<u>Fuerte</u>, 428 U.S. at 556-57 n.12. Rather, the question is whether the Government has chosen "a reasonably effective means of addressing" the need. <u>Earls</u>, 536 U.S. at 837. In structuring a program involving suspicionless search or seizure, <u>e.g.</u>, in positioning roadblocks at certain points, "the choice among . . . reasonable alternatives remains with the governmental officials who have a unique understanding of, and a responsibility for, limited public resources." <u>Sitz</u>, 496 U.S. at 453-54; <u>see also</u> <u>Martinez-Fuerte</u>, 428 U.S. at 566 ("deference is to be given to the administrative decisions of higher ranking officials"). A low percentage of positive outcomes among the total number of searches or seizures does not necessarily render a program ineffective.[38]

In this case, senior responsible officials, whose judgment on these matters is entitled to deference, <u>see</u> pages 30-31 above, have articulated why they believe that bulk collection and archiving of meta data are necessary to identify and monitor ▊ operatives whose Internet communications would

---

[38] See <u>Sitz</u>, 496 U.S. at 454 ("detention of the 126 vehicles that entered the checkpoint resulted in the arrest of two drunken drivers"); <u>Martinez-Fuerte</u>, 428 U.S. at 546 & n.1, 554 (checkpoint near border to detect illegal migrants: out of "roughly 146,000 vehicles" temporarily "'seized,'" 171 were found to contain deportable aliens).

~~TOP SECRET//HCS//COMINT//NOFORN~~

otherwise go undetected in the huge streams of ███████████

███████████        These officials have also explained why they

seek to collect meta data ████████████████████████

███████████  identified in the application.  Based on these

explanations, the proposed collection appears to be a reasonably

effective means to this end.

In summary, the bulk collection proposed in this case is

analogous to suspicionless searches or seizures that have been

upheld under the Fourth Amendment in that the Government's need

is compelling and immediate, the intrusion on individual privacy

interests is limited, and bulk collection appears to be a

reasonably effective means of detecting and monitoring ████████

related operatives and thereby obtaining information likely to be

███████ to ongoing FBI investigations.  In these circumstances,

the certification of relevance is consistent with the fact that

only a very small proportion of the huge volume of information

collected will be directly relevant to the FBI's ██████████

investigations.

---

[39]  Cf. Martinez-Fuerte, 428 U.S. at 557 (requiring
reasonable suspicion for stops at highway checkpoints "on major
routes . . . would be impractical because the flow of traffic
tends to be too heavy to allow the particularized study of a
given car").

~~TOP SECRET//HCS//COMINT//NOFORN~~

C.   The Pertinent FBI Investigations of U.S. Persons Are
     Not Conducted Solely Upon the Basis of First Amendment
     Activities.

When the information likely to be obtained concerns a U.S.

person, § 1842(c)(2) requires a certification that the "ongoing

investigation . . . of a United States person is not conducted

solely upon the basis of activities protected by the first

amendment to the Constitution."   The certification in this case

states that the pertinent investigation is not being conducted on

such a basis.   Application at 26.   The application refers to

numerous FBI National Security investigations "being conducted

under guidelines approved by the Attorney General pursuant to

Executive Order No. 12,333."[40]   Id. at 6.

> Those investigations are being conducted on the basis
> of activities of ████████ and unknown ████████
> affiliates in the United States and abroad, and to the
> extent these subjects of investigation are United
> States persons, not solely on the basis of activities
> that are protected by the First Amendment to the
> Constitution.

Id.

Thus, the certification and application contain the proper

assurance that the relevant investigations of U.S. persons are

_____

[40]   § 1842(a)(1) permits the filing of applications for
installation and use of pen register and trap and trace devices
to obtain information relevant to certain investigations "under
such guidelines as the Attorney General approves pursuant to
Executive Order No. 12333, or a successor order."

TOP SECRET//HCS//COMINT//NOFORN

not being conducted solely on the basis of activities protected
by the First Amendment. However, the unusual breadth of this
collection and its relation to the pertinent FBI investigations
calls for further attention to this issue. In the usual case,
the FBI conducts pen register and trap and trace surveillance of
a particular communications facility (e.g., a phone number or e-
mail address) because it carries communications of a person who
is the subject of an FBI investigation. The required
certification typically varies depending on whether the subject
is a U.S. person: if not, the certification will state, in the
language of § 1842(c)(2), that the information likely to be
obtained "is foreign intelligence information not concerning a
United States person;" if the subject is a U.S. person, the
certification will state that such information is "relevant to an
ongoing investigation to protect against international terrorism
. . ., provided that such investigation of a United States person
is not conducted solely upon the basis of activities protected by
the first amendment to the Constitution." This usual practice
conforms to the clear statutory purpose that pen register/trap
and trace information about the communications of U.S. persons
will not be targeted for collection unless it is relevant to an

TOP SECRET//HCS//COMINT//NOFORN

investigation that is not solely based upon First Amendment activities.

In this case, the initial acquisition of information is not directed at facilities used by particular individuals of investigative interest, but meta data concerning the communications of such individuals' ███████████████████ ███████████████████ Here, the legislative purpose is best effectuated at the querying stage, since it will be at a point that an analyst queries the archived data that information concerning particular individuals will first be compiled and reviewed. Accordingly, the Court orders that NSA apply the following modification of its proposed criterion for querying the archived data: ████████████████ will qualify as a seed ██████████████ only if NSA concludes, based on the factual and practical considerations of everyday life on which reasonable and prudent persons act, there are facts giving rise to a reasonable articulable suspicion that a particular known ████████ ██████████ is associated with ████████████████████ ██████████ provided, however, that an ███████████████ believed to be used by a U.S. person shall not be regarded as associated with ████████████████████ solely on the basis of activities that are protected by the First

Amendment to the Constitution.[41]  For example, an e-mail account
used by a U.S. person could not be a seed account if the only
information thought to support the belief that the account is
associated with          is that, in sermons or in postings on a
web site, the U.S. person espoused jihadist rhetoric that fell
short of "advocacy . . . directed to inciting or producing
imminent lawless action and . . . likely to incite or produce
such action." Brandenberg v. Ohio, 395 U.S. 444, 447 (1969) (per
curiam).

> III.  THE PROPOSED COLLECTION AND HANDLING OF META DATA
>       DO NOT VIOLATE THE FIRST OR FOURTH AMENDMENTS.

Because this case presents a novel use of statutory
authorities for pen register/trap and trace surveillance, the
Court will also explain why it is satisfied that this
surveillance comports with the protections of the Fourth
Amendment and the First Amendment.

A.  Fourth Amendment Issues

The foregoing analysis has observed at various points that
the Fourth Amendment does not apply to the proposed collection of

---

[41]  This modification will realize more fully the
Government's suggestion that "[t]he information actually viewed
by any human being . . . will be just as limited – and will be
based on the same targeted, individual standards – as in the case
of an ordinary pen register or trap and trace device."
Government's Letter of          at 3.

TOP SECRET//HCS//COMINT//NOFORN

meta data. See, e.g., pages 19, 50-51 above. This section explains the basis for that conclusion.

First, as a general matter, there is no reasonable expectation of privacy under the Fourth Amendment in the meta data to be collected. This conclusion follows directly from the reasoning of Smith v. Maryland, 442 U.S. 735 (1979), which concerned the use of a pen register on a home telephone line. In that case, the Supreme Court found that it was doubtful that telephone users had a subjective expectation of privacy in the numbers they dialed, id. at 742-43, and that in any case such an expectation "is not 'one that society is prepared to recognize as reasonable.'" Id. at 743 (quoting Katz v. United States, 389 U.S. 347, 361 (1967)). The Court "consistently has held that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties," since he "assume[s] the risk" that the third party would reveal that information to the government. Id. at 743-44.[42] The Court found this principle applicable to dialed phone numbers, regardless of the automated means by which the call is placed and the "fortuity of whether or

---

[42] This principle applies even if there is an understanding that the third party will treat the information as confidential. See SEC v. Jerry T. O'Brien, Inc., 467 U.S. 735, 743 (1984); United States v. Miller, 425 U.S. 435, 443 (1976).

TOP SECRET//HCS//COMINT//NOFORN

not the phone company in fact elects to make a quasi-permanent record of a particular number dialed." Id. at 744-45.[43]

The same analysis applies to the meta data involved in this application. Users of e-mail ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ voluntarily expose addressing information for communications they send and receive to communications service providers. Having done so, they lack any legitimate expectation of privacy in such information for Fourth Amendment purposes.[44] Moreover, the relevant statutes put this form of pen register/trap and trace surveillance on a par with pen register/trap and trace surveillance of telephone calls, on the

---

[43]  While Smith involved a pen register, its reasoning equally applies to trap and trace devices that capture the originating numbers of incoming calls. See, e.g., United States v. Hallmark, 911 F.2d 399, 402 (10th Cir. 1990).

[44]  Cf. Guest v. Leis, 255 F.3d 325, 335-36 (6th Cir. 2001) (users of computer bulletin board service lacked reasonable expectation of privacy in subscriber information that they provided to systems operator); United States v. Kennedy, 81 F.Supp.2d 1103, 1110 (D. Kan. 2000) (no reasonable expectation of privacy in subscriber information provided to ISP); United States v. Hambrick, 55 F.Supp.2d 504, 508-09 (W.D. Va. 1999) (no reasonable expectation of privacy in screen name and other information provided to ISP), aff'd, 225 F.3d 656 (4th Cir. 2000) (Table).

TOP SECRET//HCS//COMINT//NOFORN

premise that neither form of surveillance involves a Fourth

Amendment search or seizure.[45]

   This conclusion is equally well-founded for the proposed

collection of ███████████████████████ Nothing in the

Smith analysis depends on the fact that a telephone pen register

acquires addressing information for a call while it is being

placed, rather than from data ████████████████████

Indeed, the controlling principle – that voluntary disclosure of

information to a third party vitiates any legitimate expectation

that the third party will not provide it to the government – has

been applied to records █████████████ See Jerry T.

O'Brien, Inc., 467 U.S. at 737-38, 743 (records of prior stock

_____

   [45] The USA PATRIOT Act amended 18 U.S.C. § 3127 to clarify
that its definitions of "pen register" and "trap and trace
device" applied to Internet communications. See Public Law 107-
56, Title II, § 216(c); 147 Cong. Rec. S11000 (daily ed. Oct. 25,
2001) (statement of Sen. Leahy) (noting that prior statutory
language was "ill-equipped" for Internet communications and
supporting clarification of "the statute's proper application to
tracing communications in an electronic environment . . . in a
manner that is technology neutral"). Authorization to install
such devices requires relevance to an investigation, but not any
showing of probable cause. See 18 U.S.C. § 3123(a)(1), (2)
(ordinary criminal investigation); 50 U.S.C. § 1842(a)(1), (c)(2)
(investigation conducted under guidelines approved under
Executive Order 12333).

TOP SECRET//HCS//COMINT//NOFORN

trading); <u>Miller</u>, 425 U.S. at 436-38, 443 (checks, deposit slips, and other bank records).[46]

For these reasons, it is clear that, in ordinary circumstances, pen register/trap and trace surveillance of Internet communications does not involve a Fourth Amendment search or seizure. However, since this application involves unusually broad collection and distinctive modes of analyzing information, the Court will explain why these special circumstances do not alter its conclusion that no Fourth Amendment search or seizure is involved.

First, regarding the breadth of the proposed surveillance, it is noteworthy that the application of the Fourth Amendment depends on the government's intruding into some individual's reasonable expectation of privacy. Whether a large number of persons are otherwise affected by the government's conduct is irrelevant. Fourth Amendment rights "are personal in nature, and cannot bestow vicarious protection on those who do not have a reasonable expectation of privacy in the place to be searched."



TOP SECRET//HCS//COMINT//NOFORN

Steagald v. United States, 451 U.S. 204, 219 (1981); accord, e.g., Rakas v. Illinois, 439 U.S. 128, 133 (1978) ("'Fourth Amendment rights are personal rights which . . . may not be vicariously asserted.'") (quoting Alderman v. United States, 394 U.S. 165, 174 (1969)). Since the Fourth Amendment bestows "a personal right that must be invoked by an individual," a person "claim[ing] the protection of the Fourth Amendment . . . must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." Minnesota v. Carter, 525 U.S. 83, 88 (1998). So long as no individual has a reasonable expectation of privacy in meta data, the large number of persons whose communications will be subjected to the proposed pen register/trap and trace surveillance is irrelevant to the issue of whether a Fourth Amendment search or seizure will occur.

Regarding the proposed analytical uses of the archived meta data, it might be thought that ████████████████████ ████████████████████████████████████████████ ████████████████████████████████████ not immediately available from conventional pen register/trap and

TOP SECRET//HCS//COMINT//NOFORN

trace surveillance might itself implicate the Fourth Amendment.[47]
However, that suggestion would be at odds with precedent that the
subsequent use of the results of a search cannot itself involve
an additional or continuing violation of the Fourth Amendment.
For example, in United States v. Calandra, 414 U.S. 338 (1974),
it was argued that each question before a grand jury "based on
evidence obtained from an illegal search and seizure constitutes
a fresh and independent violation of the witness' constitutional
rights," and that such questioning involved "an additional
intrusion" into the privacy of the witness "in violation of the

---

[47]   The public disclosure of aggregated and compiled data
has been found to impinge on privacy interests protected under
the Freedom of Information Act (FOIA), even if the information
was previously available to the public in a scattered, less
accessible form.  See United States Dept. of Justice v. Reporters
Comm. for Freedom of the Press, 489 U.S. 749 (1989) (FBI "rap
sheets," including public-record information on arrests and
disposition of criminal charges, qualified for "personal privacy"
exemption from disclosure under FOIA, 5 U.S.C. § 552(b)(7)(C));
but cf. Paul v. Davis, 424 U.S. 693, 712-13 (1976) (circulating a
flyer publicizing an arrest for shoplifting did not violate
constitutional right to privacy).  In this case, because section
1842 authorizes the Attorney General to apply for pen
register/trap and trace authorities "[n]othwithstanding any other
provision of law," 50 U.S.C. § 1842(a)(1), and states that the
Court "shall enter an ex parte order . . . approving the
installation and use of a pen register or trap and trace device"
upon a finding "that the application satisfies the requirements
of [section 1842]," id. § 1842(d)(1), the Court has no need to
consider how other statutes, such as the Privacy Act, 5 U.S.C.
§ 552a, might apply to the proposed activities of the Government.

TOP SECRET//HCS//COMINT//NOFORN

TOP SECRET//HCS//COMINT//NOFORN

Fourth Amendment."  414 U.S. at 353 & n.9 (internal quotations

omitted).  The Court rejected this argument, explaining:

> The purpose of the Fourth Amendment is to prevent
> unreasonable governmental intrusions into the privacy
> of one's person, house, papers, or effects. . . .
> That wrong . . . is fully accomplished by the original
> search without probable cause.  Grand jury questions
> based on evidence obtained thereby <u>involve no
> independent governmental invasion</u> of one's person,
> house, papers, or effects . . . .  <u>Questions based on
> illegally obtained evidence are only a derivative use
> of the product of a past unlawful search and seizure.
> They work no new Fourth Amendment wrong.</u>

414 U.S. at 354 (emphasis added); <u>accord United States v.

Verdugo-Urquidez</u>, 494 U.S. 259, 264 (1990); <u>United States v.

Leon</u>, 468 U.S. 897, 906 (1984); <u>see also United States v.

Jacobsen</u>, 466 U.S. 109, 117 (1984) ("Once frustration of the

original expectation of privacy occurs, the Fourth Amendment does

not prohibit governmental use of the now nonprivate

information.").

In this case, sophisticated analysis of archived meta data

may yield more information about a person's Internet

communications than what would at first be apparent.

Nevertheless, such analysis would, like the grand jury

questioning in <u>Calandra</u>, involve merely a derivative use of

information already obtained, rather than an independent

governmental invasion of matters protected by the Fourth

TOP SECRET//HCS//COMINT//NOFORN

TOP SECRET//HCS//COMINT//NOFORN

Amendment.  Accordingly, the Court finds that the proposed collection and analysis does not involve a search or seizure under the Fourth Amendment.

B.  First Amendment Issues

By letter dated ████████████ the Court asked the Government to address "the general First Amendment implications of collecting and retaining this large volume of information that is derived, in part, from the communications of U.S. persons." In response, the Government acknowledges that surveillance that acquires "the contents of communications might in some cases implicate First Amendment interests, in particular the freedom of association," Government's Letter of ████████████ at 1, but denies or minimizes the First Amendment implications of surveillance that only acquires non-content addressing information.

The weight of authority supports the conclusion that Government information-gathering that does not constitute a Fourth Amendment search or seizure will also comply with the First Amendment when conducted as part of a good-faith criminal investigation.  See Reporters Comm. for Freedom of the Press v. AT&T, 593 F.2d 1030, 1051 (D.C. Cir. 1978) (First Amendment protects activities "subject to the general and incidental

TOP SECRET//HCS//COMINT//NOFORN

burdens that arise from good faith enforcement of otherwise valid criminal and civil laws that are not themselves" directed at First Amendment conduct; accordingly, subpoenas to produce reporters' telephone toll records without prior notice did not violate the First Amendment) (emphasis in original); United States v. Aguilar, 883 F.2d 662, 705 (9th Cir. 1989) (use of undercover informants "to infiltrate an organization engaged in protected first amendment activities" must be part of investigation "conducted in good faith; i.e., not for the purpose of abridging first amendment freedoms"); United States v. Gering, 716 F.2d 615, 620 (9th Cir. 1983) (mail covers targeting minister at residence and church upheld against First Amendment challenge absent showing "that mail covers were improperly used and burdened . . . free exercise or associational rights"). Conversely,

> all investigative techniques are subject to abuse and
> can conceivably be used to oppress citizens and groups,
> rather than to further proper law enforcement goals.
> In some cases, bad faith use of these techniques may
> constitute an abridgment of the First Amendment rights
> of the citizens at whom they are directed.

Reporters Comm., 593 F.2d at 1064.[48]

---

[48]   Part of Judge Wilkey's opinion in Reporters Comm. categorically concludes that the First Amendment affords no protections against government investigation beyond what is
(continued...)

TOP SECRET//HCS//COMINT//NOFORN

Here, the proposed collection of meta data is not for ordinary law enforcement purposes, but in furtherance of the compelling national interest of identifying and tracking ▮

▮ and ultimately of thwarting terrorist attacks. The overarching investigative effort against ▮ is not aimed at curtailing First Amendment activities and satisfies the "good faith" requirement described in the above-cited cases. However, the extremely broad nature of this collection carries with it a heightened risk that collected information could be subject to various forms of misuse, potentially involving abridgement of First Amendment rights of innocent persons. For this reason, special restrictions on the accessing, retention, and dissemination of such information are necessary to guard against such misuse. See pages 82-87 below. With such restrictions in place, the proposed collection of non-

---

[48] (...continued)

provided by the Fourth and Fifth Amendments. Id. at 1053-60. However, that part of the opinion was not joined by the other judge in the majority, who opined that the result of First Amendment analysis "may not always coincide with that attained by application of Fourth Amendment doctrine." Id. at 1071 n.4 (Robinson, J.).

TOP SECRET//HCS//COMINT//NOFORN

content addressing information does not violate the First
Amendment.[49]

IV. TO ENSURE LAWFUL IMPLEMENTATION OF THIS SURVEILLANCE
AUTHORITY, NSA IS ORDERED TO COMPLY WITH THE PROPOSED
RESTRICTIONS AND PROCEDURES, AS MODIFIED BY THE COURT.

The proposed collection involves an extraordinarily broad

implementation of a type of surveillance that Congress has

regulated by statute, even in its conventional, more narrowly

targeted form.  To ensure that this authority is implemented in a

lawful manner, NSA is ordered to comply with the restrictions and

procedures set out below at pages 82-87, which the Court has

adapted from the Government's application.[50]  Adherence to them

---

[49]  The court in Paton v. La Prade, 469 F. Supp. 773, 780-82
(D.N.J. 1978), held that a mail cover on a dissident political
organization violated the First Amendment because it was
authorized under a regulation that was overbroad in its use of
the undefined term "national security."  In contrast, this pen
register/trap and trace surveillance does not target a political
group and is authorized pursuant to statute on the grounds of
relevance to an investigation to protect against "international
terrorism," a term defined at 50 U.S.C. § 1801(c).  This
definition has been upheld against a claim of First Amendment
overbreadth.  See United States v. Falvey, 540 F. Supp. 1306,
1314-15 (E.D.N.Y. 1982).

[50]  The principal changes that the Court has made from the
procedures described in the application are the inclusion of a
"First Amendment proviso" as part of the "reasonable suspicion"
standard for an ██████████████████ to be used as the basis
for querying archived meta data, see pages 57-58 above, the
adoption of a date after which meta data may not be retained, see
pages 70-71 below, and an enhanced role for the NSA's Office of
(continued...)

TOP SECRET//HCS//COMINT//NOFORN

TOP SECRET//HCS//COMINT//NOFORN

will help ensure that this information is used for the stated

purpose of its collection - the identification and tracking of ██

████████████████████████████ their Internet communications -

thereby safeguarding the continued validity of the certification

of relevance under § 1842(c)(2). These procedures will also help

effectuate 50 U.S.C. § 1845(a)(2), which directs that no

information from a Court-authorized pen register or trap and

trace device "may be used or disclosed by Federal officers or

employees except for lawful purposes," and ensure that such use

and disclosure will not abridge First Amendment rights.

The Court's letter of ████████████ asked the Government to

explain "[f]or how long . . . the information collected under

this authority [would] continue to be of operational value to the

counter-terrorism investigation(s) for which it is collected."

The Government's letter of ████████████, stated that such

information "would continue to be of significant operational

value for at least 18 months," based on NSA's "analytic

judgment." ████████████ Letter at 3. During that period, meta

---

[50] (...continued)
General Counsel in the implementation of this authority, see
pages 84-85 below. The Court recognizes that, as circumstances
change and experience is gained in implementing this authority,
the Government may propose other modifications to these
procedures.

TOP SECRET//HCS//COMINT//NOFORN

data would be available to analysts online for authorized
querying. After 18 months, NSA "believes that there continues to
be operational value in retaining e-mail meta data . . . in an
'off-line' storage system," since "in certain circumstances"
information of that age could "provide valuable leads for the
investigation into ▮▮▮▮▮▮ " Id. However, the value of such
information "would diminish over time," so that "NSA assesses
that meta data would have operational value in off-line storage
for a period of three years, and could be destroyed after that
time (that is, a total of four and one-half years after it was
initially collected)." Id. In accordance with this assessment,
NSA is ordered to destroy archived meta data collected under this
authority no later than four and one-half years after its initial
collection.

\* \* \*

Accordingly, a verified application having been made by the
Attorney General of the United States for an order authorizing
installation and use of pen registers and trap and trace devices
pursuant to the Foreign Intelligence Surveillance Act of 1978
(FISA or the Act), Title 50, United States Code (U.S.C.),
§§ 1801-1811, 1841-1846, and full consideration having been given

to the matters set forth therein, the Court finds, on the grounds
explained above, that:

1.   The Attorney General is authorized to approve
applications for pen registers and trap and trace devices under
the Act and to make such applications under the Act.

2.   The applicant has certified that the information likely
to be obtained from the requested pen registers and trap and
trace devices is relevant to an ongoing investigation to protect
against international terrorism that is not being conducted
solely upon the basis of activities protected by the First
Amendment to the Constitution.

3.   ███████████████████████████████████ in the
United States and abroad are the subjects of National Security
investigations conducted by the Federal Bureau of Investigation
(FBI) under guidelines approved by the Attorney General pursuant
to Executive Order No. 12333.

4.   The pen registers and trap and trace devices ███████

██████████████████████████████████

█████████████████████████████████████████████████

TOP SECRET//HCS//COMINT//NOFORN



---

[51] The Government has represented that it is overwhelmingly likely that at

[52] The Government has represented that it is overwhelmingly likely that

TOP SECRET//HCS//COMINT//NOFORN

TOP SECRET//HCS//COMINT//NOFORN



---

⁵³  The Government has represented that it is overwhelmingly
likely that

TOP SECRET//HCS//COMINT//NOFORN

TOP SECRET//HCS//COMINT//NOFORN



TOP SECRET//HCS//COMINT//NOFORN



[54] The Government has represented that the majority of the communications



[55] Because electronic communications will

TOP SECRET//HCS//COMINT//NOFORN



TOP SECRET//HCS//COMINT//NOFORN

TOP SECRET//HCS//COMINT//NOFORN



WHEREFORE, the Court finds that the application of the United States ███████████ pen registers and trap and trace devices, as described in the application, satisfies the requirements of the Act and specifically of 50 U.S.C. § 1842 and, therefore,

IT IS HEREBY ORDERED, pursuant to the authority conferred on this Court by the Act, that the application is GRANTED, AS MODIFIED HEREIN, and it is

FURTHER ORDERED, as follows:

(1)  Installation and use of pen registers and trap and trace devices as requested in the Government's application is authorized for a period of **ninety days** from the date of this Opinion and Order, unless otherwise ordered by this Court, as follows:  installation and use of pen registers and/or trap and

TOP SECRET//HCS//COMINT//NOFORN

TOP SECRET//HCS//COMINT//NOFORN

trace devices as described above to collect all addressing and
routing information reasonably likely to identify the sources or
destinations of the electronic communications identified above on
███████████ identified above, including the "to," "from," "cc,"
and "bcc" fields for those communications ████████████████



████████████ Collection of the contents of such communications
as defined by 18 U.S.C. § 2510(8) is not authorized.

    (2)   The authority granted is within the United States.

    (3)   As requested in the application, ████████████████

████████████ (specified persons), are directed to furnish the NSA with

---

[57] Although the application makes clear that the assistance
of these specified persons is contemplated, it does not expressly
request that the Court direct these specified persons to assist
the surveillance. However, because the application, at 24,
requests that the Court enter the proposed orders submitted with
the application and those proposed orders would direct the
specified persons to provide assistance, the application
effectively requests the Court to direct such assistance.

TOP SECRET//HCS//COMINT//NOFORN

TOP SECRET//HCS//COMINT//NOFORN

any information, facilities, or technical assistance necessary to accomplish the installation and operation of pen registers and trap and trace devices in such a manner as will protect their secrecy and produce a minimum amount of interference with the services each specified person is providing to its subscribers. Each specified person shall not disclose the existence of the investigation or of the pen registers and trap and trace devices to any person, unless or until ordered by the Court, and shall maintain all records concerning the pen registers and trap and trace devices, or the aid furnished to the NSA, under the security procedures approved by the Attorney General

that have previously been or will be furnished to each specified person and are on file with this Court.

(4) The NSA shall compensate the specified person(s) referred to above for reasonable expenses incurred in providing such assistance in connection with the installation and use of the pen registers and trap and trace devices herein.

(5) The NSA shall follow the following procedures and restrictions regarding the storage, accessing, and disseminating of information obtained through use of the pen register and trap and trace devices authorized herein:

TOP SECRET//HCS//COMINT//NOFORN

a. The NSA shall store such information in a manner that ensures that it will not be commingled with other data.

b. The ability to access such information shall be limited to ten specially cleared analysts and to specially cleared administrators. The NSA shall ensure that the mechanism for accessing such information will automatically generate a log of auditing information for each occasion when the information is accessed, to include the accessing user's login, IP address, date and time, and retrieval request.

c. Such information shall be accessed only through queries using the contact chaining ███████████ methods described at page 43 above. Such queries shall be performed only on the basis of a particular known ███████ ████████████ after the NSA has concluded, based on the factual and practical considerations of everyday life on which reasonable and prudent persons act, that there are facts giving rise to a reasonable articulable suspicion that ██████████████████ is associated with ██████████ ████████████████████████ provided, however, that ██████████████ believed to be used by a U.S. person shall not be regarded as associated with ████████████

solely on the basis of
activities that are protected by the First Amendment to the
Constitution. Queries shall only be conducted with the
approval of one of the following NSA officials: the Program
Manager, Counterterrorism Advanced Analysis; the Chief or
Deputy Chief, Counterterrorism Advanced Analysis Division;
or a Counterterrorism Advanced Analysis Shift Coordinator in
the Analysis and Production Directorate of the Signals
Intelligence Directorate.

d. Because the implementation of this authority
involves distinctive legal considerations, NSA's Office of
General Counsel shall:

i) ensure that analysts with the ability to access
such information receive appropriate training and
guidance regarding the querying standard set out in
paragraph c. above, as well as other procedures and
restrictions regarding the retrieval, storage, and
dissemination of such information.

ii) monitor the designation of individuals with
access to such information under paragraph b. above and
the functioning of the automatic logging of auditing
information required by paragraph b. above.

TOP SECRET//HCS//COMINT//NOFORN

iii) to ensure appropriate consideration of any
First Amendment issues, review and approve proposed
queries of meta data in online or "off-line" storage
based on seed accounts used by U.S. persons.[58]

e.  The NSA shall apply the Attorney General-approved
guidelines in United States Signals Intelligence Directive
18 (Attachment D to the application) to minimize
information concerning U.S. persons obtained from the pen
registers and trap and trace devices authorized herein.
Prior to disseminating any U.S. person information outside
of the NSA, the Chief of Customer Response in the NSA's
Signals Intelligence Directorate shall determine that the
information is related to counterterrorism information and
is necessary to understand the counterterrorism information
or to assess its importance.

f.  Information obtained from the authorized pen
registers and trap and trace devices shall be available

---

[58]  The Court notes that, in conventional pen register/trap
and trace surveillances, there is judicial review of the
application before any ██████████████████████  In
this case, the analogous decision to use a particular e-mail
account as a seed account takes place ████████████████
██████  In these circumstances, it shall be incumbent on NSA's
Office of General Counsel to review the legal adequacy for the
basis of such queries, including the First Amendment proviso, set
out in paragraph c. above.

TOP SECRET//HCS//COMINT//NOFORN

TOP SECRET//HCS//COMINT//NOFORN

online for querying, as described in paragraphs b. and c. above, for eighteen months. After such time, such information shall be transferred to an "off-line" tape system, which shall only be accessed by a cleared administrator in order to retrieve information that satisfies the standard for online accessing stated in paragraph c. above and is reasonably believed, despite its age, to be relevant to an ongoing investigation of ███████

████████████████████████████████████ Searches of meta data in "off-line" storage shall be approved by one of the officials identified in paragraph c. above.

g. Meta data shall be destroyed no later than 18 months after it is required to be put into "off-line" storage, i.e., no later than four and one-half years after its initial collection.

h. Any application to renew or reinstate the authority granted herein shall include:

i) a report discussing queries that have been made since the prior application to this Court and the NSA's application of the standard set out in paragraph c. above to those queries.

TOP SECRET//HCS//COMINT//NOFORN

ii) detailed information regarding ████████ ████████ proposed to be added to such authority.

iii) any changes in the description of the ████████████ above or in the nature of the communications ████████████

iv) any changes in the proposed means of collection, to include ████████████ ████████ the pen register and/or trap and trace devices ████████████

Signed ████████  _10:30 a.m._ E.D.T.
        Date        Time

This authorization regarding ████████████ **in the United States and Abroad** expires on the ████████████ at _5:00 p_ m., Eastern Daylight Time.

**COLLEEN KOLLAR-KOTELLY**
Presiding Judge, United States Foreign
Intelligence Surveillance Court

TOP SECRET//HCS//COMINT//NOFORN